**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

BRAMAN MOTORS, INC., d/b/a
BUGATTI MIAMI

Case No. 1:26-cv-22291-RAR

Plaintiff,

v.

VOLKSWAGEN GROUP OF AMERICA, INC., d/b/a
BUGATTI OF THE AMERICAS, INC.,

Defendant.
_______________________________________________/

# AMENDED COMPLAINT

Plaintiff, BRAMAN MOTORS, INC., d/b/a Bugatti Miami ("Braman"), through its undersigned counsel, hereby files this Amended Complaint pursuant to Fed. R. Civ. P. 15(a)(1)(B), sues Defendant, VOLKSWAGEN GROUP OF AMERICA, INC, d/b/a Bugatti of the Americas, Inc. ("BOA"), and states as follows:

## Parties

1. Plaintiff, Braman, is a Florida corporation with its principal place of business in Miami-Dade County, Florida. Braman is a "franchised motor vehicle dealer" as defined by section 320.27(1)(c)1., Florida Statutes, and a "motor vehicle dealer" as defined by section 320.60(13), Florida Statutes.

2. At all times material hereto, BOA was and is a New Jersey corporation with its principal place of business in Reston, Virginia. BOA is doing business in Florida as an "importer" of motor vehicles as defined by section 320.60(7), Florida Statutes, and a "licensee" as defined by section 320.60(9), Florida Statutes. BOA operates under and has registered the fictitious names Bugatti of America, Inc. and RIMAC of the Americas, Inc.

3. Braman is a party to a Retailer Agreement ("Dealer Agreement"), as defined in section 320.60(1), Florida Statutes, with BOA for the sale and service of new Bugatti line-make vehicles at Braman's dealership location of 2060 Biscayne Boulevard, Miami, FL 33137. The Dealer Agreement is a "franchise agreement" as defined in section 320.60(1), Florida Statutes.

**Jurisdiction and Venue**

4. Pursuant to section 26.012, Florida Statutes, this Court has jurisdiction over the issues raised herein.

5. Pursuant to section 47.051, Florida Statutes, venue is proper in this Court as the causes of action asserted herein accrued in Miami-Dade County.

6. All conditions precedent to the filing of this lawsuit occurred, were waived, or were performed.

**General Allegations**

7. Bugatti vehicles are high-performance sports cars with a Manufacturer Suggested Retail Price (the price published by BOA as the suggested retail price) ranging from around $4,000,000 to over $5,000,000. BOA imports and distributes Bugatti line-make vehicles in Florida through a dealer network consisting of Braman and one other dealer, Bugatti Broward, located in Davie, Florida.

8. As set forth in Section 2 of the Dealer Agreement, the Dealer Agreement incorporates a set of "Standard Provisions" which detail the relationship between the two parties and delineates the basic obligations of both Braman and BOA and a set of "Retailer Operating Standards". A copy of the Dealer Agreement, Standard Provisions, and Retailer Operating Standards is attached hereto as **Exhibit "A"**. Additionally, the parties entered into an agreement for the Bugatti Passeport Tranquillite Service Programme ("Programme Agreement") which

"provides Retailers an opportunity to sell both maintenance and vehicle service contracts to Customers, as well as to service vehicles covered by the Maintenance Products." A copy of the Programme Agreement is attached hereto as **Exhibit "B"**.

9. Section 9 of the Dealer Agreement provides that it "may not be modified except in writing signed by both" Braman and BOA.

10. Pursuant to the Dealer Agreement, BOA agrees to sell and deliver authorized Bugatti products to Braman. Pursuant to the Dealer Agreement, BOA also authorizes Braman to provide warranty service on Bugatti motor vehicles and agrees to reimburse Braman within a reasonable time for warranty claims at the then-current rate of reimbursement. BOA also agrees to avoid all discourteous, deceptive, misleading, unprofessional or unethical practices in the conduct of its business with Braman.

11. Braman, pursuant to the Dealer Agreement, agrees to sell and service any and all Bugatti authorized products.

12. The Dealer Agreement establishes that Braman must provide the best possible customer service for all owners and users of authorized Bugatti products and other automobiles formerly sold by BOA and must use its best efforts to promote the servicing of authorized Bugatti products and other automobiles formerly sold by BOA.

13. The Retailer Operating Standards require that Braman employ a dedicated Service Manager, dedicated Service Advisors, dedicated Service Technician, and a Warranty Administrator for the purpose of meeting its obligations to service Bugatti products. Additionally, Braman is required to have adequate service capacity and service bays for Bugatti vehicle service and to purchase equipment and special tools required by Bugatti for the service of Bugatti vehicles.

14. BOA's appointment and recognition of Braman as a Bugatti authorized Service Partner authorized to perform warranty repairs pursuant to the Bugatti warranty creates rights and obligations for both parties.

15. In order to fulfill its rights and obligations under the Dealer Agreement, Braman has invested in state-of-the-art service facilities, employed service personnel to service Bugatti vehicles, purchased service equipment and tools required by Bugatti, and generally supported the Bugatti brand, all at a substantial cost to Braman. All of this was done in reliance on Braman's right to perform warranty service work as established by the Dealer Agreement.

16. Under the fictitious name RIMAC of the Americas, BOA has filed an affidavit dated March 1, 2024, with the Florida Department of Highway Safety and Motor Vehicles ("DHSMV") certifying that the form of Retailer Agreement Standard Provisions entered into with Florida dealers are not inconsistent with or contrary to the provisions set forth in sections 320.60-.70, Florida Statutes (the "Dealer Act"). A copy of that affidavit is attached as **Exhibit "C"**. The most recent form Retailer Agreement Standard Provisions BOA filed with DHSMV (a copy of which is attached hereto as **Exhibit "D"**) is in all respects material to the claims at issue in this case the same as the standard terms in the Dealer Agreement to which Braman is a party. Thus, according to BOA, the relevant terms of Braman's Dealer Agreement were consistent with the Dealer Act as it existed on March 1, 2024.

17. The Dealer Act establishes protections for dealers with respect to the franchise relationship between manufacturers, distributors, and importers (such as BOA).

18. The Florida Legislature has adopted the provisions of the Dealer Act for the purpose of ensuring that consumers benefit from competition between Florida dealers on prices for vehicle

sales and service and likewise protecting the substantial capital investment Florida dealers have made to provide competitive vehicle sales and service options to consumers.

**BOA'S Unlawful Retaliation and Modification of the Dealer Agreement**

19. Pursuant to section 320.696(1)(a), Florida Statutes, BOA must timely compensate a motor vehicle dealer such as Braman who performs work to maintain or repair any products issued by BOA under a warranty or maintenance plan ("Warranty Obligations").

20. Braman incurs expenses and assumes substantial risk in performing these Warranty Obligations in order to fulfill BOA's commitments regarding repairs for its customers.

21. Pursuant to section 320.696(3)(a), Florida Statutes, BOA must timely compensate a motor vehicle dealer such as Braman for any parts used in performing any Warranty Obligations.

22. Likewise, pursuant to section 320.696(4)(a), BOA must timely compensate a motor vehicle dealer such as Braman for labor performed in connection with performing any Warranty Obligations.

23. On September 26, 2024, Braman, pursuant to its rights under section 320.696(3)(a), Florida Statutes, requested an increase in its warranty parts reimbursement rate from 100.49% to 160%. On October 25, 2024, BOA accepted Braman's request for an increase in its warranty parts reimbursement rate.

24. On or around June 30, 2025, Braman requested an increase in its labor reimbursement rate to $1,350 per hour for Warranty Obligations performed on multi-million dollar Bugatti vehicles. BOA acknowledged that Braman qualified pursuant to Florida law for an immediate reimbursement rate of $1,350 per hour for labor used in fulfilling Warranty Obligations, but requested that Braman accept a labor reimbursement rate of $1,100 per hour effective from July 31, 2025, with the representation that Braman's labor rate would increase to $1,350 per hour

beginning on January 1, 2026, and moving forward. In reliance on BOA's representations, Braman agreed to accept a labor reimbursement rate of $1,100 per hour, effective from July 31, 2025, to December 31, 2025, with an increase to the labor reimbursement rate to $1,350 per hour beginning on January 1, 2026.

25. On February 11, 2026, BOA without prior warning or discussion, provided correspondence to Braman indicating that due to Braman's "excessive labor rate and parts markup", BOA is "waiving" Braman's "obligations" under the Dealer Agreement to perform Warranty Obligations or any other Bugatti line-make vehicle service. A copy of this correspondence is attached hereto as **Exhibit "E"**.

26. Specifically, BOA indicated that it revoked the following provisions:

**<u>Dealer Agreement Standard Provisions</u>**

a. Article 6(4): maintain a level of genuine parts inventory "that is sufficient to perform reasonably anticipated warranty repair and service."

b. Article 7(6): provide maintenance services and other services without customer charge.

c. Article 9(3): process warranty claims and submit warranty claims to Bugatti.

**<u>Retailer Operating Standards</u>**

d. Part I.C.4.: maintain a Warranty Administrator.

**<u>Passeport Tranquillite Agreement</u>**

e. Section 1: perform maintenance services on vehicles covered by the Passeport Tranquillite Programme.

f. Section 6: honor maintenance and vehicle service claims under the Passeport Tranquillite Programme.

27. These provisions provide rights and benefits to both BOA and Braman. BOA enjoys the benefit of having a dealer perform services promised to purchasers of new Bugatti line-make motor vehicles, and Braman enjoys the right and authorization to perform warranty repairs for those customers and be compensated by Bugatti for such repairs.

28. BOA, despite accepting Braman's requests for an increase in its parts and labor reimbursement rates, states that it will not reimburse Braman for Warranty Obligations performed on multi-million dollar Bugatti vehicles because it is able to obtain "the same quality vehicle service from other retailers at far lower costs".

29. Additionally, BOA informed Braman that it will be notifying owners of Bugatti line-make vehicles in and around Braman's market area, including existing Braman customers, that warranty service will no longer be available through Braman.

30. Finally, BOA informed Braman that it would not reimburse Braman for any vehicle service or Warranty Obligations performed by Braman on or after May 13, 2026. (Ex. E).

31. BOA's refusal to reimburse Braman for performing Warranty Obligations at Braman's previously agreed upon statutory reimbursement rates is a violation of section 320.696, Florida Statutes.

32. BOA's revocation of Braman's authorization and obligation to perform Warranty Obligations and other service of Bugatti line-make vehicles constitutes an adverse modification of Braman's Dealer Agreement which will substantially impair Braman's service obligations and investment in violation of section 320.64(9), Florida Statutes, and section 320.641, Florida Statutes.

33. Despite BOA's assertion that it is simply releasing Braman from any obligation to perform Warranty Obligations, BOA is instead unilaterally terminating Braman's authorization and right under the Dealer Agreement to perform Warranty Obligations on Bugatti vehicles. Bugatti expressly recognizes Braman as having such a right by publicly identifying Braman as a Bugatti Service Partner that is a part of the Bugatti Service Partner Network. The Dealer Agreement requires that with every Bugatti vehicle Braman sells, the customer be made aware of the Bugatti vehicle warranty that expressly provides that warranty repairs can be performed by any Bugatti Service Partner.

34. In short, Braman was (and is) authorized pursuant to the Dealer Agreement to perform the Warranty Obligations. Braman requested that BOA reimburse it for performing the Warranty Obligations at the rate set forth in section 320.696, Florida Statutes. Not wanting to pay the rate dictated by statute, BOA has announced its intention to revoke Braman's authorization to perform the Warranty Obligations.

35. BOA's decision to divert Braman's customers and other owners of Bugatti line-make vehicles in and around Braman's market area to Bugatti Broward and other authorized Bugatti dealers by informing those customers that service will no longer be available through Braman constitutes an action taken as retaliation against Braman due to Braman's invoking its statutory right to an increased parts and labor rate in violation of sections 320.64(43) and 320.696(2), Florida Statutes.

36. When Braman requested increased labor and parts reimbursement rates, BOA did not challenge the requested rates on the basis that Braman did not legally qualify for the rates. Instead, BOA agreed to Braman's rates and in return induced Braman to agree to a temporary labor rate reduction. In agreeing to Braman's rates, BOA plainly waived its right to legally challenge

Braman's entitlement to those rates. Nearly a year later, with no legal recourse to challenge Braman's rates, BOA now seeks to terminate Braman's right to perform Warranty Obligations altogether, and attempts to justify this termination solely based on the rates that BOA itself accepted. BOA's course of conduct is deceitful, unprecedented in the industry, and plainly unlawful.

37. BOA has asserted that it has the discretion to revoke Braman's authority to conduct the Warranty Obligations under Article 9(3), because that provision requires dealers to "obtain prior authorization from an authorized representative of Bugatti." This language requires dealers to confirm with BOA that the repairs requested by a customer are, in fact, covered by the warranty. This is because if dealers fail to confirm the applicability of the warranty to a particular repair and it turns out the repair performed is not covered, BOA will not pay for the repair. Pursuant to this provision, dealers who are authorized to perform Warranty Obligations, including Braman, confirm with BOA that repairs are covered under the applicable warranty before beginning repairs. This confirms that Braman is authorized to perform Warranty Obligations (for one who is not authorized to perform Warranty Obligations would have no need to confirm warranty coverage before performing the repair or service); it does not provide BOA with the authority to revoke (or "waive") Braman's rights.

**Unlawful Allocation**

38. Upon information and belief, BOA has also engaged in a discriminatory act of refusing to allocate, supply, and deliver a reasonable quantity of Bugatti line-make vehicles covered by the Dealer Agreement, and publicly advertised by BOA as being available, to Braman.

39. For example, BOA provided Braman with approximately four (4) allocation slots for the Bugatti Tourbillon model. Braman requested another four (4) allocation slots for the Tourbillon, but BOA failed to fulfill any of those four (4) requests.

40. As a result of BOA's failure to fulfill Braman's allocation requests, two of the four customers cancelled their requests for the vehicle, with one of those customers placing an order for a Tourbillon with a different BOA dealer.

41. In contrast, upon information and belief, Bugatti Broward was given an allocation of Bugatti Tourbillons that at least doubled the allocation BOA provided to Braman.

42. Section 320.64(18), Florida Statutes, prohibits BOA from establishing a system of motor vehicle allocation or distribution that is unfair, inequitable, unreasonably discriminatory, or not supportable by reason and good cause.

43. Section 320.64(19), Florida Statutes, prohibits BOA from refusing or failing to supply a reasonable quantity of motor vehicles, including the models publicly advertised by BOA as being available, to Braman.

44. Section 320.64(22), Florida Statutes, prohibits BOA from refusing to deliver to Braman, in reasonable quantities, motor vehicles covered by the Dealer Agreement.

45. Additionally, under Article 8(3) of the Standard Provisions, BOA is obliged to "endeavor to make a fair and equitable allocation and distribution of the Authorized Products available to it, but Bugatti reserves the discretion to make allocation decisions in the overall best interests of the Bugatti brand."

46. BOA's actions of failing to fulfill Braman's requests for a reasonable quantity of motor vehicles covered by the Dealer Agreement while simultaneously allocating, supplying, and delivering a substantial quantity of motor vehicles to Bugatti Broward and other dealers is

discriminatory in nature and a violation of Florida law and its contractual obligation to endeavor to make a fair and equitable allocation and distribution of Bugatti motor vehicles.

**BOA's Failure to Reimburse Braman for Pre-Delivery Inspection Work**

47. Section 320.696(1)(a), Florida Statutes, requires that BOA timely compensate Braman for fulfilling BOA's delivery or preparation procedures at Braman's statutorily established reimbursement rates.

48. Pursuant to the Dealer Agreement, Braman is required to perform a pre-delivery inspection ("PDI") before delivering a Bugatti vehicle to a customer.

49. BOA has failed to reimburse Braman for PDI work required under the Dealer Agreement at Braman's statutorily established reimbursement rates.

**BOA's Failure to Timely Reimburse Braman for Warranty Work**

50. Section 320.696(1)(c), Florida Statutes, requires that BOA compensate Braman for performing Warranty Obligations within thirty (30) days of BOA's receipt of a claim for reimbursement.

51. BOA routinely fails to reimburse Braman for performing Warranty Obligations within thirty (30) days as required by law.

52. Instead, BOA regularly reimburses Braman anywhere between sixty (60) and one hundred and twenty (120) days, and sometimes longer, following BOA's receipt of a reimbursement claim from Braman.

53. Any and all reimbursements from BOA to Braman that are more than thirty (30) days following the receipt of a reimbursement claim violate Florida law.

54. Braman has retained the undersigned counsel to bring this action and seeks injunctive relief, recovery of treble its damages, reasonable attorney's fees, and all costs and charges assessable to BOA.

**COUNT I**
**BOA's Violation of Section 320.641, Florida Statutes**

55. Braman incorporates and re-alleges paragraphs 1-54 as if fully set forth herein.

56. On February 11, 2026, BOA informed Braman that it intends to revoke Braman's authorization and obligation to perform Warranty Obligations and vehicle service as prescribed under the Dealer Agreement and Programme Agreement.

57. BOA indicated that its decision to revoke Braman's ability to perform Warranty Obligations and vehicle service was due to BOA's desire not to pay the statutory labor and parts reimbursement rates to which BOA previously agreed.

58. BOA's decision to revoke Braman's right and obligation to perform Warranty Obligations and service Bugatti vehicles constitutes an unfair and prohibited modification of the Dealer Agreement which adversely alters Braman's "rights or obligations" under the Dealer Agreement and substantially impairs Braman's investment. § 320.641(1)(a), Fla. Stat.

59. Pursuant to section 320.641(1)(a), Florida Statutes, prior to modification of a franchise agreement, a licensee such as BOA must first give written notice to the motor vehicle dealer and the Florida Department of Highway Safety and Motor Vehicles ("Department") at least ninety (90) days before the modification shall take place.

60. BOA failed to provide the requisite notice to the Department of BOA's intention to modify the existing Dealer Agreement. That failure provides Braman the option to void the proposed modification. § 320.641(1)(c), Fla. Stat.

61. Florida law authorizes Braman to file this Complaint seeking a determination of whether the proposed modification of its Dealer Agreement is unfair or prohibited. § 320.641(3), Fla. Stat.

62. Further, upon the filing of this Complaint, the Dealer Agreement must continue in effect without the proposed modification until final determination of the issues raised in this Complaint. § 320.641(3), Fla. Stat.

63. BOA's proposed modification of the Dealer Agreement is unfair and prohibited as it is not permitted by the Dealer Agreement, and/or is not undertaken for good faith, and/or is not undertaken for good cause. § 320.641(3), Fla. Stat.

64. BOA's modification of the Dealer Agreement violates section 320.641, Florida Statutes, and Braman has been damaged thereby.

65. Section 320.695, Florida Statutes, provides that "notwithstanding the existence of any adequate remedy at law, . . . any motor vehicle dealer in the name of the department and state and for the use and benefit of the motor vehicle dealer" may obtain an injunction "restraining any person . . . from violating or continuing to violate any of the provisions of ss. 320.60-320.70 . . . . A single act in violation of the provisions of ss. 320.60-320.70 shall be sufficient to authorize the issuance of an injunction."

66. Accordingly, an injunction enjoining BOA from violating 320.641, Florida Statutes, by unlawfully modifying Braman's Dealer Agreement is appropriate.

WHEREFORE, Braman demands:

(a) Pursuant to section 320.697, Florida Statutes, entry of a judgment against BOA for treble damages;

(b) Pursuant to Chapter 86, Florida Statutes (Declaratory Judgments), and section 320.641(3), Florida Statutes, a declaration, order, or judgment that BOA has indicated its intention to modify Braman's Dealer Agreement without the requisite notice required by section 320.641, Florida Statutes, that the modification of the Dealer Agreement is declared void, and that the proposed modification is unfair and prohibited by section 320.641, Florida Statutes;

(c) Pursuant to section 320.695, Florida Statutes, in the name of the Florida Department of Highway Safety and Motor Vehicles and the State of Florida for the use and benefit of Braman, entry of an injunction enjoining BOA from modifying the Dealer Agreement between Braman and BOA;

(d) An order awarding to Braman its attorneys' fees, interest, costs; and

(e) Such other relief this Court deems just and equitable.

**COUNT II**
**<u>BOA's Violation of Section 320.64(9), Florida Statutes</u>**

67. Braman incorporates and re-alleges paragraphs 1-54 as if fully set forth herein.

68. On February 11, 2026, BOA informed Braman that it intends to revoke Braman's right and obligation to perform Warranty Obligations and vehicle service as prescribed under the Dealer Agreement.

69. BOA's threat to revoke Braman's right and obligation to perform Warranty Obligations and service Bugatti vehicles would adversely alter Braman's "rights or obligations" under the Dealer Agreement and substantially impair Braman's investment.

70. Section 320.64(9), Florida Statutes, provides that it is unlawful for BOA to threaten to modify Braman's Dealer Agreement in a manner which would adversely alter the rights or obligations of Braman or substantially impair its investment.

71. BOA's actions violate section 320.64(9), Florida Statutes, and Braman has been damaged thereby.

72. Section 320.695, Florida Statutes, provides that "notwithstanding the existence of any adequate remedy at law, . . . any motor vehicle dealer in the name of the department and state and for the use and benefit of the motor vehicle dealer" may obtain an injunction "restraining any person . . . from violating or continuing to violate any of the provisions of ss. 320.60-320.70 . . . . A single act in violation of the provisions of s.s. 320.60-320.70 shall be sufficient to authorize the issuance of an injunction."

73. Accordingly, an injunction enjoining BOA from violating section 320.64(9), Florida Statutes, by unlawfully threatening to modify Braman's Dealer Agreement is appropriate.

WHEREFORE, Braman demands:

(a) Pursuant to section 320.697, Florida Statutes, entry of a judgment against BOA for treble damages;

(b) Pursuant to section 320.695, Florida Statutes, in the name of the Florida Department of Highway Safety and Motor Vehicles, and the State of Florida for the use and benefit of Braman, entry of an injunction enjoining BOA from modifying Braman's existing Dealer Agreement in a manner that would adversely alter Braman's rights or obligations under the existing Dealer Agreement or substantially impair Braman's investment;

(c) An order awarding to Braman its attorneys' fees, interest, costs; and

(d) Such other relief this Court deems just and equitable.

**COUNT III**
**<u>BOA's Violation of Section 320.64(43), Florida Statutes</u>**

74. Braman incorporates and re-alleges paragraphs 1-54 as if fully set forth herein.

75. On February 11, 2026, BOA informed Braman that it intends to revoke Braman's right to perform Warranty Obligations and vehicle service as prescribed under the Dealer Agreement.

76. BOA indicated that its decision to revoke Braman's authorization to perform Warranty Obligations and vehicle service was due to Braman invoking its right to be reimbursed at the statutory rate.

77. In addition, BOA informed Braman that it would notify Bugatti line-make vehicle owners residing in and around Braman's market area that vehicle service is no longer available through Braman and would provide those vehicle owners with reasonable alternatives for future vehicle service.

78. Section 320.64(43), Florida Statutes, prohibits BOA from engaging in an action, or implementing a policy, standard, rule, practice or program, taken as retaliation against a motor vehicle dealer because the dealer invoked a statutory right created by a provision of ss. 320.60-320.70.

79. BOA, by revoking Braman's ability to perform Warranty Obligations and vehicle service in conjunction with BOA's decision to divert consumers away from Braman, is retaliating against Braman for invoking its right to be reimbursed for Warranty Obligations at reimbursement rates as established by section 320.696, Florida Statutes.

80. BOA's actions violate section 320.64(43), Florida Statutes, and Braman has been damaged thereby.

81. Section 320.695, Florida Statutes, provides that "notwithstanding the existence of any adequate remedy at law, . . . any motor vehicle dealer in the name of the department and state and for the use and benefit of the motor vehicle dealer" may obtain an injunction "restraining any

person . . . from violating or continuing to violate any of the provisions of ss. 320.60-320.70 . . . . A single act in violation of the provisions of s.s. 320.60-320.70 shall be sufficient to authorize the issuance of an injunction."

82. Accordingly, an injunction enjoining BOA from continuing to violate section 320.64(43), Florida Statutes, by engaging in retaliatory acts against Braman for invoking its right to be reimbursed for Warranty Obligations at reimbursement rates as established by section 320.696, Florida Statutes, is appropriate.

WHEREFORE, Braman demands:

(a) Pursuant to section 320.697, Florida Statutes, entry of a judgment against BOA for treble damages;

(b) Pursuant to section 320.695, Florida Statutes, in the name of the Florida Department of Highway Safety and Motor Vehicles, and the State of Florida for the use and benefit of Braman, entry of an injunction enjoining BOA from retaliating against Braman in violation of section 320.64(43), Florida Statutes, by modifying its Dealer Agreement and notifying customers that Braman is not authorized to conduct Warranty Obligations on Bugatti vehicles;

(c) An order awarding to Braman its attorneys' fees, interest, costs; and

(d) Such other relief this Court deems just and equitable.

**COUNT IV**
**<u>BOA's Violation of Section 320.696(2), Florida Statutes</u>**

83. Braman incorporates and re-alleges paragraphs 1-54 as if fully set forth herein.

84. On February 11, 2026, BOA informed Braman that it intends to revoke Braman's right and authorization to perform Warranty Obligations and vehicle service as prescribed under the Dealer Agreement.

85. BOA indicated that its decision to revoke Braman's ability to perform Warranty Obligations and vehicle service was due to BOA's desire not to pay Braman's statutory labor and parts reimbursement rates to which BOA previously agreed.

86. In addition, BOA informed Braman that it would notify Bugatti line-make vehicle owners residing in and around Braman's market area that vehicle service is no longer available through Braman and would provide those vehicle owners with reasonable alternatives for future vehicle service.

87. Section 320.696(2), Florida Statutes, prohibits BOA from taking or threatening to take adverse action against a motor vehicle dealer who seeks to obtain compensation for performing Warranty Obligations pursuant to section 320.696, Florida Statutes.

88. BOA, by revoking Braman's ability to perform Warranty Obligations and vehicle service in conjunction with BOA's decision to divert consumers away from Braman, is retaliating against Braman for invoking its right to be reimbursed for Warranty Obligations at reimbursement rates as established by section 320.696, Florida Statutes.

89. BOA's actions violate section 320.696(2), Florida Statutes, and Braman has been damaged thereby.

90. Section 320.695, Florida Statutes, provides that "notwithstanding the existence of any adequate remedy at law, . . . any motor vehicle dealer in the name of the department and state and for the use and benefit of the motor vehicle dealer" may obtain an injunction "restraining any person . . . from violating or continuing to violate any of the provisions of ss. 320.60-320.70 . . . . A single act in violation of the provisions of s.s. 320.60-320.70 shall be sufficient to authorize the issuance of an injunction."

91. Accordingly, an injunction enjoining BOA from continuing to violate section 320.696(2), Florida Statutes, by engaging in retaliatory acts against Braman for invoking its right to be reimbursed for Warranty Obligations at reimbursement rates as established by section 320.696, Florida Statutes, is appropriate.

WHEREFORE, Braman demands:

(a) Pursuant to section 320.697, Florida Statutes, entry of a judgment against BOA for treble damages;

(b) Pursuant to section 320.695, Florida Statutes, in the name of the Florida Department of Highway Safety and Motor Vehicles, and the State of Florida for the use and benefit of Braman, entry of an injunction enjoining BOA from retaliating against Braman in violation of section 320.696(2), Florida Statutes, by modifying its Dealer Agreement and notifying customers that Braman is not authorized to conduct Warranty Obligations on Bugatti vehicles;

(c) An order awarding to Braman its attorneys' fees, interest, costs; and

(d) Such other relief this Court deems just and equitable.

**COUNT V**
**BOA's Violation of Section 320.64(18), Florida Statutes**

92. Braman incorporates and re-alleges paragraphs 1-54 as if fully set forth herein.

93. BOA has established or implemented an unfair system of motor vehicle allocation or distribution in connection with its refusal to fulfill Braman's requests for a reasonable allocation of motor vehicles and its allocation and distribution of substantially more motor vehicles to Bugatti Broward.

94. Pursuant to section 320.64(18), Florida Statutes, it is unlawful for a licensee such as BOA to establish or implement a system of motor vehicle allocation or distribution that is unfair,

inequitable, unreasonably discriminatory, or not supportable by reason and good cause after considering the equities of the affected motor vehicles dealer or dealers.

95. BOA has established or implemented a system of allocation or distribution that is unfair, inequitable, unreasonably discriminatory, and/or not supportable by reason and good cause.

96. BOA's actions violate section 320.64(18), Florida Statutes, and Braman has been damaged thereby.

97. Section 320.695, Florida Statutes, provides that "notwithstanding the existence of any adequate remedy at law, . . . any motor vehicle dealer in the name of the department and state and for the use and benefit of the motor vehicle dealer" may obtain an injunction "restraining any person . . . from violating or continuing to violate any of the provisions of ss. 320.60-320.70 . . . . A single act in violation of the provisions of s.s. 320.60-320.70 shall be sufficient to authorize the issuance of an injunction."

98. Accordingly, an injunction enjoining BOA from continuing to violate section 320.64(18), Florida Statutes, by implementing or establishing an unfair system of allocation or distribution is appropriate.

WHEREFORE, Braman demands:

(a) Pursuant to section 320.697, Florida Statutes, entry of a judgment against BOA for treble damages;

(b) Pursuant to section 320.695, Florida Statutes, in the name of the Florida Department of Highway Safety and Motor Vehicles, and the State of Florida for the use and benefit of Braman, entry of an injunction enjoining BOA from implementing or establishing an unfair system of allocation or distribution in violation of section 320.64(18), Florida Statutes;

(c) An order awarding to Braman its attorneys' fees, interest, costs; and

(d) Such other relief this Court deems just and equitable.

**COUNT VI**
**BOA's Violation of Section 320.64(19), Florida Statutes**

99. Braman incorporates and re-alleges paragraphs 1-54 as if fully set forth herein.

100. BOA has, without good and fair cause, refused to supply motor vehicles by series in a reasonable quantity to Braman, including models publicly advertised by BOA as being available.

101. As set forth above, BOA has refused to provide an adequate number of allocation slots to meet its customer demands. There is no good, fair, or reasonable cause for this refusal, as BOA has provided significantly more allocation slots to Braman's closest competitor.

102. BOA's actions constitute a violation of section 320.64(19), Florida Statutes, and Braman has been damaged thereby.

103. Section 320.695, Florida Statutes, provides that "notwithstanding the existence of any adequate remedy at law, . . . any motor vehicle dealer in the name of the department and state and for the use and benefit of the motor vehicle dealer" may obtain an injunction "restraining any person . . . from violating or continuing to violate any of the provisions of ss. 320.60-320.70 . . . . A single act in violation of the provisions of s.s. 320.60-320.70 shall be sufficient to authorize the issuance of an injunction."

104. Accordingly, an injunction enjoining BOA from continuing to violate section 320.64(19), Florida Statutes, by refusing to supply motor vehicles by series in a reasonable quantity to Braman, including models publicly advertised by BOA as being available, is appropriate.

WHEREFORE, Braman demands:

(a) Pursuant to section 320.697, Florida Statutes, entry of a judgment against BOA for treble damages;

(b) Pursuant to section 320.695, Florida Statutes, in the name of the Florida Department of Highway Safety and Motor Vehicles, and the State of Florida for the use and benefit of Braman, entry of an injunction enjoining BOA from refusing to supply motor vehicles by series in a reasonable quantity to Braman, including models publicly advertised by BOA as being available, in violation of section 320.64(19), Florida Statutes;

(c) An order awarding to Braman its attorneys' fees, interest, costs; and

(d) Such other relief this Court deems just and equitable.

**COUNT VII**
**BOA's Violation of Section 320.64(22), Florida Statutes**

105. Braman incorporates and re-alleges paragraphs 1-54 as if fully set forth herein.

106. BOA has refused to deliver, in reasonable quantities and within a reasonable time, to Braman new motor vehicles covered by the Dealer Agreement.

107. BOA's actions constitute a violation of section 320.64(22), Florida Statutes, and Braman has been damaged thereby.

108. Section 320.695, Florida Statutes, provides that "notwithstanding the existence of any adequate remedy at law, . . . any motor vehicle dealer in the name of the department and state and for the use and benefit of the motor vehicle dealer" may obtain an injunction "restraining any person . . . from violating or continuing to violate any of the provisions of ss. 320.60-320.70 . . . . A single act in violation of the provisions of s.s. 320.60-320.70 shall be sufficient to authorize the issuance of an injunction."

109. Accordingly, an injunction enjoining BOA from continuing to violate section 320.64(22), Florida Statutes, by refusing to deliver, in reasonable quantities and within a reasonable time, to Braman new motor vehicles covered by the Dealer Agreement is appropriate.

WHEREFORE, Braman demands:

(a) Pursuant to section 320.697, Florida Statutes, entry of a judgment against BOA for treble damages;

(b) Pursuant to section 320.695, Florida Statutes, in the name of the Florida Department of Highway Safety and Motor Vehicles, and the State of Florida for the use and benefit of Braman, entry of an injunction enjoining BOA from refusing to deliver, in reasonable quantities and within a reasonable time, to Braman new motor vehicles covered by the Dealer Agreement in violation of section 320.64(22), Florida Statutes;

(c) An order awarding to Braman its attorneys' fees, interest, costs; and

(d) Such other relief this Court deems just and equitable.

**COUNT VIII**
**BOA's Violation of Section 320.696, Florida Statutes**

110. Braman incorporates and re-alleges paragraphs 1-54 as if fully set forth herein.

111. Section 320.696(1)(a), Florida Statutes, requires that a licensee such as BOA must timely compensate a motor vehicle dealer who performs work to maintain or repair a licensee's product under a warranty or maintenance plan or to fulfill a licensee's delivery or preparation procedures.

112. Section 320.696(1)(c), Florida Statutes, states that compensation not paid to a motor vehicle dealer within 30 days after receipt of a claim is not timely.

113. BOA fails to reimburse Braman for any PDI work performed by Braman pursuant to its obligations under the Dealer Agreement.

114. BOA fails to timely compensate Braman for Warranty Obligations and vehicle services at its statutorily set labor and parts reimbursement rates.

115. BOA routinely compensates Braman for work performed pursuant to its Warranty Obligations later than 30 days after Braman submits a request for reimbursement.

116. These actions violate section 320.696, Florida Statutes, and Braman has been damaged thereby.

117. Section 320.695, Florida Statutes, provides that "notwithstanding the existence of any adequate remedy at law, . . . any motor vehicle dealer in the name of the department and state and for the use and benefit of the motor vehicle dealer" may obtain an injunction "restraining any person . . . from violating or continuing to violate any of the provisions of ss. 320.60-320.70 . . . . A single act in violation of the provisions of s.s. 320.60-320.70 shall be sufficient to authorize the issuance of an injunction."

118. Accordingly, an injunction enjoining BOA from refusing to reimburse Braman for any PDI work performed pursuant to the Dealer Agreement and failing to timely compensate Braman within 30 days of any reimbursement requests for fulfilling Braman's Warranty Obligations is appropriate.

WHEREFORE, Braman demands:

(a) Pursuant to section 320.697, Florida Statutes, entry of a judgment against BOA for treble damages;

(b) Pursuant to section 320.695, Florida Statutes, in the name of the Florida Department of Highway Safety and Motor Vehicles, and the State of Florida

for the use and benefit of Braman, entry of an injunction enjoining BOA from refusing to reimburse Braman for PDI work performed pursuant to the Dealer Agreement and failing to timely compensate Braman within 30 days of any reimbursement requests for fulfilling Braman's Warranty Obligations;

(c) An order awarding to Braman its attorneys' fees, interest, costs; and

(d) Such other relief this Court deems just and equitable.

**COUNT IX**
**BOA's Breach of the Dealer Agreement**

119. Braman incorporates and re-alleges paragraphs 1-54 as if fully set forth herein.

120. BOA incorporates a set of Standard Provisions into the Dealer Agreement.

121. In Article 1(3)(c) of the Standard Provisions, BOA agrees to "avoid all discourteous, deceptive, misleading, unprofessional, or unethical practices" in the conduct of its business.

122. BOA has notified Braman of its intent to revoke Braman's authorization and ability to perform its Warranty Obligations, while informing Bugatti owners in and around Braman's market that vehicle service is no longer available through Braman.

123. By doing so, BOA has violated Article 1(3)(c) of the Dealer Agreement by engaging in activity that constitutes "discourteous, deceptive, misleading, unprofessional, or unethical practices."

124. Additionally, Article 8(3) of the Standard Provisions requires that BOA "endeavor to make a fair and equitable allocation and distribution of the Authorized Products available to it, but Bugatti reserves the discretion to make allocation decisions in the overall best interests of the Bugatti brand."

125. As set forth above, BOA has not endeavored to make a fair and equitable allocation and distribution of Bugatti motor vehicles and has instead withheld allocation from Braman while providing substantially greater allocation to Braman's closest competitor and has thereby violated Article 8(3).

126. As a result of BOA's breaches, Braman has been damaged in the form of lost sales and service business.

WHEREFORE, Braman demands entry of a judgment against BOA for damages, costs, and other such relief this Court deems just and equitable.

**COUNT X**
**BOA's Anticipatory Breach of the Dealer Agreement**

127. Braman incorporates and re-alleges paragraphs 1-54 as if fully set forth herein.

128. Pursuant to the Dealer Agreement, BOA is obligated to reimburse Braman within a reasonable time for warranty claims at the then-current rate of reimbursement.

129. BOA, despite accepting Braman's requests for an increase in its parts and labor reimbursement rates, has stated that it will not reimburse Braman for Warranty Obligations and that it will be notifying owners of Bugatti line-make vehicles in and around Braman's market area that warranty service will no longer be available through Braman.

130. BOA informed Braman that it will not reimburse Braman for any vehicle service or Warranty Obligations performed by Braman on or after May 13, 2026.

131. BOA has clearly indicated that after May 13, 2026, it will not perform its contractual obligations under the Dealer Agreement relating to reimbursing Braman for performing Warranty Obligations.

132. Braman is ready and able, now and in the future, to perform its obligations under the Dealer Agreement with respect to performing Warranty Obligations.

133. BOA's repudiation of its obligation under the Dealer Agreement will substantially impair the value of the Dealer Agreement to Braman.

WHEREFORE, Braman demands entry of a judgment against BOA for damages, costs, and other such relief this Court deems just and equitable.

**COUNT XI**
**Estoppel**

134. Braman incorporates and re-alleges paragraphs 1-54 as if fully set forth herein.

135. On or around June 30, 2025, Braman requested an increase in its labor reimbursement rate to $1,350 per hour. Though BOA acknowledged that Braman qualified for an immediate reimbursement rate of $1,350 per hour for labor used in fulfilling Warranty Obligations, BOA requested that Braman accept a labor reimbursement rate of $1,100 per hour, effective from July 31, 2025, to December 31, 2025, with the express promise that BOA would increase the labor rate to $1,350 per hour for labor used in fulfilling Warranty Obligations on or after January 1, 2026, with the understanding that BOA would not attempt to keep Braman from performing Warranty Obligations.

136. On February 11, 2026, BOA without prior warning or discussion provided correspondence to Braman stating that BOA was terminating Braman's right to perform Warranty Obligations and to receive reimbursement from BOA.

137. BOA induced Braman to accept a temporarily reduced labor reimbursement rate from July 31, 2025, to December 31, 2025, by promising to Braman that BOA would pay the full labor rate beginning January 1, 2026. BOA intended for Braman to rely on BOA's promise that it would pay the full labor rate beginning January 1, 2026, if Braman agreed to a reduced labor rate from July 31, 2025, to December 31, 2025. Braman relied on that promise and accepted less than it was entitled to for labor reimbursement arising from performing Warranty Obligations.

138. Enforcement of BOA's promise to reimburse Braman for labor used in performing Warranty Obligations at the rate of $1,350 per hour is necessary to avoid injustice.

WHEREFORE, Braman demands entry of a judgment against BOA requiring it to reimburse Braman for labor used in performing Warranty Obligations at the rate of $1,350 per hour, costs, and other such relief this Court deems just and equitable.

**COUNT XII**
**BOA's Breach of the Programme Agreement**

139. Braman incorporates and re-alleges paragraphs 1-54 as if fully set forth herein.

140. The Programme Agreement provides Braman the right to sell both maintenance and vehicle service contracts to customers, "as well as to service vehicles covered by the Maintenance Products."

141. On February 11, 2026, BOA informed Braman that it intends to revoke Braman's right to service vehicles covered by maintenance products pursuant to the Programme Agreement, effectively terminating the Programme Agreement between Braman and BOA.

142. The Programme Agreement does not permit BOA to terminate the Programme Agreement unless BOA has terminated the Passeport Tranquillite Service Programme or Braman's Dealer Agreement. BOA has not terminated the Passeport Tranquillite Service Programme or Braman's Dealer Agreement.

143. Section 12 of the Programme Agreement cannot be modified except by written agreement signed by both parties. No such written agreement exists modifying the Programme Agreement to eliminate Braman's right to service vehicles covered by maintenance products.

144. BOA has notified Braman of its intent to revoke Braman's right to service vehicles covered by maintenance products pursuant to the Programme Agreement, while informing Bugatti owners in and around Braman's market that vehicle service is no longer available through Braman.

145. By doing so, BOA has violated the Programme Agreement.

WHEREFORE, Braman demands entry of a judgment against BOA for damages, costs, and other such relief this Court deems just and equitable.

**COUNT XIII**
**BOA's Violation of Section 320.64(43), Florida Statutes**

146. Braman incorporates and re-alleges paragraphs 1-54 as if fully set forth herein.

147. The Programme Agreement provides participating Bugatti dealers the right to sell both maintenance and vehicle service contracts to customers, "as well as to service vehicles covered by the Maintenance Products."

148. Dealers participating in the Passeport Tranquillite Service Programme, which provides prepaid maintenance service to Bugatti owners, are entitled to be reimbursed for providing those maintenance services at the dealer's established reimbursement rate pursuant to section 320.696, Florida Statutes.

149. In July of 2022, Bugatti informed Braman that it would not permit Braman to participate in the Passeport Tranquillite Service Programme unless Braman accepted a lower rate of reimbursement for performing maintenance services than the rate to which Braman was entitled by section 320.696, Florida Statutes.

150. In order to participate in the Passeport Tranquillite Service Programme, Braman was forced by Bugatti to accept a rate of reimbursement for performing maintenance services that is less than the rate to which Braman is entitled by section 320.696, Florida Statutes, as established in the Programme Agreement executed by Braman on December 8, 2022.

151. Section 320.64(43), Florida Statutes, prohibits BOA from engaging in an action, or implementing a policy, standard, rule, practice or program, taken as retaliation against a motor

vehicle dealer because the dealer invoked a statutory right created by a provision of ss. 320.60-320.70.

152. BOA's refusal to permit Braman to participate in the Passeport Tranquillite Service Programme because Braman asserted its rights pursuant to section 320.696, Florida Statutes, violates section 320.64(43), Florida Statutes, and Braman has been damaged thereby.

153. Section 320.695, Florida Statutes, provides that "notwithstanding the existence of any adequate remedy at law, . . . any motor vehicle dealer in the name of the department and state and for the use and benefit of the motor vehicle dealer" may obtain an injunction "restraining any person . . . from violating or continuing to violate any of the provisions of ss. 320.60-320.70 . . . . A single act in violation of the provisions of s.s. 320.60-320.70 shall be sufficient to authorize the issuance of an injunction."

154. Accordingly, an injunction enjoining BOA from continuing to violate section 320.64(43), Florida Statutes, by requiring that Braman accept a rate for reimbursement for performing maintenance services that is less than the rate to which Braman is entitled by section 320.696, Florida Statutes, is appropriate.

WHEREFORE, Braman demands:

(a) Pursuant to section 320.697, Florida Statutes, entry of a judgment against BOA for treble damages;

(b) Pursuant to section 320.695, Florida Statutes, in the name of the Florida Department of Highway Safety and Motor Vehicles, and the State of Florida for the use and benefit of Braman, entry of an injunction enjoining BOA from retaliating against Braman in violation of section 320.64(43), Florida Statutes, by requiring that Braman accept a rate of reimbursement for performing

maintenance services that is less than the rate to which Braman is entitled by section 320.696, Florida Statutes;

(c) An order awarding to Braman its attorneys' fees, interest, costs; and

(d) Such other relief this Court deems just and equitable.

## COUNT XIV
## BOA's Violation of Section 320.696(2), Florida Statutes

155. Braman incorporates and re-alleges paragraphs 1-54 as if fully set forth herein.

156. The Programme Agreement provides participating Bugatti dealers the right to sell both maintenance and vehicle service contracts to customers, "as well as to service vehicles covered by the Maintenance Products."

157. Dealers participating in the Passeport Tranquillite Service Programme, which provides prepaid maintenance service to Bugatti owners, are entitled to be reimbursed for providing those maintenance services at the dealer's established reimbursement rate pursuant to section 320.696, Florida Statutes.

158. In July of 2022, Bugatti informed Braman that it would not permit Braman to participate in the Passeport Tranquillite Service Programme unless Braman accepted a lower rate of reimbursement for performing maintenance services than the rate to which Braman was entitled by section 320.696, Florida Statutes.

159. In order to participate in the Passeport Tranquillite Service Programme, Braman was forced by Bugatti to accept a rate of reimbursement for performing maintenance services that is less than the rate to which Braman is entitled by section 320.696, Florida Statutes, as established in the Programme Agreement executed by Braman on December 8, 2022.

160. Section 320.696(2), Florida Statutes, prohibits BOA from taking or threatening to take adverse action against a motor vehicle dealer who seeks to obtain compensation for performing Warranty Obligations pursuant to section 320.696, Florida Statutes.

161. BOA's refusal to permit Braman to participate in the Passeport Tranquillite Service Programme because Braman asserted its rights pursuant to section 320.696, Florida Statutes, violates section 320.696(2), Florida Statutes, and Braman has been damaged thereby.

162. Section 320.695, Florida Statutes, provides that "notwithstanding the existence of any adequate remedy at law, . . . any motor vehicle dealer in the name of the department and state and for the use and benefit of the motor vehicle dealer" may obtain an injunction "restraining any person . . . from violating or continuing to violate any of the provisions of ss. 320.60-320.70 . . . . A single act in violation of the provisions of s.s. 320.60-320.70 shall be sufficient to authorize the issuance of an injunction."

163. Accordingly, an injunction enjoining BOA from continuing to violate section 320.696(2), Florida Statutes, by requiring that Braman accept a rate for reimbursement for performing maintenance services that is less than the rate to which Braman is entitled by section 320.696, Florida Statutes, is appropriate.

WHEREFORE, Braman demands:

(a) Pursuant to section 320.697, Florida Statutes, entry of a judgment against BOA for treble damages;

(b) Pursuant to section 320.695, Florida Statutes, in the name of the Florida Department of Highway Safety and Motor Vehicles, and the State of Florida for the use and benefit of Braman, entry of an injunction enjoining BOA from retaliating against Braman in violation of section 320.696(2), Florida Statutes,

by requiring that Braman accept a rate of reimbursement for performing maintenance services that is less than the rate to which Braman is entitled by section 320.696, Florida Statutes;

(c) An order awarding to Braman its attorneys' fees, interest, costs; and

(d) Such other relief this Court deems just and equitable.

Respectfully submitted this 27th day of May, 2026.

/s/ John W. Forehand
John W. Forehand (Fla. Bar No. 979813)
jforehand@kfb-law.com
R. Craig Spickard (Fla. Bar No. 721751)
cspickard@kfb-law.com
Michael J. Sanchez (Fla. Bar No. 1018168)
msanchez@kfb-law.com
KURKIN FOREHAND BRANDES LLP
1089 West Morse Boulevard, Suite D
Winter Park, FL 32789
Telephone: (407) 602-0249

Michael A. Hanzman (Fla. Bar No. 510637)
mhanzman@bilzin.com
Kayla M. Hernandez (Fla. Bar No. 1025839)
khernandez@bilzin.com
BILZIN SUMBERG BAENA PRICE &
AXELROD LLP
1450 Brickell Avenue, 23rd Floor
Miami, Florida 33131
Telephone: (305) 375-6127

*Attorneys for Plaintiff, Braman Motors, Inc*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 27, 2026, a true and correct copy of the foregoing was filed via the CM/ECF system and thereby served on all counsel of record.

/s/ John W. Forehand

# EXHIBIT A

# RETAILER AGREEMENT
# UNITED STATES

# BUGATTI MIAMI

BUGATTI AUTOMOBILES USA, INC.
3800 HAMLIN ROAD, AUBURN HILLS, MI 48326 PHONE 248.754.5000 FAX 248.754.6455

# RETAILER AGREEMENT

1. **APPOINTMENT**. Volkswagen of America, Inc., a New Jersey corporation doing business as Bugatti Automobiles USA, Inc. ("Bugatti"), having a place of business at 3800 Hamlin Road, Auburn Hills, Michigan 48326, appoints Braman Motors, Inc. ("Retailer"), doing business as Bugatti Miami, having its place of business at 2020 Biscayne Boulevard, Miami, Florida 33137 as an authorized retailer in Authorized Products. Accordingly, the parties agree as follows:

2. **STANDARD PROVISIONS**. The Bugatti Retailer Agreement Standard Provisions (the "Standard Provisions") and the Bugatti Retailer Operating Standards (the "Operating Standards" and, collectively, with the Standard Provisions, the "Other Retailer Documents") are part of this Agreement, and together constitute the entire agreement of the parties with respect to the appointment of Retailer as an authorized retailer in Authorized Products. Any capitalized term not defined in this Agreement has the meaning given such term in the Other Retailer Documents. Throughout the term of this Agreement, the Operating Standards are subject to revision or modification from time to time by Bugatti at its discretion.

3. **OWNERSHIP AND MANAGEMENT**. To induce Bugatti to enter into this Agreement, Retailer represents that the persons identified in the Statement of Ownership and Management, which is attached as Addendum A, are Retailer's Owners and Retailer's Executives. Bugatti is entering into this Agreement in reliance upon these representations, and upon the continued provision by such persons of their personal services in fulfillment of Retailer's obligations under this Agreement. Accordingly, Retailer shall not change Retailer's Owners or Authorized Representative without Bugatti's prior written consent, and, except with regard to the Authorized Representative, shall not change Retailer's Executives without prior written notice to Bugatti.

4. **MINIMUM FINANCIAL REQUIREMENTS**. Retailer shall comply and maintain compliance with the minimum financial requirements set forth in the Other Retailer Documents and such other reasonable financial standards as Bugatti may prescribe, in consultation with Retailer, or as reasonably established by Bugatti.

5. **RETAILER'S PREMISES**. Retailer's Premises shall be the premises set forth in Addendum B to this Agreement and no other location. Retailer shall operate only at Retailer's Premises. Retailer shall not, without Bugatti's prior written consent: (a) make any major structural change in or modification to any of Retailer's Premises; (b) change the location of any of Retailer's Premises; or (c) establish any additional premises for any of Retailer's Operations.

6. **EXCLUSION OF WARRANTIES**. EXCEPT FOR BUGATTI'S EXPRESS WRITTEN WARRANTIES, AND EXCEPT AS PROVIDED IN ARTICLE 9(1) OF THE STANDARD PROVISIONS, THERE ARE NO EXPRESS OR IMPLIED WARRANTIES OR OBLIGATIONS OF THE MANUFACTURER OR BUGATTI AS TO THE QUALITY OR CONDITION OF AUTHORIZED PRODUCTS, OR AS TO THEIR MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, AND, TO THE EXTENT PERMITTED BY LAW, RETAILER EXCLUDES ANY AND ALL SUCH WARRANTIES AND OBLIGATIONS IN ITS SALES OF AUTHORIZED PRODUCTS.

7. **TERM.** The term of this Agreement begins on the date listed at the end of this Agreement and shall continue in effect until terminated by either party or superseded by a new Bugatti Retailer Agreement, whichever is earlier.

8. **GOVERNING LAW.** This Agreement shall be construed in accordance with the laws of the State of Connecticut. If any provision herein contravenes the laws or regulations of any state or other jurisdiction wherein this Agreement is to be performed, or denies access to the procedures, forums, or remedies provided for by such laws or regulations, such provision shall be deemed modified to conform to such laws or regulations, and all other terms and provisions shall remain in full force.

9. **ADDITIONAL TERMS AND CONDITIONS**. This Retailer Agreement, including the Other Retailer Documents and the Addenda incorporated herein by reference, contains the entire understanding between the parties with respect to the subject matter hereof and supersedes any prior understanding or written or oral agreements among them with respect thereto. No representations or statements other than those expressly set forth or referred to in these documents, or in Retailer's written application documents, were made or relied upon in entering into this Retailer Agreement. Each Addendum may be canceled or superseded at any time by mutual agreement of Retailer and Bugatti, through the later execution by both parties of a replacement, which then shall be deemed part of this Agreement. This Retailer Agreement may not be modified except in writing signed by both parties hereto; provided, however, the parties agree that any and all changes that Bugatti makes from time to time to the Operating Standards (as applicable to all of its retailers) shall be binding upon Retailer as if such changes were adopted expressly in writing by Retailer as amendments to this Agreement.

10. **DUE AUTHORIZATION / VALIDITY.** Retailer represents, warrants, and agrees that the execution, delivery, and performance by Retailer of this Retailer Agreement is within its, his, or her partnership, corporate, and individual power, as the case may be, and has been duly authorized by all necessary partnership, corporate, or other action, as the case may be. Retailer represents, warrants, and agrees that this agreement has been duly and validly executed by Retailer and constitutes a legal, valid and binding obligation of Retailer, enforceable against Retailer in accordance with its terms.

11. **<u>COMPLIANCE WITH LAWS AND CONTRACTS</u>.** Retailer represents, warrants, and agrees that, to the best of its knowledge after good faith investigation, the execution, delivery, and performance of this Agreement by Retailer does not and will not: (a) violate any statute, ordinance, rule, regulation, order, or decree of any court or of any public, governmental, or regulatory body, agency, or authority applicable to Retailer; (b) require any filing with, or permit, consent, or approval of, or the giving of any notice to, any public, governmental, or regulatory body, agency, or authority by Retailer; or (c) conflict with, or result in a breach of, any of the terms, conditions, or provisions of any mortgage, lien, or other security arrangement or any agreement, instrument, order, judgment, decree, or any other restriction of similar kind or character to which Retailer is a party or is otherwise bound.

12. **<u>NOTICE</u>.** Except regarding notices of protest or the filing of formal claims or litigation against Bugatti by Retailer, all other notices or other communication required or desired to be given hereunder shall be in writing and shall be given personally, by delivery by a nationally recognized courier service, or by pre-paid registered or certified mail, return receipt requested, to the parties at the addresses set forth below:

| | |
|---|---|
| If to Bugatti: | Bugatti Automobiles USA, Inc.<br>3800 Hamlin Road.<br>Auburn Hills, MI 48326<br>Attn: General Counsel |
| If to Retailer: | Norman Braman, President<br>Bugatti Miami<br>Braman Management Association<br>2060 Biscayne Boulevard<br>Second Floor<br>Miami, Florida 33137 |
| (With copy to): | Stanley J. Krieger, General Counsel<br>Bugatti Miami<br>Braman Management Association<br>2060 Biscayne Boulevard<br>Second Floor<br>Miami, Florida 33137 |

Notices hereunder shall be deemed to have been delivered and effective for all purposed hereunder: (a) if given by facsimile transmission, when such facsimile transmission is transmitted to the facsimile number specified in this section and confirmed answerback is received; (b) if given by registered or certified mail, on the third business day after mailing; or (c) if given by any other means, when delivered at the address specified in this section. The address of any party hereto may be changed by a notice in writing given in accordance with the provisions hereof. **NOTICES OF PROTEST OR THE FILING OF FORMAL CLAIMS OR LITIGATION AGAINST BUGATTI BY RETAILER**

**MUST BE SERVED UPON BUGATTI IN ACCORDANCE WITH APPLICABLE STATE LAWS FOR SERVICE OF PROCESS.**

DATED: APRIL 9, 2007.

**BUGATTI AUTOMOBILES USA, INC.**

BY: ______________________
Market Manager

**BRAMAN MOTORS, INC. d/b/a**
**BUGATTI MIAMI**

BY: ______________________
Authorized Signatory

# RETAILER AGREEMENT
# ADDENDUM A

## STATEMENT OF OWNERSHIP AND MANAGEMENT
## DATED APRIL 9, 2007

1. Retailer Name: Braman Motors, Inc.

   Retailer Assumed Name (d/b/a): Bugatti Miami

2. Principal Place of Business: 2020 Biscayne Boulevard, Miami, Florida 33137

3. Retailer is a ☐ proprietorship
   ☐ partnership
   ☐ limited liability company
   ☒ corporation, incorporated on August 22, 1996 under the laws of the State of Florida
   ☐ other: ____________________

4. The following persons are the record and beneficial owners of Retailer:

| Name and Address of Each Record and Beneficial Interest Owner of Retailer | Number and Class of Ownership | | Percentage of Ownership |
|---|---|---|---|
| | Number | Class | |
| Second Amended and Restated Declaration of Trust of Norman Braman, Norman Braman, Trustee | 157.5<br>12,442.5 | Class A – Voting Common<br>Class B – Non-Voting Common | 68.4%<br>54.58% |
| Edward R. Leibowitz Revocable Trust of 2004 | 26.25<br>2598.75 | Class A – Voting Common<br>Class B – Non-Voting Common | 11.4%<br>11.4% |

| | | | |
|---|---|---|---|
| Blossom M. Leibowitz Revocable Trust of 2004 | 26.25<br>2598.75 | Class A – Voting Common<br>Class B – Non-Voting Common | 11.4%<br>11.4% |
| Ken Harte<br>2500 Lake Avenue<br>Miami Beach, Florida 33140 | 11.51<br>1139.80 | Class A – Voting Common<br>Class B – Non-Voting Common | 5%<br>5% |
| Robert Bernstein<br>2645 South Bayshore Drive, #1602<br>Coconut Grove, Florida 33133 | 4.375<br>433.125 | Class A – Voting Common<br>Class B – Non-Voting Common | 1.9%<br>1.9% |
| Stanley J. Krieger<br>1717 North Bayshore Drive, #3551<br>Miami, Florida 33132 | 4.375<br>433.125 | Class A – Voting Common<br>Class B – Non-Voting Common | 1.9%<br>1.9% |
| Braman Family Irrevocable Trust<br>Irma Braman, Trustee | 3150.00 | Class B – Non-Voting Common | 13.82% |

5. The following persons are Retailer's Executives, excluding Authorized Representative:

| Name and Address | Title |
|---|---|
| Norman Braman<br>1 Indian Creek Island Road<br>Indian Creek Village, Florida 33154 | President and Chairman |
| Edward R. Leibowitz<br>903 Guisando de Avila<br>Tampa, Florida 33613 | Vice-President |
| Stanley J. Krieger<br>1717 North Bayshore Drive, #3551<br>Miami, Florida 33132 | Secretary |
| Robert Bernstein<br>2645 South Bayshore Drive, #1602<br>Coconut Grove, Florida 33133 | Treasurer |

6. The following person is the Authorized Representative of Retailer, and as such shall be physically present at Retailer's Premises during most of Retailer's customary operating hours:

| Name and Address | Title |
|---|---|
| Ken Harte<br>2500 Lake Avenue<br>Miami Beach, Florida 33140 | General Manager |

7. Any one or more of Retailer's Owners and Retailer's Executives, including the Authorized Representative, shall have the authority to execute documents relating to dealership operations and receive communications on behalf of Retailer. These persons shall be agents of Retailer, and Bugatti is

entitled to rely on the authority of any one or more of these people to make any decision on behalf of Retailer with respect to Retailer's operations.

Retailer hereby certifies that the foregoing information is true and complete as of the date below. Bugatti has entered into this Agreement in reliance upon the qualifications, and the continued provision of personal services in the ownership and management of Retailer by, the persons identified above.

This Addendum cancels any prior Statement of Ownership and Management.

DATED: APRIL 9, 2007.

**BUGATTI AUTOMOBILES USA, INC.**

BY: ______________________
Market Manager

**BRAMAN MOTORS, INC. d/b/a**
**BUGATTI MIAMI**

BY: ______________________
Authorized Signatory

BUGATTI

# RETAILER AGREEMENT
# ADDENDUM B

## RETAILER PREMISES ADDENDUM
## DATED APRIL 9, 2007

1. Retailer Name: Braman Motors, Inc.

   Retailer Assumed Name (d/b/a): Bugatti Miami

2. Bugatti has approved the location of the following premises, and no others, for Retailer's Operations:

   a. Sales Facilities: 2020 Biscayne Boulevard, Miami, Florida 33157

   b. Service Facilities: 2060 NE 2nd Avenue, Miami, Florida 33137

   c. Genuine Parts Storage Facilities: 2060 NE 2nd Avenue, Miami, Florida 33137

Retailer hereby certifies that the foregoing information is true and complete as of the date below.

This Addendum cancels any prior Retailer Premises Addendum.

DATED: APRIL 9, 2007.

**BUGATTI AUTOMOBILES USA, INC.**

BY: ______________________

Market Manager

**BRAMAN MOTORS, INC. d/b/a**
**BUGATTI MIAMI**

BY: ______________________

Authorized Signatory

BUGATTI

# RETAILER OPERATING STANDARDS 2007

FORM 2006-OS

# RETAILER OPERATING STANDARDS
# 2007

Dear Bugatti Retailer:

This document is incorporated into, and is an integral part of, the Bugatti Retailer Agreement. In the case of a conflict between this document and the Retailer Agreement or the Retailer Agreement Standard Provisions, the Retailer Agreement or the Retailer Agreement Standard Provisions shall control. This document shall remain in effect until such time as it is superseded by a subsequent publication. Any references made to monetary amounts in this document are in US dollars.

The purpose of this document is to set some key operational standards with respect to the retail representation of the Bugatti marque in the USA.

The standards have been worked in conjunction with representatives of the Bugatti USA Retailer body, and are designed to ensure maximum customer satisfaction from customers of this very famous Bugatti marque.

The requests here are not onerous or over costly, as we fully realize that the Bugatti Marque, although long in reputation and standing, has been absent from the market for nearly fifty years. As such, the return to the market needs to be a joint collaboration of market and customer development.

That said, the USA will be the most important market for the Bugatti Veyron, and for future models from Bugatti SAS, and our intent is to build the very best and most accomplished Retail Partnership in order to support the very special customer base, who want to own this very special marque.

We fully understand as well, that Standards and Operating principles must be met on both sides, and we will do all we can to meet our commitments towards you, the Bugatti Retailer Body, as well as to our customers.

Thank you for your support for the Bugatti Marque.

BUGATTI AUTOMOBILES USA, INC.

# RETAILER OPERATING STANDARDS
# 2007

## TABLE OF CONTENTS


PART I MANAGEMENT .......... 1

- **A. General Management** .......... 1
- **B. Sales Management** .......... 1
- **C. Service Management** .......... 2
- **D. Parts Management** .......... 3

PART II OPERATIONS .......... 3

- **A. General Operations** .......... 3
- **B. Sales Operations** .......... 4
- **C. Service Operations** .......... 4
- **D. Parts Operations** .......... 5

PART III CAPITALIZATION .......... 5

- **A. Net Working Capital** .......... 5
- **B. Owners Equity** .......... 7

PART IV FACILITIES .......... 7

- **A. Sales** .......... 8
- **B. Service** .......... 8
- **C. Parts** .......... 8
- **D. Body Shop** .......... 9
- **E. Parking** .......... 9
- **F. Signage** .......... 9



Bugatti Automobiles USA, Inc.
3800 Hamlin Road, Auburn Hills, MI 48326 Telephone 248.754.6464 Fax 248.754.6455
www.Bugattimotors.com

G. APPEARANCE ........ 9

PART V INFORMATION TECHNOLOGY ........ 9

A. HARDWARE REQUIREMENTS ........ 9
B. SOFTWARE REQUIREMENTS ........ 10

PART VI MARKETING ........ 11

A. MARKETING REQUIREMENTS ........ 11

# RETAILER OPERATING STANDARDS 2007

## PART I
## MANAGEMENT

A Bugatti Retailer must have professional management. This is especially true because Bugatti is a niche brand, where there is a correlation between the quality of Retailer's management team and the performance of Retailer. Retailer staff representing Bugatti must strive to be dedicated, proud, and competent professionals.

### A. GENERAL MANAGEMENT

Retailer must have a General Manager. The Principal of a Bugatti Retailer may act as the General Manager. Another qualified professional, however, must act as the General Manager if the principal of the Bugatti Retailer is inactive in the management of Retailer, lacks automotive experience, or is absent from Retailer's Premises for 50% or more of Retailer's business hours.

The General Manager must be a Dedicated General Manager. "Dedicated" means this individual handles all Bugatti business, and additionally, may handle other brands. The General Manager must be authorized to make all operating decisions on behalf of Retailer.

The General Manager must be Bugatti trained, this means the individual has successfully completed all required training specified by Bugatti from time-to-time for the general manager position.

### B. SALES MANAGEMENT

#### 1. Overview

Sales of new Bugatti vehicles shall be made only by trained Bugatti Sales Specialists. No other individuals shall sell new Bugatti vehicles.

#### 2. Sales Specialists

Retailer must have a Bugatti Sales Specialist.

Sales Specialists must be Bugatti certified. "Bugatti Academy Certified" means the individual has successfully completed all required training specified by Bugatti from time-to-time for the Sales Specialist position.

## C. SERVICE MANAGEMENT

### 1. Service Manager

Retailer must have a Bugatti Service Manager.

The Service Manager must be a Dedicated Service Manager. "Dedicated" means this individual manages all Bugatti service operations, and, additionally, may manage service operations for other brands.

The Service Manager must be Bugatti trained, which means the individual has successfully completed all required training specified by Bugatti from time-to-time for the Service Manager Position.

### 2. Service Advisors

Retailer must have a dedicated Bugatti Service Advisor. "Dedicated" means this individual handles service consultations for service customers with Bugatti customers, and, additionally, may handle service consultations for service customers of other brand vehicles.

Service Advisors must be Bugatti trained.

### 3. Service Technicians

Retailer must have one (1) or more Bugatti Service Technicians.

Service Technicians must be Bugatti Certified. Bugatti Certified means the individual has successfully completed all required training specified by Bugatti from time-to-time for the Service Technician position.

### 4. Warranty Administrator

Retailer must have a Bugatti Warranty Administrator.

The Warranty Administrator must be a Dedicated Warranty Administrator. "Dedicated" means this individual will handle all Bugatti warranty claims processing, and, additionally, may handle warranty claims processing for other brands.

The Warranty Administrator should be Bugatti Academy Certified. "Bugatti Academy Certified" means the individual has successfully completed all available training specified by Bugatti Motors Inc from time-to-time for the Warranty Administrator position.

### 5. Other Personnel

Retailer must have a sufficient number of other service support personnel, such as porters, janitors, and vehicle wash attendants, to assure that business needs and customer expectations are met.

## D. PARTS MANAGEMENT

### 1. Parts Manager / Specialist

Retailer must have a Bugatti Parts Manager or Bugatti Parts Specialist.

The Parts Manager/ Specialist must be a Dedicated Parts Manager/ Specialist. "Dedicated" means this individual manages all Bugatti parts operations, and, additionally, may manage parts operations for other brands.

# PART II
# OPERATIONS

A Bugatti Retailer must meet certain operational requirements.

## A. GENERAL OPERATIONS

Retailer shall conduct its Bugatti business operations under a trading name approved by Bugatti, such as "Bugatti <Name of Retailer's City>."

Retailer is encouraged to have a separate and dedicated telephone number for its Bugatti business operations, with such telephone answered using the approved trading name in the greeting.

## B. SALES OPERATIONS

### 1. New Vehicle Sales

With respect to the wholesale purchase and retail sale of new Bugatti vehicles, Retailer must comply with the following:

- In retailing a Bugatti to an end customer Retailer shall utilise the Bugatti Contract as supplied.
- Cars shall be ordered from VWoA via approved order form.
- Upon receipt of this order an invoice for the first deposit will be issued
- No order will be validated without received payment of the required deposit , payment made by wire transfer to xxxxx ( tbc)
- Configuration of the car must be received, on Official Configuration form, 16 weeks before start of production of vehicle. Retailer will be notified in good time of this date.
- A Final invoice will be issued for the full payment of the vehicle. Final invoice needs to be paid in full prior to shipment of vehicle from Manufacturer.
- Upon the retail sale of a vehicle, Retailer shall report the sale by submitting a retail delivery record (RDR) to Bugatti via scanned PDF file. Such RDR shall be submitted within seventy two (72) hours of the delivery of the vehicle to the customer.

### 2. Pre-Owned Vehicle Sales

With respect to the retail sale of pre-owned Bugatti's Retailer shall report the sale of the vehicle by submitting an RDR via scanned PDF file to Bugatti Market Manager. Such RDR shall be submitted within seventy-two (72) hours of the delivery of the vehicle to the customer.

## C. SERVICE OPERATIONS

Retailer must comply with the retailer service policies and procedures set forth in the After-Sales Information Letter (Attached).

Retailer must employ a system, and have adequate service capacity, to ensure the availability of a service appointment within four (2) business days and a repair appointment immediately. Retailer is encouraged to provide a loaner vehicle or pick-up and delivery service for Bugatti customers while warranty work is being completed on new and pre-owned vehicles.

Retailer must meet, at all times, minimum equipment and special tool requirements as set forth by Bugatti, from time-to-time.

## D. PARTS OPERATIONS

### 1. Parts Policies and Procedures

Retailer must comply with the retailer parts and accessories policies and procedures set forth in the Bugatti After-Sales Information Letter.

### 2. Parts Availability

For Bugatti model vehicles currently being imported into North America by Bugatti, Retailer shall maintain an inventory of parts and accessories as considered necessary by Bugatti. Retailer may also maintain inventory of, and display, a representative sample of Bugatti's current branded goods and accessories.

### 3. Retailer Statements

Retailer statements will be mailed to Retailer, and Retailer must pay balances due on such statements within thirty (30) days. For accounts overdue by ninety (90) days, Bugatti reserves the right to place Retailer on "cash on delivery" (COD) terms.

# PART III
# CAPITALIZATION

A Bugatti Retailer must meet certain capitalization requirements. Capitalization requirements are established to ensure that Retailer has sufficient capital available for current operations, as well as for future growth.

## A. NET WORKING CAPITAL

### 1. Net Working Capital - Actual

Retailer's Net Working Capital consists of Retailer's Current Assets minus Retailer's Current Liabilities.

Retailer's Current Assets consist of the following: (a) cash and cash equivalents; (b) accounts receivable; (c) pre-owned vehicle inventory; (d) parts and accessories inventory; and (e) pre-paid expenses. Retailer's Cash and Cash Equivalents consists of the following: (a) cash on hand and in the bank; (b) finance contracts in transit; (c) liquid marketable securities owned by Retailer; (d) accounts receivable-vehicles; and (e) new vehicle equity (which consists of equity in new vehicles and demonstrators in inventory, plus LIFO reserves, less new vehicle notes payable). BMI reserves the right to adjust the categories of information provided on Retailer's financial statement.

Retailer's Current Liabilities consist of one (1) month's operating expenses.

### 2. Net Working Capital - Requirement

Retailer's Net Working Capital, at all points in time during a year, must equal or exceed the amount calculated as set forth below:

**CURRENT ASSETS**

| | |
|---|---|
| Cash and Cash Equivalents | One (1) month's average operating expenses. (For a retailer with fewer than twelve (12) months of operation, two (2) month's forecasted operating expenses.) |
| | PLUS |
| Accounts Receivable | One (1) month's average service, parts, and accessories sales. (For a retailer with fewer than twelve (12) months of operation, one (1) month's forecasted service, parts, and accessories sales.) |
| | PLUS |
| Pre-Owned Vehicle Inventory | Sixty (60) days' supply of pre-owned vehicles, based upon the greater of : (a) Retailer's immediately preceding twelve (12)-month sales multiplied by Retailer's average unit retail cost of sale; or (b) .5 to 1 retailer pre-owned to new ratio, multiplied by Retailer's average unit retailer cost of sale. (For a retailer with fewer than twelve (12) months of operation, sixty (60) days' supply of pre-owned vehicles based upon .5 to 1 retailer pre-owned to new ratio, multiplied by average composite retail pre-owned cost of sale.) |
| | PLUS |
| Parts/Accessories Inventory | Two (2) months average parts and accessories inventory. (For a retailer with fewer than twelve (12) months of operation, two (2) months forecasted parts and accessories inventory.) |
| | PLUS |
| Prepaid Expenses | Twenty (20) percent of average month's total operating expenses. (For a retailer with fewer than twelve (12) months of operation, twenty (20) percent of average monthly forecasted total operating expenses.) |
| | MINUS |

**CURRENT LIABILITIES**

| | |
|---|---|
| Accounts Payable/Liabilities | One (1) month's average operating expenses. (For a retailer with fewer than twelve (12) months of operation, one (1) month's forecasted operating expenses.) |

**B. <u>OWNERS EQUITY</u>**

Owner's Equity is the investment made by Retailer's owner in Retailer's business. Retailer must maintain a minimum Owner's Equity in an amount calculated as follows: (a) 50% of total Operating Investment; (b) 100% of land, construction-in-progress, and buildings, net of mortgage loans payable; and (c) 100% of investments and advances.

Operating Investment shall comprise the total of:

- Net Working Capital;
- Leasehold Improvements;
- Machinery and Equipment;
- Furniture and Fixtures;
- Company Vehicles;
- Other Depreciable Assets;
- Long-term Notes Receivable;
- Receivables – Owner, Employee and Other Finance and Insurance Receivables
- Lease Vehicles (Less Liabilities on Lease Vehicles)
- Cash Surrender Value of Life Insurance, minus all accumulated depreciation

Owner's notes shall be considered debt unless the notes are subordinated to any capital loans and the subordination is documented.

## PART IV
## FACILITIES

The Bugatti brand image is a critical element of the success of the Bugatti brand. Retailers' facilities are where customers experience the brand and its personality, and it is important that the Bugatti brand be communicated in the marketplace in a consistent manner; therefore, Retailer's facilities (land and building) must meet Bugatti's minimum requirements as set forth below.

Retailer facilities must be compliant with Bugatti's requirements in terms of appearance, location, décor, finishes, and space. The remodelling, rebuilding, expansion, or relocation of all or any part of Retailer's facilities used for Bugatti operations requires the prior written approval of Bugatti.

## A. SALES

### 1. Vehicle Showroom

Bugatti at this time has no requirement for a dedicated showroom space. However, Retailer must display new Bugatti vehicles, when there is stock available, in a suitable showroom. Retailer is encouraged also to display pre-owned Bugatti vehicles in the showroom.

Bugatti display requirements for showroom cars are as follows:

- Sufficient space around the car to allow full appreciation of car style and design;
- Appropriate and dedicated lighting applied to the car, in order to highlight key design features.
- Display of the approved internal Bugatti signage
- Use of Bugatti supplied photographs / DVD footage as appropriate

## B. SERVICE

### 1. Overview

Bugatti Service area must display approved internal Bugatti sign.

### 2. Service Bays

Retailer must have one service bay with lift approved by Bugatti

### 3. Wash Bay

Retailer must have at least one (1) wash bay. The wash bay must have a minimum dimension of 14' x 24' (336 square feet).

### 4. Special Tools Storage Area

Retailer must have a special tools storage area, for storage of Bugatti special tools.

### 5. Service Write-Up Area

Retailer must have a Service Write-Up Area.

### 6. Customer Reception and Waiting Areas

Retailer must have customer reception and waiting areas.

## C. PARTS

### 1. Parts Counters

Retailer shall have a technician parts counter. Retailer shall have a separate retail parts counter. Retailer may locate the retail parts counter in a location other than in the service workshop. Guidelines for counter sizes are set forth in Appendix A – Bugatti Facility Guidelines.

2. **Parts and Branded Goods Displays**

Retailer must have a separate and distinct area for the display of retail parts, accessories and Bugatti branded Goods, with appropriate Bugatti identification.

3. **Parts Storage Area.**

Retailer must have appropriate parts and accessories storage area and Offices.

### D. Body Shop

Retailer is not required to have a body shop. If a body shop is operational, bays exclusive from service must be provided commensurate with body shop activity.

### E. Parking

Retailer shall provide on-site customer parking. The on-site parking and access areas must be hard surfaced, graded, lined, and identified.

### F. Signage

Retailer must display minimum Bugatti corporate identification signage in designated Bugatti showroom and service area.

### G. Appearance

Retailer must maintain a clean and orderly appearance for all facilities, both internal and external. Retailer must employ a regular cleaning and maintenance schedule.

## PART V
## INFORMATION TECHNOLOGY

Information Technology is key to enabling Bugatti and Retailer to communicate in a timely, efficient and effective manner. It is paramount that all areas of Retailer's operations have access to the necessary communication tools to be competitive in today's business environment. This entails having high performance hardware, software, and internet access sufficient to handle current communications systems.

E mail and The Bugatti Internet Communications System (BICS) is the primary channel for communication of data between Bugatti and Retailer. It is imperative, therefore, that Retailer has access to such system, has staff trained to use the system, and has at least one employee assigned to the role of BICS administrator.

### A. Hardware Requirements

1. **Sales Department**

Every Sales Manager and Sales Specialist must have a PC with high-speed Internet access at his or her desk, which must have immediate and unrestricted access to BICS. Personal Computers (PCs) must be maintained in the following ratios:

Sales Manager – One (1) PC

Sales Specialists – One (1) PC per Sales Specialist

The sales department must have a sales-specific e-mail address, approved by Bugatti, capable of sending and receiving BMI e-mail. The recommended format is "sales@Bugatti<Name of Retailer's City>.com."

Every Sales Manager and Sales Specialist must have a specific e-mail address capable of sending and receiving Bugatti e-mail. The recommended format is "<first name.last name>@Bugatti<Name of Retailer's City>.com."

2. **Service Department**

Every Service Manager, Service Advisor, Service Technician, and Warranty Administrator must have a PC with high-speed Internet access at his or her work area, which must have immediate and unrestricted access to BICS. PC's must be maintained in the following ratios:

Service Manager – One (1) PC

Service Advisors – One (1) PC per work area

Shop Floor - One (1) PC for every four (4) technicians

The service department must have a service-specific e-mail address, approved by Bugatti, capable of sending and receiving Bugatti e-mail. The recommended format is "service@Bugatti<Name of Retailer's City>.com."

Every Service Manager, Service Advisor, Service Technician, and Warranty Administrator must have a specific e-mail address, approved by Bugatti, capable of sending and receiving Bugatti e-mail. The recommended format is "<first name.last name>@Bugatti<Name of Retailer's City>.com."

3. **Parts Department**

Every Parts Manager and Parts Specialist must have a PC with high-speed Internet access at his or her work area, which must have immediate and unrestricted access to BICS. PCs must be maintained in the following ratios:

Parts Manager – 1 PC

Parts Specialist – 1 PC per Parts Specialist

The parts department must have a parts-specific e-mail address, approved by Bugatti, capable of sending and receiving Bugatti e-mail. The recommended format is "parts@Bugatti<Name of Retailer's City>.com."

Every Parts Manager and Parts Specialist must have a specific e-mail address capable of sending and receiving Bugatti e-mail. The recommended format is "<first name.last name>@Bugatti<Name of Retailer's City>.com."

## B. SOFTWARE REQUIREMENTS

Retailer must have software necessary to conduct business operations, including software for access to BICS (Microsoft Internet Explorer 5 or greater), Microsoft Word, Microsoft Excel, WinZip, and Adobe Acrobat Reader.

Each user of BICS must have a unique token, which can be obtained through Bugatti Market Manager.

# PART VI
# MARKETING

The Bugatti marque is a unique asset. Retailer must present and market the Bugatti brand in a professional manner.

## A. MARKETING REQUIREMENTS

Retailer must have a nominated person responsible for all Bugatti marketing and public relations.

Retailer must have a written annual marketing and public relations plan, which details Retailer's plans with respect to new and pre-owned vehicle advertising, public relations, direct mail, and special events.

Retailer must have the ability to use the internet for generating sales enquiries.

Retailer must have a clear process for handling sales enquiries, including internet enquiries, walk-in enquiries, and telephone enquiries. Retailer must have a process for handling Bugatti-generated sales leads.

Retailer must have a regular, structured, and systematic method of tracking prospecting activity, including the recording of telephone, email, and direct mail contacts. Retailer also must maintain an accurate customer and prospect database. ***The Sales Manager must utilize a prospecting system to record daily customer contacts (by telephone, salesperson appointment, or showroom visit) for the purpose of customer follow-up and supervision of Sales Specialists.***

Retailer must, at all times, have an adequate supply of brochure materials and other media available on all models of vehicles currently being imported into North America by **Bugatti**, including the latest vehicle configurator, pricing information, and showroom point of sale materials.

Retailers must comply with new product advertising embargos.

| | | | | | Display and Storage | |
|---|---|---|---|---|---|---|
| | | | | | New Vehicles Sq. Ft. per Unit | Pre-Owned Vehicles Sq. Ft. per Unit |
| | | | | | 220 | 220 |
| | | | | | 220 | 220 |
| | | | | | 220 | 220 |
| | | | | | 220 | 220 |
| | | | | | 220 | 220 |

BUGATTI

# RETAILER AGREEMENT
# STANDARD PROVISIONS

# UNITED STATES

BUGATTI

# RETAILER AGREEMENT STANDARD PROVISIONS

# UNITED STATES

## TABLE OF CONTENTS

Article 1 Basic Obligations of Bugatti ....3
Article 2 Basic Obligations of Retailer ....4
Article 3 Management and Facility Requirements ....4
Article 4 Identification; Advertising ....5
Article 5 Sales ....6
Article 6 Parts and Accessories ....8
Article 7 Service ....9
Article 8 Retailer's Purchases and Inventories ....11
Article 9 Warranty to Customers ....14
Article 10 Retailer's Record Keeping and Reports; Inspection of Retailer's Operations ....15
Article 11 Retailer Performance Review ....16
Article 12 Succeeding Retailers ....16
Article 13 Dispute Resolution ....18
Article 14 Termination ....19
Article 15 Rights and Liabilities upon Termination ....22
Article 16 Definitions ....25
Article 17 General Provisions ....27

# RETAILER AGREEMENT STANDARD PROVISIONS

# UNITED STATES

## ARTICLE 1
## BASIC OBLIGATIONS OF BUGATTI

### SUPPLY OF AUTHORIZED PRODUCTS AND DESIGNATION OF RETAILER'S AREA

(1) Bugatti will sell and deliver Authorized Products to Retailer in accordance with this Agreement.

### ASSISTANCE

(2) Bugatti will endeavor to assist Retailer with regard to Retailer's Operations through such means as Bugatti considers appropriate. Bugatti may, from time to time and at its discretion, provide assistance through such methods, as it deems appropriate, including:

(a) Conducting periodic reviews of Retailer's compliance with this Agreement and the Operating Standards;

(b) Providing Recommendations; and

(c) Providing classes, special training and meetings for Retailer's personnel.

### COMPLIANCE WITH ETHICAL STANDARDS

(3) In the conduct of its business, Bugatti will:

(a) Safeguard and promote the reputation of Authorized Products and the Manufacturer;

(b) Refrain from all conduct which might be harmful to the reputation or marketing of Authorized Products or inconsistent with the public interest; and

(c) Avoid all discourteous, deceptive, misleading, unprofessional or unethical practices.

# ARTICLE 2
# BASIC OBLIGATIONS OF RETAILER

**SALES, SERVICE AND PARTS SUPPLY**

(1) Retailer is responsible for the promotion and sale of Authorized Products and for the supply of Genuine Parts and customer service for Authorized Products. This Agreement does not give Retailer any exclusive right to sell or service Authorized Products in any area or territory.

**COMPLIANCE WITH ETHICAL STANDARDS**

(2) In the conduct of its business, Retailer must:

(a) Safeguard and promote the reputation of Authorized Products, the Manufacturer and Bugatti;

(b) Refrain from all conduct which might be harmful to the reputation or marketing of Authorized Products or inconsistent with the public interest; and

(c) Avoid all unlawful, discourteous, deceptive, misleading, unprofessional or unethical practices.

**DISCLAIMER OF FURTHER LIABILITY BY BUGATTI**

(3) Except as expressly provided in this Agreement, Bugatti is not liable for any expenditure made or liability incurred by Retailer in connection with Retailer's performance of its obligations under this Agreement.

# ARTICLE 3
# MANAGEMENT AND FACILITY REQUIREMENTS

**RETAILER'S MANAGEMENT**

(1) In the conduct of its business, Retailer must have the following minimum staff:

(a) An Authorized Representative, and

(b) Such personnel as set forth in the Operating Standards.

**RETAILER'S PREMISES**

(2) Retailer's Premises, in sales, service and parts, will conform to the requirements of this Agreement, the Operating Standards and such other reasonable standards as Bugatti may prescribe from time to time, after review with Retailer.

(3) Retailer must operate Retailer's Premises during the hours set forth in the Operating Standards or, if no such hours are set forth, the customary business hours of the trade in the community in which Retailer operates.

# ARTICLE 4
# IDENTIFICATION; ADVERTISING

## USE OF AUTHORIZED TRADEMARKS

(1) Bugatti will supply Retailer, from time to time, with trademark standards to assist Retailer in the proper usage of Authorized Trademarks, including standards in the Bugatti Corporate Identity Guidelines. Retailer must comply with such trademark standards and may use the Authorized Trademarks only to the extent its operations are in compliance with such standards and this Agreement. Retailer must use Authorized Trademarks only in connection with the promotion and sale of new Authorized Products and customer service for Authorized Products pursuant to this Agreement, and only in the manner and for the purposes Bugatti specifies. Retailer must not use any Authorized Trademark as part of its corporate or business name without the prior written consent of Bugatti, except that Retailer's assumed name shall be in the form set forth in the Operating Standards. Retailer also may use Authorized Trademarks in connection with the sale of pre-owned vehicles if Retailer complies fully with Bugatti's requirements relating to pre-owned vehicle sales under the Authorized Trademarks. If Retailer does not comply fully with these requirements, Retailer may not use any Authorized Trademarks in connection with its pre-owned vehicle sales, except that Retailer may use the word "Bugatti" to describe Authorized Automobiles, if this word appears in characters and colors different from those usually employed by the Manufacturer, Bugatti and authorized retailers of Bugatti. This Agreement does not grant Retailer any license or permission to use Authorized Trademarks except as mentioned herein, and Retailer has no right to grant any such permission or interest to any other person or entity.

## SIGNS

(2) Retailer must display conspicuously at Retailer's Premises Authorized Signs as set forth in the Operating Standards and as Bugatti reasonably may require. Retailer must use its best efforts to obtain all governmental approvals necessary for such display. If Retailer transfers any of Retailer's Premises to another location, Retailer immediately must remove all Authorized Signs and other references to Authorized Products displayed at or around the prior location.

## STATIONERY

(3) Bugatti will supply Retailer, from time to time, with stationery and business form standards, including standards in the Bugatti Corporate Identification Guidelines. All stationery and business forms used in Retailer's Operations must be prepared in accordance with such standards. Retailer's use of Authorized Trademarks on stationery and business forms must be in accordance with trademark standards supplied by Bugatti, including standards in the Bugatti Corporate Identity Guidelines.

## ADVERTISING

(4) Bugatti and Retailer recognize the need for maintaining the highest standards of ethical advertising, and that it is of a quality that is consistent with the Bugatti Brand in the United States. Accordingly, neither Bugatti nor Retailer must

publish or cause to be published any advertising relating to Authorized Products that is not in compliance with all applicable Federal, state and local laws, ordinances, rules, regulations and orders or that is likely to mislead, confuse or deceive the public or impair the goodwill of Manufacturer, Bugatti or Retailer, or the reputation of Authorized Products or Authorized Trademarks. Retailer shall advertise Authorized Products and customer service for Authorized Products only in accordance with reasonable guidelines and policies established by Bugatti. Retailer shall refrain from all false, deceptive, misleading or unlawful advertising. Authorized Trademarks will be used for identification in all product and customer service advertising, in accordance with the provisions of this Agreement. Bugatti will provide or sell to Retailer sufficient quantities of all legally required brochures, as well as all current sales, service and parts literature and promotional materials, and Retailer must prominently display them and make them readily available.

## ARTICLE 5
## SALES

### NEW VEHICLE SALES OPERATIONS

(1) Retailer's new vehicle operations must conform to the requirements of the Operating Standards and such other reasonable standards as Bugatti may prescribe, in consultation with Retailer, or as reasonably established by Bugatti

### SALES PROMOTION AND PERFORMANCE

(2) Retailer must use its best efforts to promote the sale of Authorized Automobiles through regular contacts with owners, users, and prospective owners and users of Authorized Products; through promotion, prospecting, and follow-up programs; and through such means and at such levels as are set forth in the Operating Standards, as may be indicated by Bugatti in consultation with Retailer, or as reasonably may be established by Bugatti. Retailer understands and acknowledges that it is of vital importance to the reputation of Authorized Products that such Authorized Products are sold in a manner that promotes consumer satisfaction. Retailer must fully and accurately disclose to its customers all material information concerning the products and services sold by Retailer and the terms of purchase and sale including, without limitation, the items making up the price of the product or service, the source of products or services and all warranties applicable to the products or services. Retailer must not make any misleading statement or misrepresentation concerning the products or services sold by Retailer, the terms of the sale, the applicable warranties, the source of the products or services or the recommendations or approvals of Bugatti or Manufacturer.

(3) Retailer must achieve the best sales performance possible for each model and type of Authorized Automobile. To measure Retailer's performance against such standard, Bugatti may from time to time, in its discretion with or without consultation with Retailer, establish sales objectives for Retailer

**SALES OUTSIDE AREA**

(4) Subject to Retailer's performance of its obligations under Article 5(2), Retailer may sell Authorized Products within the 50 United States. Retailer understands and acknowledges, however, that it is necessary to preserve the integrity of the orderly worldwide distribution network for the products produced by the Manufacturer, and to maximize customer satisfaction by ensuring that Authorized Products meet the certification and operational standards of the markets for which they are designed. Retailer therefore is authorized to sell new Authorized Products only in the 50 United States, and is not authorized to, and agrees that it will not, sell any new Authorized Product for sale or use elsewhere and will not knowingly assist others in importing or exporting Authorized Products into or from the United States. Retailer agrees that in the event it receives inquiries from prospective customers outside the United States for deliveries outside the United States, Retailer will inform Bugatti promptly so that Bugatti may ensure that such prospective customers receive prompt follow up from the Bugatti distributor authorized in such other country.

**DEFECTIVE OR DAMAGED AUTHORIZED PRODUCTS**

(5) If any Authorized Product sold by Bugatti to Retailer should become defective or damaged prior to its delivery by Retailer to a customer, Retailer must repair such defect or damage so that such Authorized Product is placed in first-class salable condition prior to such delivery. Retailer immediately must notify Bugatti of any substantial defects or damage and must follow such procedures for making damage claims as Bugatti may establish from time to time. Bugatti shall have the option to repurchase any Authorized Products with substantial defects or damage at the price at which they were originally sold by Bugatti, less any prior refunds or allowances made by Bugatti and less any insurance proceeds received by Retailer in respect of such defect or damage. Bugatti may make an equitable adjustment with respect to damage that Retailer can demonstrate occurred prior to the time of delivery to Retailer. Bugatti will disclose to Retailer as may be required any damage that Bugatti repaired before delivering an Authorized Automobile to Retailer. Retailer must properly disclose such repair prior to delivering such Authorized Automobile to a customer, and shall hold Bugatti harmless from any claims that required disclosure was not made.

**CHANGES BY RETAILER TO AUTHORIZED PRODUCTS**

(6) Bugatti may request Retailer to make changes, or not to make changes, to Authorized Products, and Retailer agrees to comply promptly with such requests. Retailer also agrees to take such steps as Bugatti may direct it to take to comply with any law or regulation pertaining to safety, emissions, noise, fuel economy or vehicle labeling. Bugatti will reimburse Retailer at the then-current rate of reimbursement specified by Bugatti for Retailer for Genuine Parts and for labor, which may be used by Retailer in making such required changes on Authorized Products. Parts and other materials necessary to make such changes may be shipped to Retailer without Retailer's authorization and Retailer must accept them. Bugatti will give Retailer credit for parts so shipped which prove unnecessary, provided they are returned or disposed of in accordance with Bugatti's instructions. If the laws of the state in which Retailer is located or a vehicle is to be registered require motor vehicles to carry equipment not installed

or supplied as standard equipment by the Manufacturer or Bugatti, upon Bugatti's request Retailer must, prior to selling any Authorized Automobiles on which such installation is required, properly install at its own or its customers' expense equipment conforming to such laws and to Bugatti's standards. Retailer agrees to indemnify the Manufacturer and Bugatti and hold them harmless against and from any and all liabilities that may arise out of Retailer's failure or alleged failure to comply with any obligation assumed by Retailer in this paragraph.

**PRODUCT CHANGES BY RETAILER NEITHER REQUESTED BY BUGATTI NOR REQUIRED BY LAW**

(7) If Retailer installs on a new Authorized Automobile any equipment, accessory or part other than a Genuine Part; sells any new Authorized Automobile which has been modified; or sells in conjunction with a new Authorized Automobile a service contract not offered or specifically endorsed in writing by Bugatti, then Retailer must advise the customer of the identity of the warrantor of such modification, equipment, accessory or part, or, in the case of a service contract, of the identity of the provider of its coverage. Retailer must indemnify Bugatti against claims that may be asserted against Bugatti in any action by reason of such modification, equipment, accessory, part or service contract. **ANY UNAUTHORIZED MODIFICATION TO AUTHORIZED PRODUCTS BY RETAILER WHICH ADVERSELY AFFECTS THE SAFETY OR EMISSIONS OF AN AUTHORIZED AUTOMOBILE WILL BE A VIOLATION OF THIS AGREEMENT AND CAUSE FOR TERMINATION PURSUANT TO ARTICLE 14(2).**

**PRE-OWNED VEHICLE OPERATIONS AND SALES**

(8) Retailer must use its best efforts to acquire, promote, and sell at retail pre-owned Authorized Automobiles and other pre-owned vehicles, through such means and at such levels as are set forth in the Operating Standards, as may be indicated by Bugatti in consultation with Retailer, or as reasonably may be established by Bugatti. Retailer's pre-owned vehicle operations must conform to the requirements of the Operating Standards and such other reasonable standards as Bugatti may prescribe, in consultation with Retailer, or as reasonably established by Bugatti.

## ARTICLE 6
## PARTS AND ACCESSORIES

**PARTS AND ACCESSORIES OPERATIONS**

(1) Retailer's parts and accessories operations must conform to the requirements of the Operating Standards and such other reasonable standards as Bugatti may prescribe, in consultation with Retailer, or as reasonably established by Bugatti.

**PARTS AND ACCESSORIES PROMOTION AND PERFORMANCE**

(2) Retailer must use its best efforts to promote and sell Genuine Parts and Authorized Accessories through regular contacts with owners, users, and prospective owners and users of Authorized Products; through promotion, prospecting and follow-up programs; and through such means and at such levels

as are set forth in the Operating Standards, as may be indicated by Bugatti in consultation with Retailer, or as reasonably may be established by Bugatti.

**SALE OF NON-GENUINE PARTS AND ACCESSORIES**

(3) Retailer shall not sell any parts that are not equivalent in quality and design to Genuine Parts, if such parts are necessary to the mechanical operation of Authorized Automobiles. Retailer shall not represent as new Genuine Parts or Authorized Accessories any parts or accessories that are not new Genuine Parts or Authorized Accessories. If Retailer sells a part or accessory that is not a Genuine Part or Authorized Accessory, Retailer must advise the customer of the identity of the warrantor of such part or accessory.

**PARTS AND ACCESSORIES INVENTORY**

(4) Retailer must maintain an inventory of Genuine Parts as set forth in the Operating Standards and that is sufficient to perform reasonably anticipated warranty repair and service.

## ARTICLE 7
## SERVICE

**SERVICE OPERATIONS**

(1) Retailer's service operations must conform to the requirements of the Operating Standards and such other reasonable standards as Bugatti may prescribe, in consultation with Retailer, or as reasonably established by Bugatti.

**SERVICE PROMOTION AND PERFORMANCE**

(2) Retailer must use its best efforts to promote the servicing of Authorized Automobiles, and other automobiles formerly sold by Bugatti, through regular contacts with owners and users of Authorized Products and other automobiles formerly sold by Bugatti; through promotion, prospecting, and follow-up programs; and through such means and at such levels as are set forth in the Operating Standards, as may be indicated by Bugatti in consultation with Retailer, or as reasonably may be established by Bugatti. Retailer must provide the best possible customer service for all owners and users of Authorized Automobiles and other automobiles formerly sold by Bugatti,

**TOOLS AND EQUIPMENT**

(3) Retailer must have special tools and general workshop equipment meeting Bugatti's standards available at Retailer's Premises in working condition. The types and quality of such special tools and equipment must meet the requirements set forth in the Operating Standards.

**USE OF NON-GENUINE PARTS**

(4) Retailer must not use in the repair or servicing of Authorized Automobiles any parts that are not equivalent in quality and design to Genuine Parts, if such parts are necessary to the mechanical operation of such Authorized Automobiles.

**RETAILER MUST USE ONLY GENUINE PARTS IN PERFORMING WARRANTY SERVICE ON AUTHORIZED AUTOMOBILES. RETAILER MUST NOT REPRESENT AS NEW GENUINE PARTS ANY PARTS USED BY IT IN THE REPAIR OR SERVICING OF AUTHORIZED AUTOMOBILES THAT ARE NOT NEW GENUINE PARTS.**

**OWNER'S DOCUMENTS**

(5) Upon delivering a new Authorized Automobile to a customer, Retailer must provide the Owner's Documents supplied by Bugatti for such Authorized Automobile, properly completed by Retailer. Retailer must take all steps required prior to delivery of the Authorized Automobile, and, in particular, will perform properly any and all services specified from time to time by Bugatti to be performed either before or after the delivery of the Authorized Automobile to the customer.

**MAINTENANCE AND OTHER SERVICES WITHOUT CUSTOMER CHARGE**

(6) In accordance with bulletins issued from time to time by Bugatti and Bugatti's Warranties, certain maintenance services and other repairs following delivery of a new Authorized Automobile may be free of charge to the customer. Upon presentation of an appropriate Owner's Document, Retailer must perform properly the services required, whether or not the Authorized Automobile to be serviced was sold by Retailer. Upon the submission of appropriate claims, Bugatti will reimburse Retailer for performing such services at the then-current rate of reimbursement specified by Bugatti for Retailer. Bugatti will establish procedures for submitting and processing such claims and transmitting reimbursements to Retailer. Retailer must comply with these procedures to receive reimbursement

**REPEATED REPAIRS**

(7) Retailer must notify Bugatti in writing or by electronic mail of repairs to Authorized Automobiles pursuant to Bugatti's Warranties regardless of the circumstances. Such notification shall be made at the times and by the means Bugatti may have instructed in any then-current retailer warranty manual issued by Bugatti, including the Aftersales Policies and Procedures Guide.

**IN THE EVENT THAT RETAILER FAILS TO COMPLY WITH THESE NOTIFICATION REQUIREMENTS FOR AN AUTHORIZED AUTOMOBILE AND BUGATTI THEREAFTER REPURCHASES THAT AUTHORIZED AUTOMOBILE FROM A CUSTOMER, RETAILER'S OPEN PARTS AND ACCESSORIES ACCOUNT MAY BE CHARGED BACK, AT BUGATTI'S DISCRETION, FOR ANY AMOUNT THAT BUGATTI PAYS OVER THE MANUFACTURER'S SUGGESTED RETAIL PRICE FOR THE AUTHORIZED AUTOMOBILE.**

**FURTHER, TO THE EXTENT THAT SUCH CUSTOMER BECOMES ENTITLED TO THE REPURCHASE OR REPLACEMENT OF SUCH AUTHORIZED AUTOMOBILE PURSUANT TO ANY STATE'S "LEMON LAW," THROUGH THE PASSAGE OF TIME IN RETAILER'S POSSESSION OR THROUGH A NUMBER OF REPEATED REPAIR ATTEMPTS BY RETAILER, AND TO THE EXTENT THAT THE FAILURE TO REPAIR SUCH AUTHORIZED AUTOMOBILE WAS DUE TO FAILURE OR INABILITY ON THE PART OF RETAILER AND NOT DUE TO ANY FAULT OF BUGATTI, BUGATTI MAY, TO THE EXTENT PERMITTED BY LAW, SEEK INDEMNIFICATION FROM RETAILER FOR ALL OR A PORTION OF BUGATTI'S EXPENSES**

IN CONNECTION WITH THE REPURCHASE OR REPLACEMENT OF SUCH AUTHORIZED AUTOMOBILE.

## ARTICLE 8
## RETAILER'S PURCHASES AND INVENTORIES

### TERMS OF ORDERING, PAYMENT, AND DELIVERY

(1) The Bugatti Terms of Ordering, Payment, and Delivery, as they may be in effect from time to time, are part of this Agreement. Retailer acknowledges receiving the Terms of Ordering, Payment, and Delivery, and Retailer will comply with them as though fully set forth herein.

### INVENTORIES

(2) Retailer will have in inventory or on order such number of Authorized Automobiles as the Operating Standards may prescribe from time to time.

### PRODUCT ALLOCATION

(3) Retailer recognizes that certain Authorized Products may not be available in sufficient supply from time to time because of factors such as product importation, consumer demand, component shortages, manufacturing constraints, governmental regulations, or other causes. Bugatti will endeavor to make a fair and equitable allocation and distribution of the Authorized Products available to it but Bugatti reserves the discretion to make allocation decisions in the overall best interests of the Bugatti brand.

### TAXES

(4) Retailer is responsible for any and all taxes (including but not limited to Goods & Services, luxury, sales and excise taxes, and gas guzzler taxes) and other governmental charges imposed, levied, or based upon the sale of Authorized Products by Bugatti to Retailer. Retailer represents and warrants, as of the date of the purchase of each Authorized Product, that all Authorized Products purchased from Bugatti are purchased by Retailer for resale in the ordinary course of Retailer's business and that Retailer has complied with all laws relating to the collection and payment of all taxes and other governmental charges applicable to the purchase of such products and will furnish evidence thereof upon request. If any Authorized Products are put to taxable use by Retailer, or are purchased by Retailer for purposes other than resale in the ordinary course of Retailer's business, Retailer must make timely return and payment to the appropriate taxing authorities of all applicable taxes and other governmental charges imposed, levied, or based upon the sale of such Authorized Products by Bugatti to Retailer and will hold Bugatti harmless with respect thereto.

### PAYMENTS TO RETAILER OR RETAILER'S PERSONNEL

(5) From time to time, Bugatti may conduct incentive programs that involve payments to Retailer or to Retailer's personnel. Retailer acknowledges that regardless of the nature of such programs or payments, Retailer's personnel are not employees, contractors or agents of Bugatti. All matters relating to the

employment or retention of Retailer's personnel are solely Retailer's responsibility. In the case of payments by Bugatti to Retailer, Retailer alone will be responsible for the payment of any and all applicable taxes. In the case of payments to Retailer's personnel, Bugatti will make appropriate information or other returns to appropriate taxing authorities. In the event Retailer does not want Bugatti to make direct payments to Retailer's personnel, Retailer must notify Bugatti to that effect in writing. After receiving such written notice, Bugatti will pay directly to Retailer any subsequent payments coming due Retailer's personnel. Retailer represents and warrants that it shall pass such payments directly through to Retailer's personnel as intended; that it will make any necessary returns to any taxing authority; and that it will hold Bugatti harmless from any claims whatsoever that such payments were not received by the intended recipients or that appropriate withholdings were not made.

**PAYMENT BY RETAILER**

(6) Retailer must pay for Authorized Products in the manner, at the time, and upon the conditions specified in the terms of payment established from time to time by Bugatti. Delivery of instruments of payment other than cash does not constitute payment until Bugatti has collected the full amount in cash. Retailer must pay all collection charges, including reasonable attorney's fees, and costs of exchange, if any, incurred in connection with its payments.

**PASSING OF TITLE; SECURITY INTEREST**

(7) Title to Authorized Products remains with Bugatti until Bugatti has collected their full purchase price in cash. Retailer must execute and deliver, and Bugatti is authorized to execute and deliver on behalf of Retailer or, to the extent permitted by law, to file without the signature of Retailer, all financing statements and other instruments that Bugatti may deem necessary to evidence its ownership of such Authorized Products. Where applicable Retailer hereby grants Bugatti a purchase money security interest in all Authorized Products for which Bugatti has not collected in full, authorizes Bugatti to take such steps as Bugatti deems necessary to perfect such security interests, and agrees to cooperate fully with Bugatti in connection therewith. Bugatti may take possession at any time of Authorized Products to which it has title.

**PASSING OF RISKS**

(8) Authorized Products will be at Retailer's risk and peril from the time of their delivery to Retailer or Retailer's agent. Retailer must insure such risks for its benefit and at its expense.

**RESPONSIBILITY FOR DEFECTS AND DAMAGE**

(9) Bugatti assumes responsibility for the quality and condition of Authorized Products, to the extent of (a) defects caused by its own negligence and (b) damage caused or repaired prior to delivery of the Authorized Products to Retailer or Retailer's agent. Bugatti will make any required disclosure thereof to Retailer. If Bugatti has insured against such defects in or damage to Authorized Products, Bugatti's liability to Retailer for such damage will be limited to the amount actually paid by the insurance carrier to Bugatti by reason of such defect

of damage, together with any deductible amount applicable to such claim. Retailer may decline to accept any Authorized Products delivered to Retailer in damaged condition or with respect to which Bugatti has notified Retailer that Bugatti has repaired damage; however, should Retailer accept such Authorized Product Retailer must, subject to the provisions of Article 5(5), repair all such defects and damage fully as required by Bugatti before any defective or damaged Authorized Product is delivered to a customer. Retailer must make any required disclosure to Retailer's customers of damage or repairs, and shall hold Bugatti harmless with respect thereto. Bugatti will notify Retailer promptly of the amount thereof, or any other amount due from Bugatti pursuant to this paragraph, following Retailer's submission of such proof of repair as Bugatti may require.

**CLAIMS FOR INCOMPLETE DELIVERY**

(10) Retailer must make all claims for incomplete delivery of Authorized Products (including the delivery of Authorized Products with damage) in writing not later than three business days after Retailer's receipt of shipment; *provided, however,* that Retailer must make claims as to Genuine Parts within the period specified in policies established by Bugatti from time to time, including in the Aftersales Policies and Procedures Guide; and *provided, further,* that Retailer must note claims for visible damage to Authorized Automobiles on the delivery receipt.

**CHANGES OF SPECIFICATIONS**

(11) Bugatti will deliver Authorized Products to Retailer in accordance with specifications applicable at the time of their manufacture. In the event of any change or modification with respect to any Authorized Products, Retailer shall not be entitled to have such change or modification made to any Authorized Products manufactured prior to the introduction of such change or modification. Bugatti expressly reserves, and Retailer acknowledges, the right to make such changes and modifications, and Retailer's only right in such event shall be the right, hereby granted, to cancel any orders for Authorized Products affected by the change or modification and not yet accepted by Bugatti.

**FAILURE OF OR DELAY IN DELIVERY BY BUGATTI**

(12) Bugatti will not be liable to Retailer for failure of or delay in delivery under orders of Retailer accepted by Bugatti, other than failure or delay resulting from willful misconduct or gross negligence of Bugatti.

**RETURN OR DIVERSION ON RETAILER'S FAILURE TO ACCEPT**

(13) If Retailer fails or refuses for any reason to accept delivery of any Authorized Products ordered by Retailer (except as permitted under Article 8(11)), Retailer shall be liable to Bugatti for all expenses incurred as a result of such failure or refusal, and will store such Authorized Products at no charge to Bugatti until Bugatti can arrange for their removal. Retailer's liability pursuant to this paragraph will be in addition to, and not in lieu of, any other liabilities that may arise from Retailer's failure or refusal to accept delivery.

### AUTHORIZED ACCESSORIES AND AUTHORIZED PARTS

(14) Retailer acknowledges that some of or all Authorized Accessories, Authorized Parts, or both, will be sold and supplied to Retailer by the Manufacturer pursuant to a separate agreement, and that except to the extent specifically set forth in this Agreement, Bugatti will have no responsibility with respect thereto.

## ARTICLE 9
## WARRANTY TO CUSTOMERS

### BUGATTI'S WARRANTIES

(1) Bugatti warrants each new Authorized Automobile as set forth in Bugatti's Warranties.

### INCORPORATION OF BUGATTI'S WARRANTIES IN RETAILER'S SALES

(2) Retailer must make all sales of Authorized Automobiles in such a way that its customers acquire all rights in accordance with Bugatti's Warranties and, to the extent permitted by law, no other express or implied warranties. Retailer must make the text of Bugatti's Warranties part of its contracts for the sale of Authorized Automobiles and shall display the text of the warranties of all products it sells in customer contact areas where Authorized Automobiles are offered.

### WARRANTY PROCEDURES

(3) Retailer must comply with the provisions of the various retailer warranty manuals that Bugatti may issue from time to time and the provisions of the Operating Standards, and shall follow the procedures established by Bugatti for processing warranty claims and returning and disposing of defective Genuine Parts. Retailer must also comply with all requests of Bugatti for the performance of services pursuant to warranty claims and shall maintain detailed records of time and parts consumption and any other records used as the basis for submitting warranty claims. Unless otherwise specified in the Operating Standards or otherwise by notice to Retailer from time to time, Retailer will before performing any service pursuant to warranty claims consult with Bugatti by "hot line channel" telephone and obtain prior authorization from an authorized representative of Bugatti. Retailer must submit warranty claims to Bugatti electronically, and in accordance with procedures established by Bugatti. Upon Retailer's compliance with such requests and maintenance of such records, Bugatti will reimburse Retailer within a reasonable time for warranty claims at the then-current rate of reimbursement specified by Bugatti for Retailer. Strict adherence to the procedures and means established for processing warranty claims is necessary for Bugatti to process such claims fairly and expeditiously. Bugatti shall have no obligation with respect to warranty claims not submitted electronically and not made strictly in accordance with such procedures.

# ARTICLE 10
# RETAILER'S RECORD KEEPING AND REPORTS; INSPECTION OF RETAILER'S OPERATIONS

## RETAILER'S FORMS, BUSINESS MACHINES, OFFICE EQUIPMENT AND BOOKKEEPING

(1) Retailer must use accounting, sales, bookkeeping and service workshop forms; business machines; data processing and transmission equipment; and other office equipment, which meets specifications, and which enables Retailer and Bugatti to communicate electronically for all purposes and which otherwise provides information and functions in the manner prescribed by Bugatti and its affiliates in the Operating Standards, and by other means. Bugatti will advise Retailer, or ensure that suppliers to Bugatti advise Retailer, periodically of the hardware and software requirements, communications protocols, and other specifications which Retailer's data processing and transmission equipment must meet in order to satisfy the requirements of this paragraph, and Retailer must timely adhere to such requirements, protocols and specifications. Retailer must keep accurate and current records in accordance with Bugatti's uniform accounting system and with accounting practices and procedures reasonably satisfactory to Bugatti, in order to enable Bugatti to develop comparative data and to furnish Retailer business management assistance.

## FINANCIAL STATEMENTS TO BE SUPPLIED BY RETAILER

(2) Retailer must transmit to Bugatti (a) on or before the tenth day of each calendar quarter, in such form and by such methods as Bugatti reasonably may require, a financial and operating statement reflecting the consolidated operations of Retailer for the preceding month and from the beginning of the calendar year to the end of the preceding month and (b) within three and one-half months after the close of Retailer's fiscal or calendar year, a consolidated balance sheet and profit and loss statement of Retailer, which documents shall be certified by a chartered accountant if so requested by Bugatti at least 30 days prior to the close of Retailer's fiscal or calendar year. **RETAILER'S FAILURE TO PROVIDE FINANCIAL AND OPERATING STATEMENTS IN THE FORMAT AND BY THE METHOD REQUIRED BY BUGATTI MAY, AT BUGATTI'S DISCRETION, RESULT IN THE REVOCATION OF RETAILER'S OPEN PARTS AND ACCESSORIES ACCOUNT.**

## REPORTS TO BE SUPPLIED BY RETAILER

(3) Retailer must furnish to Bugatti, on such forms and by such methods as Bugatti reasonably may require, accurate timely reports of retailer's sales and transfers of new Authorized Automobiles. Retailer also must furnish to Bugatti, on a timely and accurate basis, such other reports and financial statements as Bugatti reasonably may require.

## INSPECTION OF RETAILER'S OPERATIONS AND RECORDS

(4) Until the expiration or termination of this Agreement, and thereafter until consummation of all transactions referred to in Article 15, Bugatti, through its employees and other designees, at all reasonable times during regular business

hours, may inspect Retailer's Operations, Retailer's Premises and the methods, records and accounts of Retailer relating to Retailer's Operations.

## ARTICLE 11
## RETAILER PERFORMANCE REVIEW

Bugatti may from time to time evaluate Retailer's Operations, including but not limited to, Retailer's vehicle sales, service and parts operations and performance, Retailer's Premises and Retailer's customer satisfaction. When evaluating Retailer's compliance with its obligations under this Agreement, Bugatti may take into account any objectives established for Retailer by Bugatti in consultation with Retailer, or as reasonably established by Bugatti from time to time. If Retailer's performance does not meet the requirements of this Agreement and/or the Operating Standards, then Bugatti, at its discretion, may take such steps as may be reasonably necessary to assist Retailer in improving Retailer's performance or to terminate this Agreement, in accordance with the provisions of Article 14(2).

## ARTICLE 12
## SUCCEEDING RETAILERS

### PROCEDURE

(1) If Retailer chooses to transfer its principal assets or change any of Retailer's Owners, Bugatti has the right to approve the proposed transferees and, if different from Retailer's Premises, the proposed premises. Bugatti will consider any such proposal Retailer may submit to it during the term of this Agreement. Bugatti has no obligation to approve such proposal in general, and in particular if such proposal includes relocation from Retailer's Premises. In determining whether the proposal is acceptable to it, Bugatti will take into account factors such as the personal, business and financial qualifications of the proposed new owners and executives as well as the proposal's effect on competition. In such evaluation, Bugatti may consult with the proposed new owners and executives on any aspect of the transaction or their proposed dealership operations. Bugatti will consider the proposal reasonably and in good faith.

### APPROVALS

(2) Bugatti will notify Retailer in writing of the approval or disapproval of a proposal by Retailer for transfer of principal assets or change of any owner within 45 business days, or of the exercise by Bugatti of its right of first refusal under Article 12(3) within 30 calendar days, after Retailer has furnished to Bugatti all applications and information reasonably requested by Bugatti to evaluate such proposal. If Bugatti approves Retailer's proposal, Bugatti shall be obligated to grant the proposed transferees only a Retailer Agreement in substantially the same form as the Retailer Agreements then currently offered by Bugatti to its retailers in Authorized Automobiles generally. Retailer understands and agrees that Bugatti's approval of a proposed buyer who otherwise meets Bugatti's reasonable and consistently applied requirements will be conditioned upon Retailer meeting all outstanding commitments and obligations to Bugatti. Bugatti's approval of Retailer's proposal may be conditioned on the proposed transferees agreeing to provide different facilities for their Bugatti operations. Upon the consummation of Retailer's approved proposal, Retailer must deliver to

Bugatti a voluntary termination of this Agreement, a general release in favor of Bugatti and payment in full for any net balance then owing from Retailer to Bugatti.

**RIGHT OF FIRST REFUSAL**

(3) Whenever Retailer proposes to transfer its principal assets or change owners of a majority interest, Bugatti shall have the right to purchase such assets or ownership interest, as follows:

(a) Bugatti may elect to exercise its purchase right by written notice to Retailer within 30 calendar days or less after Retailer has furnished to Bugatti all applications and information reasonably requested by Bugatti to evaluate Retailer's proposal.

(b) If Retailer's proposed sale or transfer was a sale or transfer exclusively to a successor approved in advance by Bugatti, to any of Retailer's Owners, to Retailer's employees as a group or to Retailer's spouse, children or heirs, then Retailer may withdraw its proposal within 30 calendar days following receipt of Bugatti's notice of election of its purchase right.

(c) Bugatti's right under this Article 12(3) shall be a right of first refusal, permitting Bugatti to:

(i) assume the proposed transferee's rights and obligations under its agreement with Retailer as such rights and obligations relate to Retailer's Operations, unless, if required by law, Bugatti must exercise its right with respect to Retailer's operations for all of its line makes, in which such case Bugatti may choose, at its election, to assume the proposed transferee's rights and obligations respecting Retailer's Operations and Retailer's operations for other line makes; and

(ii) cancel this Agreement and all rights granted Retailer hereunder.

Except to the extent specifically inconsistent with the terms of this Agreement, the price and all other terms of Bugatti's purchase shall be as set forth in any bona fide written purchase and sale agreement between Retailer and its proposed transferee and in any related documents.

(d) Retailer must furnish to Bugatti copies of all applicable liens, mortgages, encumbrances, leases, easements, licenses or other documents affecting any of the property to be transferred, and shall assign to Bugatti any permits or licenses necessary for the continued conduct of Retailer's Operations.

(e) Bugatti may assign its right of first refusal to any party it chooses, but in that event Bugatti will remain primarily liable to Retailer for payment of the purchase price or such portion of the purchase price as is allocated to Retailer's Operations.

(f) If Bugatti exercises its purchase right, Bugatti will reimburse Retailer's proposed transferee for reasonable documented actual expenses that such proposed transferee incurred through the date of such exercise

which are directly and solely attributable to the transaction Retailer proposed.

(g) Nothing contained in this Article 12(3) shall require Bugatti to exercise its right of first refusal in any case, nor restrict any right Bugatti may have to refuse to approve Retailer's proposed transfer.

**SUCCESSION**

(4) Article 14(1)(a) notwithstanding, in the event of the death of any of Retailer's Owners, Bugatti will not terminate this Agreement by reason of such death if:

(a) The owner's interest in Retailer passes directly as specified in any Successor Addendum to this Agreement; or

(b) The owner's interest in Retailer passes directly to his or her surviving spouse or children, or any of them, and (i) Retailer's Authorized Representative remains as stated in the Statement of Ownership and Management or (ii) within 90 days after the death of such owner Retailer appoints another qualified individual as Retailer's Authorized Representative; *provided, however,* that in this event, the following provisions apply: Bugatti will evaluate Retailer's performance during the 12 months following the owner's death. After the expiration of this 12-month period and Bugatti's evaluation of the performance of Retailer's performance during such period, Bugatti will review with Retailer the changes, if any, in the management or equity interests of Retailer required by Bugatti as a condition of continuing a relationship with Retailer. Retailer shall make such changes, if any. Any new Retailer Agreement entered into pursuant to this paragraph will be in substantially the same form as the Retailer Agreements then currently offered by Bugatti to its retailers in Authorized Automobiles generally.

**MODIFICATION OF TERMS OF PAYMENT**

(5) Upon receipt of an application for approval of a transfer or principal assets or change of owners of a majority interest, Bugatti may modify its terms of payment with respect to Retailer to the extent Bugatti deems appropriate, irrespective of Retailer's credit standing or payment history, including placing Retailer's Open Parts and Accessories Account on C.O.D.

## ARTICLE 13
## DISPUTE RESOLUTION

**STATUTE OF LIMITATIONS FOR DAMAGES**

(1) All claims by Retailer for damages against Bugatti shall be brought within one year of the accrual date of the claim, or in accordance with the applicable state statute of limitations, whichever is shorter.

**PERFORMANCE TO CONTINUE**

(2) Bugatti and Retailer agree to continue to perform their respective obligations under this Agreement pending final resolution of any dispute arising out of or relating to this Agreement.

## ARTICLE 14
## TERMINATION

**IMMEDIATE TERMINATION BY BUGATTI**

(1) Except to the extent a greater notice period is required by any applicable statute, Bugatti may terminate this Agreement, with immediate effect, by sending notice of termination to Retailer, if any of the following should occur:

(a) Death or incapacity of any of Retailer's Owners; any change, whether voluntary or by operation of law, in the record or beneficial ownership of Retailer or Authorized Representative without Bugatti's prior written consent; any change in Retailer's Executives, except with regard to the Authorized Representative, without prior written notice to Bugatti; or any failure of Retailer's Executives to continue to manage Retailer's Operations (unless, in the case of a death of Retailer's owners, the provisions of Article 12(4) above have been satisfied);

(b) Dissolution or liquidation of Retailer;

(c) Insolvency of Retailer or voluntary institution by Retailer of any proceeding under the Bankruptcy Act or state insolvency law; or the involuntary institution against Retailer of any proceeding under the Bankruptcy Act or state insolvency law which is not vacated within ten days from the institution thereof; or the appointment of a receiver or other officer having similar powers for Retailer or Retailer's business who is not removed within ten days of his appointment; or any levy under attachment, execution or similar process which is not within ten days vacated or removed by payment or bonding.

(d) Any transfer or assignment or attempted transfer or assignment of this Agreement by Retailer, in whole or in part, without Bugatti's prior written consent;

(e) Any change in the location of any of Retailer's Premises or the establishment of any additional premises for Retailer's Operations without Bugatti's prior written consent;

(f) Failure of Retailer to continue to operate any of Retailer's Premises in the usual manner for a period of five consecutive business days, unless caused by an Act of God, war, riot, strike, lockout, fire, explosion or similar event;

(g) Retailer's failure, for a period of ten consecutive business days, to have any license necessary for the conduct of Retailer's Operations;

(h) Conviction of Retailer or any of Retailer's Owners or Retailer's Executives of a felony or any misdemeanor involving fraud, deceit or an unfair business practice or Conviction of Retailer or any of Retailer's Owners or

Retailer's Executives of any crime or violation of law, if in Bugatti's opinion such conviction may adversely affect the conduct of Retailer's business, or be harmful to the goodwill of the Manufacturer or Bugatti or to the reputation and marketing of Authorized Products;

(i) Any material misrepresentation by any of Retailer's Owners or Retailer's Executives as to any fact relied upon by Bugatti in entering into this Agreement;

(j) Submission by Retailer of any fraudulent or knowingly false report, statement or claim for payment, reimbursement, refund or credit;

(k) Failure or refusal of Retailer or Retailer's Owners, Retailer's Executives, or Retailer's agents or employees to provide Bugatti, upon request, with access to and the opportunity to inspect and copy all books, papers, instruments, certificates or other documents evidencing the record or beneficial ownership of Retailer;

(l) Failure of Retailer to maintain a wholesale line of credit dedicated solely toward the purchase of Authorized Automobiles with a reputable financial institution reasonable acceptable to Bugatti for a period of thirty days;

**TERMINATION BY BUGATTI ON 60 DAYS' NOTICE**

(2) Except to the extent a greater notice period is required by any applicable statute, and except as governed by Article 14(1), Bugatti may terminate this Agreement upon 60 days' notice if any of the following shall occur:

(a) Any disagreement or personal difficulties of Retailer's Owners or Retailer's Executives which in Bugatti's opinion may adversely affect the conduct of Retailer's business, or the presence in the management of Retailer of any person who in Bugatti's opinion does not have appropriate qualifications for their position;

(b) Impairment of the reputation or financial standing of Retailer or any of Retailer's Owners or Retailer's Executives or ascertainment by Bugatti of any fact existing at or prior to the time of execution of this Agreement which tends to impair such reputation or financial standing;

(c) The failure of Retailer to meet its minimum customer satisfaction requirements, including, but not limited to, measures for sales satisfaction and service satisfaction, as established by Bugatti for its retailers generally, from time to time, and as set forth in the- Operating Standards or in any other publication, within a minimum of 180 days after notice by Bugatti to Retailer that Retailer has not met such requirements; or

(d) The breach by Retailer of any material obligation of Retailer pursuant to this Agreement or any other agreement between Bugatti or any of its parents, subsidiaries, or affiliates and Retailer, including, but not limited to, the termination or non-renewal of the Bentley Retailer Agreement (if any) to which Retailer is a party as of the date of this Agreement.

**MODIFICATION OF TERMS OF PAYMENT**

(3) During the period a situation specified in Article 14(1) or 14(2) continues to exist, Bugatti may at its discretion modify its terms of payment with respect to Retailer

to such extent as Bugatti may consider appropriate, irrespective of Retailer's credit standing or payment record, including but not limited to payment on a cash on delivery basis, together with immediate payment of all existing indebtedness.

**NO WAIVER BY FAILURE TO TERMINATE**

(4) Should Bugatti be entitled to terminate this Agreement but fail to do so, such failure shall not be considered a waiver of Bugatti's right to terminate this Agreement unless the situation entitling Bugatti to terminate this Agreement has ceased to exist and (a) six months have elapsed from the time Bugatti obtained knowledge of such situation or (b) Bugatti has entered into a subsequent written agreement with Retailer superseding this Agreement. Nevertheless, any situation entitling Bugatti to terminate this Agreement may be considered at any subsequent time together with any subsequent events in determining Bugatti's right to terminate this Agreement.

**NO RIGHT TO CURE DURING TERMINATION NOTICE PERIOD**

(5) Retailer has no right to cure its deficiencies during any termination notice period.

**TERMINATION BY RETAILER**

(6) Retailer has the right to terminate this Agreement without cause by Bugatti giving 60 days' written notice of such termination. Upon receipt of Retailer's notice of termination, Bugatti may, at Bugatti's option, waive in writing the 60-day notice period. In the event Retailer, in connection with its termination of this Agreement, also wishes to terminate any other agreement between Retailer and Bugatti or any of Bugatti's subsidiaries or affiliates, Retailer must do so separately and subject to the provisions of Article 14(9) below.

**CONTINUATION OF BUSINESS RELATIONS AFTER TERMINATION**

(7) Any business relations between Bugatti and Retailer after the termination of this Agreement without a written extension or renewal or a new written retailer agreement will not operate as an extension or renewal of this Agreement or as a new retailer agreement. Nevertheless, all such business relations, so long as they are continued, will be governed by terms identical with the provisions of this Agreement.

**SUPERSEDING AGREEMENTS**

(8) If any superseding form of Retailer Agreement is offered by Bugatti to its authorized retailers generally at any time, Bugatti may, by written notice to Retailer, terminate this Agreement and replace it with a Retailer Agreement in the superseding form.

**AGREEMENTS WITH AFFILIATES OF BUGATTI**

(9) The termination of this Agreement by either party does not waive or terminate any other agreement between Retailer and Bugatti or any of its subsidiaries or affiliates. Such other agreements may be terminated only in accordance with their terms, and the parties' respective obligations under any such other agreements will continue in accordance with their terms until terminated. The

parties agree, however, that notwithstanding the terms of Article 14, Paragraph 9, of the Bentley Retailer Agreement between Retailer and Bugatti's affiliate Bentley Motors, Inc., the termination of the Bentley Retailer Agreement by either party does in fact terminate this Agreement.

## ARTICLE 15
## RIGHTS AND LIABILITIES UPON TERMINATION

### BUGATTI'S OBLIGATIONS

(1) Within 90 days after the termination of this Agreement pursuant to Article 14, Bugatti will purchase from Retailer and (subject to the provisions of Article 15(4) below) Retailer must sell to Bugatti all the following:

### New Authorized Automobile Inventory

(a) All new, undamaged current model year Authorized Automobiles (introduced in the United States no earlier than 12 months prior to the date of such expiration or termination and not superseded by a later model year) in Retailer's inventory on the date of such expiration or termination which are in first-class salable condition, provided they (i) have 300 or fewer actual miles more than the mileage with which Bugatti delivered them to Retailer; (ii) were sold by Bugatti and purchased by Retailer from Bugatti (or in the ordinary course of business from other retailers of Authorized Automobiles appointed by Bugatti) and (iii) have never been sold by Retailer. The price for such Authorized Automobiles shall be the price at which they were originally sold by Bugatti, less all prior refunds or allowances made by Bugatti, if any.

### New Genuine Parts and Accessories Inventory

(b) Bugatti will purchase all of the following new, unused and undamaged articles listed in Bugatti's current Genuine Parts Price List (other than articles listed as obsolete) in Retailer's inventory on the date of such expiration or termination which are in first-class salable condition and complete, *provided* they were purchased by Retailer from Bugatti (and not directly from the Manufacturer) and never sold by Retailer:

(i) New parts and new factory remanufactured replacement parts supplied by Bugatti for Authorized Automobiles;

(ii) Accessories considered by Bugatti to be suitable for installation in the current model year Authorized Automobiles specified in Article 15(1)(a); and

(iii) Other accessories, provided that Bugatti has made sales of identical articles during six of the last twelve full calendar months immediately preceding such expiration or termination.

The price for all such articles shall be the price then last established by Bugatti for the sale of identical articles, less a handling charge equal to ten percent of such amount and less all prior refunds or allowances made by Bugatti;

**Tools and Equipment**

(c) All special tools and equipment for servicing Authorized Automobiles owned by Retailer on the date of expiration or termination which are in operating condition and complete, provided they were purchased by Retailer from Bugatti or pursuant to written requests of Bugatti. The price for such tools and equipment shall be determined on the basis of five year straight line depreciation; and

**Authorized Signs**

(d) All Authorized Signs that Retailer displayed publicly or at Retailer's Premises. The price for such Authorized Signs shall be the fair market value thereof.

**TERMS OF SALE**

(2) Any and all items to be sold by Retailer to Bugatti pursuant to this paragraph will be delivered by Retailer to Bugatti at Retailer's place of business suitably packed for transportation. For such periods of time as Bugatti reasonably may determine, Bugatti may enter Retailer's Premises for the purpose of taking an inventory of all or any part of Retailer's stock of Authorized Products and special tools and equipment. At the request of Bugatti, Retailer must comply in all respects with the provisions of all applicable bulk sales acts or similar statutes protecting a transferee of personal property with respect to liabilities of the transferor. Promptly following performance by Retailer of all its obligations pursuant to this Article 15, the completion by Bugatti of all steps required to obtain possession of such items and the delivery to Bugatti of a bill of sale, documents of title and a general release of Bugatti and the Manufacturer from Retailer and Retailer's Owners, all in form satisfactory to Bugatti, Bugatti will pay Retailer the specified prices for the said items, less all amounts owed by Retailer to Bugatti, its subsidiaries or affiliates. Bugatti shall not be required to purchase any item from Retailer pursuant to this paragraph unless Retailer is able to convey to Bugatti, within such 90-day period, title to such item free and clear of all liens, claims, encumbrances and security interests.

**PENDING ORDERS AND RETAILER'S OBLIGATIONS**

(3) Upon the expiration or termination of this Agreement, all pending orders of Retailer for Authorized Products previously accepted by Bugatti will be canceled and Retailer immediately must:

**Removal of Authorized Signs**

(a) Remove at its own expense all Authorized Signs which it displayed publicly or at its premises;

**Authorized Trademarks**

(b) Cease all usage of the Authorized Trademarks, cease to hold itself out as an authorized retailer in Authorized Automobiles, destroy all stationery and other printed material bearing any Authorized Trademark, and, if its

corporate or business name contains any Authorized Trademark, take all steps to remove the same therefrom;

**Orders and Files**

(c) Transfer to Bugatti

(i) All orders for sale by Retailer of Authorized Products then pending with Retailer,

(ii) All deposits made thereon, whether in cash or property;

(iii) All Retailer's warranty records for Authorized Products or complete copies of all such records and files; and

(iv) All Retailer's customer service files. Upon the written request of Retailer, Bugatti will return such customer service files to Retailer after Bugatti has made copies of such files at Bugatti's expense;

**Customer Lists**

(d) Make available to Bugatti in writing the names and addresses of all its service customers and prospective customers for Authorized Products; and

**Literature**

(e) Deliver to Bugatti at Retailer's place of business, free of charge, all technical or service literature, advertising and other printed material relating to Authorized Products, including sales instruction manuals or promotional material, then in Retailer's possession and which were acquired by Retailer from Bugatti. None of the foregoing will result in any liability of Bugatti to Retailer for damages, commissions, loss of profits or compensation for services, or in any other liability of Bugatti to Retailer of any kind of nature whatsoever.

**DIRECT SALES BY RETAILER**

(4) Upon Retailer's written request, Bugatti may waive Retailer's obligation to sell certain assets to Bugatti and may consent to Retailer's sale of any of or all its assets to any party of Retailer's choosing; *provided, however*, that Retailer may not sell any new Authorized Automobile, Authorized Sign nor any new Genuine Parts to any person or entity other than another retailer in the same line-make authorized by Bugatti.

**SPECIFIC PERFORMANCE**

(5) Since Retailer's obligations under this Article 15 are of such a nature that it is impossible to measure in money the damages which will be suffered by Bugatti if Retailer should fail to perform any of them, Retailer agrees that, in the event of any such failure of performance on its part, Bugatti will be entitled to maintain an action to compel the specific performance by Retailer of these obligations and Retailer agrees not to assert in any such action the defense that Bugatti has an adequate remedy at law.

# ARTICLE 16
# DEFINITIONS

Throughout this Agreement various abbreviations and abbreviated phrases have been used. Their meanings are:

**AUTHORIZED ACCESSORIES**

(1) "Authorized Accessories" means apparel, gear, vehicle accessories and optional equipment of the Bugatti brand and comprising such items as may be supplied by Bugatti or by the Manufacturer during the term of this Agreement.

**AUTHORIZED AUTOMOBILES**

(2) "Authorized Automobiles" means motor vehicles of the Bugatti brand and comprising such models and types as may be supplied by Bugatti during the term of this Agreement.

**AUTHORIZED PRODUCTS**

(3) "Authorized Products" means Authorized Automobiles, Authorized Accessories and Genuine Parts.

**AUTHORIZED REPRESENTATIVE**

(4) "Authorized Representative" means a qualified representative, such as a General Manager, of Retailer whose full-time professional efforts are devoted to the conduct of Retailer's Operations, who is authorized on behalf of Retailer to execute documents and, make all operational decisions with respect to Retailer's Operations, on whose authority Bugatti is entitled to rely, and who is physically present at Retailer's Premises during most of Retailer's customary operating hours.

**AUTHORIZED SIGNS**

(5) "Authorized Signs" means displays of any Authorized Trademark, in such material, type, presentation and colors as Bugatti may prescribe from time to time.

**AUTHORIZED TRADEMARKS**

(6) "Authorized Trademarks" means any trademark, service mark or trade name now or any other time hereafter used or claimed by the Manufacturer or Bugatti.

**BUGATTI**

(7) "Bugatti" means Volkswagen of America, Inc., a New Jersey corporation doing business as Bugatti Automobiles USA, Inc., and includes, as appropriate, all divisions of that corporation.

**BUGATTI'S WARRANTIES**

(8) "Bugatti's Warranties" means, with respect to each Authorized Product, those express written warranties provided with such product or as set forth in the

Retailer Warranty Manual for Authorized Products in effect at the time such product is first sold at retail, as well as any express written warranties which Bugatti may issue with respect to any product during the course of its service life.

**GENUINE PARTS**

(9) "Genuine Parts" means new and factory rebuilt replacement parts for Authorized Automobiles and other automobiles formerly sold by Bugatti but only if such parts are supplied by Bugatti or by the Manufacturer.

**MANUFACTURER**

(10) "Manufacturer" means Bugatti Automobiles S.A.S., a French corporation.

**NET WORKING CAPITAL AND OWNER'S EQUITY**

(11) "Net Working Capital" and "Owner's Equity" shall have the meanings set forth in the Operating Standards, and in accordance with generally accepted accounting principles.

**OPERATING STANDARDS**

(12) "Operating Standards" means the Bugatti Retailer Operating Standards issued by Bugatti to its Bugatti retailers, including any replacements, amendments, revisions or additions, from time to time issued during the term of this Agreement.

**OWNER'S DOCUMENTS**

(13) "Owner's Documents" means all the documents which are supplied by Bugatti in respect of each Authorized Automobile and which are intended for the customer, including, but not limited to, the Owner's Handbook, Owner's Information Booklet, and Owner's Service Booklet.

**RECOMMENDATIONS**

(14) "Recommendations" means written suggestions provided by Bugatti to Retailer from time to time during the term of this Agreement, as well as all currently applicable written suggestions previously provided by Bugatti.

**RETAILER'S AREA**

(15) "Retailer's Area" means the area designated by Bugatti in its discretion from time to time for Retailer's Operations.

**RETAILER'S EXECUTIVES**

(16) "Retailer's Executives" means all the persons who are corporate officers, trustees, managing members or managing partners and the person who is the Authorized Representative of Retailer, as well as any other person who succeeds to any such position in Retailer.

**RETAILER'S OPERATIONS**

(17) "Retailer's Operations" means all activities of Retailer relating to the promotion and sale of Authorized Products, the supply of Genuine Parts, customer service for Authorized Products and all other activities of Retailer pursuant to this Agreement.

**RETAILER'S OWNERS**

(18) "Retailer's Owners" means all the persons or entities who have beneficial or record ownership of Retailer, as well as any other person or entity who acquires or succeeds to any beneficial interest or record ownership in Retailer in accordance with the provisions of this Agreement.

**RETAILER'S PREMISES**

(19) "Retailer's Premises" means the premises used by Retailer for or in connection with Retailer's Operations, including sales facilities, service workshops, offices, facilities for storage of Authorized Automobiles and Genuine Parts, used car sales facilities and parking facilities as set forth in the addenda to this Agreement.

## ARTICLE 17
## GENERAL PROVISIONS

**RETAILER NOT AN AGENT**

(1) Retailer must conduct all Retailer's Operations on its own behalf and for its own account. Retailer has no power or authority to act for the Manufacturer or Bugatti. Retailer is not an agent of Bugatti.

**AUTHORITY TO SIGN**

(2) Retailer acknowledges that only the Regional Team Leader is authorized on behalf of Bugatti to execute this Agreement or to agree to any variation, modification or amendment of any of its provisions or to sign any notice of termination, and that such Agreement, variation, modification, amendment or notice of termination must be countersigned by the Director, Operations or an officer of Bugatti. Bugatti may from time to time, at its discretion, change the signature authority for documents identified in this paragraph by providing written notice to Retailer of such change.

**RELEASE OF CLAIMS UNDER PRIOR AGREEMENT**

(3) This Agreement terminates and supersedes all prior agreements with respect to Authorized Products between the parties, if any. The parties hereby waive, abandon and relinquish any and all claims of any kind and nature arising out of or in connection with any such prior agreement, except for any accounts payable by one party to the other as a result of the purchase of any Authorized Products, audit adjustments or reimbursement for any services.

**AGREEMENT NON-TRANSFERABLE**

(4) No part of this Agreement nor any interest in this Agreement may be transferred by Retailer without the prior written consent of Bugatti.

**DEFENSE AND INDEMNIFICATION**

(5) Bugatti will, upon Retailer's written request:

(a) Defend Retailer against any and all claims for breach of Bugatti's Warranties, bodily injury or death, or for physical damage to or destruction of property, that, during the term of this Agreement, may be asserted against Retailer in any action solely by reason of a manufacturing defect or design deficiency in

(i) An Authorized Product; or

(ii) A product previously supplied by Bugatti pursuant to this Agreement or a former retailer agreement; and

(b) Hold Retailer harmless from any and all settlements made and final judgments rendered with respect to such claims;

*provided,* that in each case Retailer promptly notifies Bugatti in writing of the commencement of such action against Retailer and cooperates fully in the defense of such action in such manner and to such extent as Bugatti may require. However, such defense and indemnification by Bugatti will not be required if any fact indicates that any negligence, error, omission, act, failure, breach, statement or representation of Retailer may have caused or contributed to the claim asserted against Retailer or if Bugatti determines that such action seeks recovery for allegations other than those described in Article 17(5)(a).

**PROTECTION OF CUSTOMER INFORMATION**

(6) Bugatti and Retailer each agree to maintain physical, electronic and procedural safeguards that comply with Federal and state laws, so as to maintain the confidentiality of all "Customer Information" that may come into their possession. As used herein, "Customer Information" refers to non-public personal information (as defined in the Gramm-Leach-Bliley Act), collected by Retailer about its customers, including the fact that a person may be a credit customer of Retailer. Bugatti and Retailer agree that Customer Information will be held in strict confidence and accessed only for business purposes relating to this Agreement. Bugatti and Retailer agree to protect the Customer Information according to commercially reasonable standards and to afford Customer Information no less protection than that afforded their own customers' personal information.

**WAIVERS**

(7) The waiver by either party of any breach or violation of or default under any provision of this Agreement will not operate as a waiver of such provision or of any subsequent breach or violation thereof or default thereunder. The failure or refusal of Bugatti to exercise any right or remedy shall not be deemed to be a waiver or abandonment of any such right or remedy.

**TITLES**

(8) The titles appearing in this Agreement have been inserted for convenient reference only and do not in any way affect the construction, interpretation or meaning of the text.

Dear Bugatti partners,

As a partner of the world sales, marketing and after sales organization, you take part in the whole process of manufacturing, delivery and service of our Bugatti Veyron 16.4. For this reason, we would like to inform you, hereby, about the main features of the Bugatti After Sales Organization.

***<u>Car Delivery - PDI</u>***

We principally work with the delivery company, DHL, which delivers our vehicles. DHL picks up the vehicle here in Molsheim, takes the vehicle to the airport and delivers the vehicle to the customer.

As you know, the Post Delivery Inspection (PDI) must be carried out before vehicle handover to the customer. In principle, this service should be carried out in your workshop before handing the vehicle over to the customer.

The PDI of the first vehicle that you will deliver to the customer will be carried out by our technicians. Your technicians must take part in the whole PDI in order to deepen the knowledge that they acquired during the training, so that they will be able to carry out the PDI independently for the next vehicles.

***<u>When technical support is needed for the second and following PDIs, it has to be requested by the dealer of the Bugatti After Sales Team before the delivery. To this end, the dealer will be invoiced for the travel and work costs.</u>***

A PDI takes place as follows:

- o We would like to remind you that the vehicle should be driven onto a lifting platform to carry out the PDI.
- o In order to do this, a ramp is usually needed.
- o You have to manufacture this simple use tool as shown in training.

<u>PDI</u>

a) Take delivery of the vehicle at the Bugatti partner.
b) Check the vehicle for any damage.
c) Unpack the PDI-Pack and place the parts back into the vehicle.
d) Carry out the PDI works.
e) Clean the vehicle completely.
f) Complete final inspection and preparation of the vehicle before handing the vehicle over to the customer.

<u>Vehicle handover to the customer</u>

a) Cover the vehicle (blue cover).
b) Deliver the vehicle to the customer.
c) Hand the vehicle over to the customer.
d) Hand over the box.
e) Sign and get the required documents signed.

Of course, we will inform you when the vehicle will arrive in your workshop, so that you can be prepared for the PDI.

2007 Bugatti S.A.S.

BUGATTI

## ***Service Repairs, Spare Parts and Tools***

As a partner, you are responsible for the repairs of Levels 1 and 2 for the service we would like to offer to our customers.

In order to carry out repairs, you have to first of all get equipped parts and special tools from Bugatti S.A.S.

To enable us to make you an appropriate offer or to send you genuine parts, please contact us as soon as possible with your debit details.

## ***Spare Parts Order Process***

You can order genuine parts for repairs in a very easy way.

- Access the spare parts catalogue on the Bugatti page of the Bentley BICS System. You have received a user name and a password to directly access the catalogue and be able to order parts.
- All parts are listed and illustrated to facilitate your search.
- The order process is simple. You only have to select the needed parts and confirm your on-line order.
- In order to send the parts, we also work with the company, DHL.
- DHL offers us different services depending on rank of importance. DHL organizes the transport of the parts from Molsheim to your workshop and also takes care of the payment of customs duty.
- As soon as we get your order, you are provided a bill from Bugatti Automobiles. This invoice has to be paid in advance.
- As soon as we receive payment, we organize the transport of parts by DHL. Parts are delivered to the workshops, DDP (Delivered Duty Paid).

## ***Body and Paint Repairs***

In the case that body parts have to be replaced (damages caused by an accident, paint damages etc.), we have organized a repair and delivery service of painted parts by our supplier, Weiss Automotive.

- Your order is directly sent to Bugatti Automobiles; however, the spare parts order system can also be used.
- The company, Weiss Automotive, organizes and delivers the parts directly to you in special containers. The services are invoiced by Bugatti Automobiles.
- Should you have to carry out small aesthetic body works, we give you (if you require), some technological tips on how to do this.

BUGATTI

## ***Training***

During the launch period of the Bugatti EB Veyron 16.4, we trained your technicians in order to prepare them for the features and the technical challenge "Bugatti".

We divided the trainings into 3 levels.

| | |
|---|---|
| Level 1: | History, description of the vehicle, PDI (training accomplished)* |
| Level 2: | Regular service works (training accomplished)* |
| Level 3: | Works on complex assembly groups |

**Training can be organized later for partners who have not yet been able to take part in the training. We look forward to receiving your expectations. The training takes place only in English.*

- o We first train your technicians for Levels 1 and 2. This training is compulsory for working on the EB Veyron 16.4.
- o Once your technicians have successfully completed Levels 1 and 2, they can then take part in the Level 2+ training.
- o This training takes place until the end of September, 2007. The training looks at the complex assembly groups of the car. The invitations follow until the end of June, 2007.
- o After successful completion of Level 2+, we offer training on the job for additional works.
- o We can also organize a special training, on request, in your workshop for your personnel. (You have to pay for this training).

## ***Service***

So as to reach the highest level of customer satisfaction and product quality, we would like to support you in your work on the vehicles. We support you with the first vehicles which will be launched in your market.

For this reason, besides the training previously mentioned and the training on the job during the PDI, we have arranged an internal service organization at Bugatti S.A.S.

This organization is composed of technicians, flying doctors, trainers and mechanics.

Should you urgently need support, our team is available on request. Nevertheless, as a Bugatti partner, you are responsible for the customers' support. The support service in our company is as follows:

- o Our launch team — Hotline: +33 6 50 38 38 11
- o Customer service — Mr. David Jenkins, Customer Care Manager for the U.S. market<br>Tel.: +1 805 557 1050
- o Bentley/Bugatti Hotline Channel
- o E-mail and fax — Fax: +1 805 435 0496 E-mail: david.jenkins@bugatti-auto.com<br>+ aftersales@bugatti-auto.com

BUGATTI

When you deliver the first car to the customer, you get access to the Bugatti Service Container via the Bentley BICS System. Use this system for technical information, guarantee applications, spare parts orders and information downloads.

***Note: You must give a report on all repair works carried out on customer vehicles. The hotline, which enables you to reach our team, has to be considered as a partner support telephone and should not be given to the customer.***

### ***Launch Team***

A launch team was founded to support technical questions. This team is composed of specialists from: Bugatti Engineering, Production, Quality and the After Sales departments.

Should your trained specialists have any technical questions during the launch phase, they should contact this team at the number mentioned above (hotline). Moreover, the team will interview your technicians to gather technical information and to get initial customers' reactions.

### ***Hotline Channel***

Before you start working on a vehicle, you must inform us about all the repair works and services you have to carry out via the Hotline Channel. The Hotline Channel is the interface which deals with answering the inquiries of the workshops in the Bentley Organization.

New access for technical questions to Bugatti is available to authorized partners on the Bentley-Hotline Channel.

### ***Guarantee Process***

The Bugatti Veyron has a two-year guarantee from the company. The authorization to carry out the works under guarantee is transmitted via the Hotline Channel. The services under guarantee are invoiced via AS400 with Bentley Inc.

Do not hesitate to contact us if you have any further questions.

Thank you for your cooperation.

Best regards,

Manfred Behrend and your After Sales Team

# EXHIBIT B

# Bugatti

December 2, 2022

Attn: Alex Shack
Braman Management Association
2060 Biscayne Boulevard, 2nd Floor
Miami, FL 33137-5024
davidl@bramanmanagement.com

RE: Bugatti Passeport Tranquillite Service Programme

Dear Alex:

On behalf of Bugatti Automobiles of Americas ("Bugatti"), I am writing regarding the ongoing discussion between Bugatti and the Braman Management Association ("Braman") as to the Bugatti Passeport Tranquillite Service Programme (the "Program"). This letter will serve as documentation of our final resolution of those discussions, which are more specifically set forth in the following:

- Braman's initial letter to me dated November 16, 2021from Brian J. Shack, Assistant General Counsel,
- Multiple e-mails and telephone calls thereafter,
- Two additional letters to me dated March 14, 2022, from David Leibowitz,
- My letter responding back to Mr. Leibowitz dated June 27, 2022,
- A face-to-face meeting with Braman on September 19, 2022, and
- Many additional emails and telephone calls since then in which we have finally reached an agreement in principle that will allow Braman to participate in the Program.

After consideration of all of the above, Bugatti and Braman have agreed that Braman will participate in the Program with modification to the reimbursement rate for parts used on all Passeport Tranquillite and Passeport Tranquillite Service Programme products. Specifically, Bugatti and Braman agree to modify Sections 1 and 7 in the Bugatti Passeport Tranquillite Service Programme Retailer Agreement Terms and Conditions (hereafter the "Agreement") to read as follows:

**"1. Programme Participation by Retailer.**

"In addition to providing Customers with the benefits of the Programme, it provides Retailers an opportunity to sell both maintenance and vehicle service contracts to Customers, as well as to service vehicles covered by the Maintenance Products. Retailer participation in the Programme is optional and voluntary. Retailers who choose to participate in the Programme must agree to both sell the Customer Agreement offered through the Programme and perform maintenance services

on covered vehicles as provided in the Customer Agreement purchased by Customer. Customers are entitled to purchase the Programme from any participating BUGATTI Retailer in the United States but are not required to return to the selling Retailer for the delivery of the maintenance services specified within those Customer Agreement and may choose to have such services performed by any participating BUGATTI Retailer. Participating Retailers must agree to service vehicles pursuant to the Programme even if the Retailer did not sell the Customer Contract to the Customer. This obligation includes and extends to Customer Contracts covering BUGATTI vehicles legally imported into the United States, even if those Customer Contracts were sold by BUGATTI Partners outside of the United States.

~~**"Retailers who do not wish to participate in the Passeport Tranquillité Service Programme are not required to take any action.**~~

***"In order to participate in the Passeport Tranquillité Service Programme, Retailers must agree to the Terms and Conditions set forth in this Agreement by submitting the enrollment form included in this Agreement to the Retailer's Regional After Sales Manager ("ASM"). Retailers may enroll in the Programme at any time until such time as BUGATTI cancels the Programme, which it may choose to do at any time and in its sole discretion. If BUGATTI chooses to cancel the Programme it will provide at least one (1) calendar month of notice prior to cancellation and will inform all participating Retailers via the BUGATTI Partner Portal. Under such circumstances, BUGATTI will continue to honor any remaining service intervals that then-existing Customers may have, and will continue to reimburse participating Retailers in accordance with the Terms and Conditions set forth in this Agreement for performing the maintenance services in the Customer Contract.***

"Retailers who enroll in the Programme but later wish to withdraw their enrollment must submit a written statement, signed by an authorized representative, to their ASM at least thirty (3) calendar days before they intend the withdrawal to become effective. Until the withdrawal is effective, Retailers must continue to honor this Agreement and complete any existing Customer maintenance bookings made under the Programme. ~~**Withdrawing Retailers will continue to be reimbursed by BUGATTI for all maintenance services performed even after submitting notice of withdrawal from the Programme, until the withdrawal becomes effective.**~~ Upon Retailer's effective withdrawal and termination of its participation in the Programme, the parties agree that all rights and remedies under applicable law, including but not limited to Sections 320.60-320-70, Florida Statutes, are fully reserved and not waived."

**"7. <u>Retailer Reimbursement for Maintenance</u>**

"Labor costs incurred by Retailer in connection with maintenance services provided to Customers pursuant to the Programme will be reimbursed at Retailer's warranty labor rate in place at the time Retailer enrolls in the Programme (the "Programme Labor Rate"). Labor reimbursement amounts will be based on the total Service / Maintenance performed and will be calculated by multiplying the Programme Labor Rate by the Suggested Repair Time published by BUGATTI for the services that are to be performed for the maintenance interval."

# Bugatti

"The Suggested Repair Times for the relevant services are outlined in Annex E."

"Notwithstanding any other provision in this Agreement to the contrary, throughout the effective duration of this Agreement Braman is permitted to submit and apply for increased reimbursement rates for all labor performed in connection with the Programme pursuant to applicable Florida law, including but not limited to Section 320.696, Florida Statutes. Labor reimbursement rates will be determined and paid by BUGATTI in accordance with applicable Florida law." "Oil, fluids, and parts used for the maintenance work, as stated in the pre-paid scheduled maintenance plan available from BUGATTI, will be reimbursed at a 20% discount from the MSRP listed for those items in the price list in effect at the time the Retailer submits for reimbursement (the "Purchase Price"), plus an additional 40% markup of that amount by the Retailer. Retailers must use BUGATTI Genuine Parts and BUGATTI approved oil and fluids to complete any Programme maintenance."

"BUGATTI will not reimburse the Retailer for any standard maintenance completed outside of the time frame specified in, or otherwise in compliance with, the terms and conditions of the Passeport Tranquillite Service Programme for the vehicle."

Your signature below will serve as acceptance of this letter to modify the quoted provisions of Section 7 of the Agreement. If you have any questions, please let us know.

Sincerely,

Dedrick Hagans
Bugatti Automobiles of the Americas

Hagans Dedrick VWPKI 413BDFF83E1BCF65

Digitally signed by Hagans Dedrick VWPKI 413BDFF83E1BCF65
Date: 2022.12.07 13:21:16 -05'00'

Accepted on behalf of Braman by:

Alex Shack
Braman Management Association

12-08-2022
Date signed

0149257.0751539 4868-2528-9533v1

# BUGATTI PASSEPORT TRANQUILLITÉ Service Programme

RETAILER AGREEMENT
TERMS AND CONDITIONS

## Introduction

Volkswagen Group of America, Inc. d/b/a BUGATTI Automobiles of the Americas, an operating unit of ("BUGATTI") is offering to Bugatti Veyron and Chiron owners (the "Customer") pre-paid scheduled maintenance plans and vehicle service contracts for sale by participating BUGATTI Retailers (the "Customer Agreement"). The BUGATTI Passeport Tranquillité Service Programme ("Programme") consists of the pre-paid scheduled maintenance and a vehicle service contract products identified in Annex A to these Programme Terms and Conditions (collectively these products, together with any other maintenance plans which may be offered to Customers in the future through the Programme, are referred to herein as "Maintenance Products"). Annex A will be updated periodically to describe maintenance plans and vehicle service contracts currently offered by BUGATTI. Annex B identifies the wholesale pricing ("Retailer Price") of Maintenance Products available to participating Retailers as well as current suggested retail pricing for those Maintenance Products.

This document sets forth the terms and conditions applicable to Retailers who choose to participate in the Programme and is referenced throughout as the "Agreement."

## PROGRAMME TERMS AND CONDITIONS

THE UNDERSIGNED PARTICIPATING BUGATTI RETAILER ACKNOWLEDGES AND AGREES TO THE FOLLOWING TERMS AND CONDITIONS:

### 1. Programme Participation by Retailer.

In addition to providing Customers with the benefits of the Programme, it provides Retailers an opportunity to sell both maintenance and vehicle service contracts to Customers, as well as to service vehicles covered by the Maintenance Products. Retailer participation in the Programme is optional and voluntary. Retailers who choose to participate in the Programme must agree to both sell the Customer Agreement offered through the Programme and perform maintenance services on covered vehicles as provided in the Customer Agreement purchased by Customer. Customers are entitled to purchase the Programme from any participating BUGATTI Retailer in the United States but are not required to return to the selling Retailer for the delivery of the maintenance services specified within those Customer Agreement and may choose to have such services performed by any participating BUGATTI Retailer. Participating Retailers must agree to

service vehicles pursuant to the Programme even if the Retailer did not sell the Customer Contract to the Customer. This obligation includes and extends to Customer Contracts covering BUGATTI vehicles legally imported into the United States, even if those Customer Contracts were sold by BUGATTI Partners outside of the United States.

**Retailers who do not wish to participate in the Passeport Tranquillité Service Programme are not required to take any action.**

***In order to participate in the Passeport Tranquillité Service Programme, Retailers must agree to the Terms and Conditions set forth in this Agreement by submitting the enrollment form included in this Agreement to the Retailer's Regional After Sales Manager ("ASM"). Retailers may enroll in the Programme at any time until such time as BUGATTI cancels the Programme, which it may choose to do at any time and in its sole discretion. If BUGATTI chooses to cancel the Programme it will provide at least one (1) calendar month of notice prior to cancellation and will inform all participating Retailers via the BUGATTI Partner Portal. Under such circumstances, BUGATTI will continue to honor any remaining service intervals that then-existing Customers may have, and will continue to reimburse participating Retailers in accordance with the Terms and Conditions set forth in this Agreement for performing the maintenance services in the Customer Contract.***

Retailers who enroll in the Programme but later wish to withdraw their enrollment must submit a written statement, signed by an authorized representative, to their ASM at least thirty (30) calendar days before they intend the withdrawal to become effective. Until the withdrawal is effective, Retailers must continue to honor this Agreement and complete any existing Customer maintenance bookings made under the Programme. Withdrawing Retailers will continue to be reimbursed by BUGATTI for all maintenance services performed even after submitting notice of withdrawal from the Programme, until the withdrawal becomes effective.

2. **Customer Agreement Creation & Administration**.

Retailers must use the BUGATTI Passeport Tranquillité Service Programme Order Forms as directed by BUGATTI, to create and administer the Customer Agreements. Copies of the relevant current Order Forms will be made available via the BUGATTI Partner Portal. An example of the Order Form is contained within Annex C. All Order Forms and Agreements must be recorded

and submitted electronically to the Retailer's ASM. Please contact your BUGATTI ASM for details. Retailers must furnish the Customer with the appropriate maintenance certificate, claim approval / denial documentation, and any other required documentation so that Customers are able to document each service performed under their Customer Agreement.

The cost of Customer Contract may be financed by the Customer as part of the vehicle purchase loan if the Programme is purchased at the time of vehicle purchase from Retailer. However, if the Customer Contract is purchased at a later date, the customer may not roll the cost into their pre-existing vehicle loan.

Retailers are responsible for collecting and paying any related or relevant sales tax on the Customer Contracts, as may be required by state and/or local law where the products are purchased.

3. **Advertising**.

Retailers who enroll in the Programme agree to BUGATTI identifying them as a participating Retailer on www.Bugatti.com. All advertisements and promotional materials are subject to the Bugatti Retailer Agreement Standard Provisions and may be disapproved by BUGATTI. Retailers also agree that BUGATTI may place advertisements for the Program on their dealership website, including the publication of the Manufacturer Suggested Retail Price ("MSRP") for current Customer Contracts as well as any future products that BUGATTI decides to offer through the Programme.

4. **MSRP, Customer Price, and Retailer Price**.

It is recommended that Retailers offer Customer Contracts to Customers at the MSRP published by BUGATTI. However, Retailers may offer Customer Contracts at a price other than MSRP. Retailers have final control over the prices at which Customer Contracts are offered to customers, except in the state of Florida. Retailers located in Florida must comply with the pricing agreements between BUGATTI and any applicable underwriting carrier for vehicle service contracts.

BUGATTI reserves the right to change the MSRP for the Customer Contracts at any time. Any such changes will be communicated to all participating Retailers in advance with a minimum of thirty (30) calendar days' notice before changes become effective. BUGATTI hereby provides

notice that the MSRP pricing of the Customer Contracts will be reviewed, and MSRP may be adjusted, by BUGATTI on no less than an annual basis effective at the start of each calendar year.

Regardless of the price at which a Retailer sells a Customer Contract to a Customer, the Retailer will pay BUGATTI the "Retailer Price" for the Maintenance Product set by BUGATTI as of the date of sale. The Retailer Price is the amount that the Retailer must pay to BUGATTI for each Customer Contract sold to a Customer. All Pricing and Payment Schedules issued by BUGATTI to participating Retailers are incorporated by reference into these Terms and Conditions.

On finalization of the Customer Contract with the Customer and notification to BUGATTI, the Retailer will be invoiced the applicable Retailer Price for the Customer Contract sold, less the applicable sales commission in place at the time of sale. The current sales commission is specified in Annex B of this Agreement. The sales commission amount will be reviewed no less than once per year. BUGATTI reserves the right to change the sales commission at any time. Retailers will be advised of any changes to the sales commission with a minimum of 30 calendar days' notice before any changes become effective. Retailer will be expected to pay BUGATTI against the relevant invoice within the payment terms applicable at the time from BUGATTI.

Retailers must receive payment from the Customer for the Customer Contract prior to commencing any maintenance services covered by the Programme.

5. **Vehicle Eligibility**.

In order for a Veyron or Chiron to be eligible for a Customer Contract under the Programme, one of the following must occur prior to the offer being made to the Customer. Either:

- The vehicle has been serviced within the last 13 months by an Authorized BUGATTI Retailer, either as part of previous Loyalty Maintenance Programme (in the case of the Veyron the old 3 Year LMP) or the inclusive 4 years servicing as standard (in the case of the Chiron); or
- A "110-Point Vehicle Quality Check" must be completed by the Retailer (an example of the 110-Point Vehicle Quality Check is shown in Annex D). This Vehicle Check serves the same role as the original Pre-Delivery Inspection Report, and the Retailer is

responsible for assessing the quality and mechanical roadworthiness of the vehicle by way of this Vehicle Quality Check.

The 110-Point Vehicle Quality Check can be charged directly to the prospective Customer at a rate agreed upon between the Retailer and the Customer. For final acceptance into the Programme, the Vehicle Quality Check must be completed and submitted to the Retailer's BUGATTI ASM for review against the Vehicle Record and determination of eligibility.

***Please note*** – in the future when a Customer wishes to renew their Customer Contract), a subsequent 110-Point Vehicle Quality Check will NOT be required if the vehicle has been maintained in accordance with the original Programme schedule. See the Agreement Renewal provision of the Customer Agreement for additional details.

6. **Customer Maintenance and Vehicle Service Contract Claims.**

By enrolling in the Programme, Participating Retailers agree they will honor all maintenance and vehicle service contract claims on vehicles covered by the Customer Contract. Retailers may not charge a Customer additional amounts for scheduled maintenance services or for any amount that is covered as part of the vehicle service contract under the applicable Customer Contract. The scope of what is included within the Programme is outlined in Annex A to this document.

Retailers are required to perform all Programme maintenance and vehicle service contract claims in accordance with the BUGATTI Workshop manual and the Vehicle Owner's Manual. BUGATTI will not reimburse Retailer for parts or labor expenses that are ***not*** identified under the scheduled maintenance interval for which the work is being performed.

Consistent with current BUGATTI notification procedures, Retailers must continue to follow the established process of notifying BUGATTI of the arrival of vehicles covered by a Customer Contract into their workshop and advise in advance the planned work due to be carried out pursuant to this Agreement.

Retailers must abide by all guidelines and training material provided by BUGATTI to the Retailers regarding Unfair and Deceptive Acts applicable to the sale of Customer Contracts, Claim Processes and Procedures, and Claims and Complaint Record Retentions, which may be updated from time to time.

Upon receipt of a maintenance plan or vehicle service contract claim, the Retailer must create a document which identifies:

- The contract number for the Bugatti Customer Contract under which the claim was made;
- A unique identifier for the claim;
- The date the claim was made;
- The amount of service fee collected from the contract holder;
- The date service was provided to the customer;
- The costs in labor, parts, and related fulfillment expenses incurred in fulfilling the claim;
- If the requested benefit or service was denied:
    - The date the denial was communicated to the customer; and
    - The reason for the service denial communicated to the customer.

If it appears to Retailers that a covered vehicle requires additional service work (i.e., maintenance or repair work not included in the Customer Contract applicable to the covered vehicle), Retailer must discuss and agree upon such service work directly with the Customer. Service work outside the scope of the Programme and the Customer Contract for which the vehicle is enrolled are solely between Customer and Retailer. Retailers will not be entitled to compensation or reimbursement by BUGATTI for labor or parts expenses incurred for maintenance or repair services beyond the scope of the applicable Customer Contract.

**7. Retailer Reimbursement for Pre-Paid Scheduled Maintenance Plan Work.**

Labor costs incurred by Retailer in connection with maintenance services provided to Customers pursuant to the Programme will be reimbursed at Retailer's warranty labor rate in place at the time Retailer enrolls in the Programme (the "Programme Labor Rate"). Labor reimbursement amounts will be based on the total Service / Maintenance performed and will be calculated by multiplying the Programme Labor Rate by the Suggested Repair Time published by BUGATTI for the services that are to be performed for the maintenance interval.

The Suggested Repair Times for the relevant services are outlined in Annex E.

Retailer agrees and acknowledges that the Programme Labor Rate will be fixed for a period of 24 months following enrollment as a Participating Retailer, regardless of any change to the Retailer's warranty labor rate during that 24-month period. Retailers may request an increase to the Programme Labor Rate once every 24 months, and if so requested shall be entitled to have their Programme Labor Rate increased to be equal with the Retailer's then-existing warranty labor rate.

Oil, fluids, and parts used for the maintenance work, as stated in the pre-paid scheduled maintenance plan available from BUGATTI, will be reimbursed at the MSRP listed for those items in the price list in effect at the time the Retailer submits for reimbursement. Retailers must use BUGATTI Genuine Parts and BUGATTI approved oil and fluids to complete any Programme maintenance.

BUGATTI will not reimburse the Retailer for any standard maintenance completed outside of the time frame specified in, or otherwise not in compliance with, the terms and conditions of the Passeport Tranquillité Service Programme for the vehicle.

**8. Refunds & Cancellations.**

If a Customer Contract is eligible for cancellation and refund, BUGATTI will refund the customer's purchase price to the BUGATTI Retailer less any applicable cancellation fee or proration for services performed under the Customer Contract, and the Retailer shall reimburse the Customer the relevant refunded amount, in accordance with the terms and conditions of the Customer Contract. The Retailer must maintain records of any refunds made for a period of five years. Please see the applicable Customer Contract for further information regarding the Customer's right to cancellation and refunds.

**9. Regulatory Compliance**

In performing its obligations under this Agreement and the actions contemplated hereunder, each Party shall comply fully with all applicable laws of the jurisdiction in which they operate and take any necessary actions to ensure ongoing compliance in the event of changes to the existing applicable laws. Each Party agrees to notify each other and cooperate to address or respond to

any regulatory filings, investigations, examinations or similar inquiries, or reviews, whether formal or informal, made by any state regulator related to the Customer Contract.

**10. Support.**

Retailers may send any inquiries related to the Programme directly to their ASM or email inquiries to customerservice.americas@bugatti.us
This email address is for Retailer inquiries only and must not be shared with Customers.

**11. Effective Date.**

This Agreement shall be effective as of the ____ day of _____________, 202__.

**12. Assignment and Modification of Agreement.**

This Agreement is granted to the BUGATTI Retailer on a strictly personal basis and is entered into for the benefit of BUGATTI and Retailer only, and not for the benefit of any other person or entity. Consequently, Retailer shall not assign or transfer all or part of its rights and obligations under this Agreement to anyone, including through transfer, merger, partial contribution of assets or transfer of goodwill without the prior written consent of BUGATTI. Any effort to assign or transfer Retailer's rights and obligations under this Agreement without BUGATTI's prior written authorization shall constitute a material breach of this Agreement and entitle BUGATTI to immediately terminate this Agreement.

This Agreement represents the entire agreement between the signing parties with respect to the subject matter of this Agreement. No modification of this Agreement will be enforceable unless made in writing and signed by both parties.

In the event of any conflict between an Annex and the body of this Agreement, the body of the Agreement will prevail.

**13. Retailer Acknowledgement – Not A Dealer Agreement or Franchise.**

The Retailer acknowledges that the Programme is not part of the Retailer's BUGATTI Retailer Agreement, the Retailer's Franchise Agreement, or Franchise as those terms, or analogous terms relating to the relationship between BUGATTI and Retailer may be defined under applicable federal or state law (collectively referred to as a Franchise). The Retailer recognizes that this

Agreement will not merge into the Retailer's BUGATTI Retailer Agreement, nor will the Retailer's BUGATTI Retailer Agreement merge into this Agreement. The Retailer further acknowledges that Bugatti has the absolute right to modify or cancel the Programme or the Terms and Conditions in this Agreement at any time with immediate effect, and that any modification or cancellation of thereof is not in any way a modification or cancellation of the Retailer's BUGATTI's Retailer Agreement or BUGATTI Franchise.

If the Retailer Agreement or the Retailer's BUGATTI Franchise is terminated by BUGATTI, this Programme enrollment is automatically terminated.

Retailer covenants that it will not sue BUGATTI asserting or alleging any claims that in any way rely on the Programme being part of the BUGATTI Retailer Agreement or the Retailer's BUGATTI Franchise.

**14. Invalidity / Severability.**

Invalidity of any provision of this Agreement shall not invalidate the remaining provisions of this Agreement. The parties agree to replace provisions which are declared null and void by a judicial or administrative authority with other provisions having comparable economic effect.

**15. Notices.**

Subject to any other provisions of this Agreement, any written information or notice between the parties shall be given by registered mail, with acknowledgement of receipt, or by any other means commercially used by the parties, sent to the address given on the first page of this Agreement for the party for which it is intended. Any deadline shall be counted from the date the communication is received by the party to which it is sent.

**16. Applicable Law – Jurisdiction.**

This Agreement or any term of it shall be governed by the laws of the state where Retailer is located.

**17. List of annexes attached to this Agreement.**

**ANNEX A "*Bugatti Veyron and Chiron Passeport Tranquillité Service Programme Terms and Conditions*"**

**ANNEX B "*Bugatti Veyron and Chiron Passeport Tranquillité Service Programme MSRP and Retailer Pricing 2022*"**

**ANNEX C "*Passeport Tranquillité Service Programme Order Form Examples*"**

**ANNEX D "*Example of 110-Point Vehicle Quality Check*"**

**ANNEX E "Suggested Repair Times"**

***

This Agreement is signed in two (2) original copies by the parties or their duly authorized representatives.

# BUGATTI PASSEPORT TRANQUILLITÉ Service Programme
RETAILER ENROLLMENT FORM

## RETAILER ENROLLMENT FORM

The BUGATTI Passeport Tranquillité Service Programme enrollment form must be completed by the **authorized representative identified in the Retailer's Bugatti Retailer Agreement** and submitted to BUGATTI. By completing this form, the Retailer agrees to participate in the sale of the BUGATTI Passeport Tranquillité Service Programme and honor the Programme service claims process outlined in the Agreement Terms and Conditions.

| | |
|---|---|
| **Retailer Name:** | Bugatti Miami |
| **Retailer Code:** | 3071 |
| **Retailer Address:** | 2060 Biscayne Boulevard |
| **City:** | Miami |
| **Country:** | United States |
| **Zip Code:** | 33137 |
| **Retailer Email:** | mrodriguez@bramanmiami.com |
| **Retailer's Authorized Representative:** | Mike Rodriguez |
| **Date:** | December 29, 2022 |

☒ **I acknowledge that I have read and voluntarily accepted the Terms and Conditions of the Program, including ANNEX A ("*Bugatti Veyron and Chiron Passeport Tranquillité Service Programme Contents*"), ANNEX B ("*Bugatti Veyron and Chiron Passeport Tranquillité Service Programme Pricing 2022*"), ANNEX C ("*Passeport Tranquillité Service Programme Order Form Example – Veyron*") and ANNEX D ("*Example of 110-Point Vehicle Quality Check*") and I enroll the above mentioned dealership to participate in the Program.**

By:______________________________
Retailer's Authorized Representative

# ANNEX A

## Bugatti Veyron and Chiron Passeport Tranquillité Service Programme Terms and Conditions

**BUGATTI PASSEPORT TRANQUILLITÉ SERVICE PROGRAMME**
**Terms and Conditions**

This Passeport Tranquillité Service Programme is sold by any Authorized Bugatti Partner which sells Bugatti Approved Vehicles ("Vehicle"). The Passeport Tranquillité Service Programme is provided by Volkswagen Group of America Inc. d/b/a Bugatti Automobiles of the Americas ("Bugatti", "Obligor", "Provider", "We", "Us", "Our"), with Office address: 2003 Edmund Halley Drive, Reston, Virginia 20191

### I. DEFINITIONS

1. "Authorized Bugatti Partner" means a car dealership that has been authorized by Us to perform repairs on a Bugatti Approved Vehicle and to sell the Passeport Tranquillité Service Programme.
2. "Bugatti Approved Vehicle" means the Vehicle manufactured by Us, which was certified to be covered by this Passeport Tranquillité Service Programme and sold by an Authorized Bugatti Partner.
3. "Breakdown" means a failure of the Covered Item as described in the Service Contract Coverage section of this Passeport Tranquillité Service Programme.
4. "Coverage Letter" means the letter attached to and incorporated into this Passeport Tranquillité Service Programme which contains Your specific coverage information for your Bugatti Approved Vehicle.
5. "Coverage Period" means the duration of this Passeport Tranquillité Service Programme as identified on the Coverage Letter.
6. "Coverage Period End Date" means the date that Your Coverage Period ends, as listed on the Coverage Letter, and which is subject to earlier termination or cancellation pursuant to the terms of this Passeport Tranquillité Service Programme.
7. "Coverage Period Start Date" means the date listed on the Coverage Letter.
8. "Covered Items" means any factory-installed part within Your Bugatti Approved Vehicle except as excluded below.
9. "Maintenance Service" means Your regularly scheduled maintenance work that is performed in accordance with the schedule provided in Your Coverage Letter.
10. "Passeport Tranquillité Service Programme" means this maintenance and service contract between You and Us that covers your Bugatti Approved Vehicle and includes the Coverage Letter that was provided upon Your purchase.
11. "Owner's Manual" means the booklet regarding Your Vehicle's maintenance requirements provided to You upon Your purchase.
12. "Plan" means the coverage You have selected as indicated on Your Coverage Letter.
13. "Purchase Price" means the amount You paid for this Passeport Tranquillité Service Programme.
14. "Selling Dealer" means the Authorized Bugatti Partner at which You purchased Your Bugatti Approved Vehicle.
15. "Service Contract Service" or "Service Contract Services" means the diagnosis and performance of the work, including parts and labor, to repair or replace any Covered Item which suffers a Breakdown.
16. "Trade Call Fee" means an amount due by You per Service request for a Service visit to an Authorized Bugatti Partner, as listed on the Coverage Letter.
17. "You," "Your," and "Customer" mean the holder of this Passeport Tranquillité Service Programme, whose name appears on the Coverage Letter.

### II. WHAT YOU MUST DO TO REQUEST SERVICE

In order to obtain either Maintenance Service or Service Contract Service, You must take Your Bugatti Approved Vehicle to an Authorized Bugatti Partner during normal service hours. If the car is not drivable because of a Breakdown under Your Service Contract Coverage, Bugatti will be responsible for transporting the vehicle to the Authorized Bugatti Partner and will pay the applicable transportation costs. Transportation costs will not be provided when You bring Your Bugatti Approved Vehicle to an Authorized Bugatti Partner for Maintenance Services.

You are responsible for presenting Your Bugatti Approved Vehicle to an Authorized Bugatti Partner as soon as practical. Failure to do so could result in consequential damage that may not be covered by the Passeport Tranquillité Service Programme.

You will also receive a maintenance certificate identifying the individual vehicle and the purchased plan, which should be kept with the vehicle and provided to the BUGATTI Partner at the time of your service as a proof of maintenance entitlement.

### III. WHAT IS COVERED

Your coverage depends upon the Plan You selected. Your selected Plan is listed in the Coverage Selected section of Your Coverage Letter. The specific coverages included in Your Plan(s) are listed on Your Coverage Letter. Coverage under each Plan is subject to certain limits and exclusions, as described below.

#### A. Maintenance Plan Coverage

Your Plan includes the number of maintenance visits indicated on Your Coverage Letter. The Maintenance Service will be performed at an Authorized Bugatti Partner in accordance with the schedule below.

| Maintenance Interval | Months from Plan purchase date |
|---|---|

| | |
|---|---|
| **9,375 miles service** | 12 months |
| **18,750 miles service** | 24 months |
| **28,125 miles service** | 36 months |
| **37,500 miles service** | 48 months |

We highly recommend that the Maintenance Service is performed within 625 miles of the scheduled maintenance interval or **one year from the date** that the Maintenance Service was last performed on the Bugatti Approved Vehicle, whichever occurs first. For complete details regarding Maintenance Service, please either consult Your Vehicle's Owner Manual or speak to Your Authorized Bugatti Partner.

All Maintenance Services must be completed by bringing Your Bugatti Approved Vehicle to an Authorized Bugatti Partner. The responsibility and cost of transportation to and from the Authorized Bugatti Partner is not provided within the Passeport Tranquillité Service Programme and is Your sole responsibility. We advise You to consult directly with Your chosen Authorized Bugatti Partner in case local transportation arrangements can be secured.

Maintenance Service performed by a party other than an Authorized Bugatti Partner will not be provided by Your Passeport Tranquillité Service Programme. You are also responsible for confirming that the Authorized Bugatti Partner at which You intend to obtain Maintenance Service is a participating Authorized Bugatti Partner before obtaining Maintenance Service. At-home service will not be provided.

<u>i. Tire Package</u>

The Passeport Tranquillité Service Programme does not include the replacement or emergency tires for Your Bugatti Approved Vehicle. However, You may purchase the optional Tire package and this will be reflected on Your Coverage Letter. Purchase of the Tire package allows You to receive one complete set of new tires for Your Bugatti Approved Vehicle prior to the overall expiration of the Passeport Tranquillité Service Programme.

To redeem the Tire Package purchased within the Passeport Tranquillité Service Programme, You must contact an Authorized Bugatti Partner. Tires must be installed at the time of redemption and may only be installed by an Authorized Bugatti Partner or BUGATTI Automobiles SAS in Molsheim.

The tire package contains the right for You to have up to four (4) tires changed on their Bugatti Approved Vehicle – the pre-paid cost includes all associated costs of transportation of the wheels (where relevant) and also the replacement of the tire pressure monitor sensors and valves but excludes the replacement or repair of any rims on which the tires are mounted.

For the Bugatti Veyron the tire that will be fitted is the Michelin Pilot Sport PAX 2C BG; and for the Bugatti Chiron the tire that will be fitted is the Michelin Pilot Sport 2 BG – both subject to availability of the tires.

**B. Service Contract Plan Coverage**

<u>i. Chiron Service Contract Plan Coverage</u>

The Service Contract Services provided will cover all repairs to remedy material or finishing faults of the manufacturer to Covered Items with the exceptions detailed in the exclusion section below (a "Breakdown").

<u>ii. Veyron Service Contract Plan Coverage</u>

The Service Contract Services provided will cover all repairs to remedy a failure of all mechanical and electrical items with the Bugatti Approved Vehicle with the exceptions detailed in the exclusion section below (a "Breakdown").

<u>iii. General Service Contract Coverage</u>

We will only provide coverage as described below; no other coverage will be afforded to You. Preexisting conditions that occurred prior to the Coverage Period Start Date will not be covered. Service Contract Services will be provided free of charge for parts and labor at an Authorized Bugatti Partner. Please see Our website for additional coverages or limited warranties regarding parts and labor.

<u>iv. Emergency Repairs</u>

Should Your Vehicle become completely disabled, requiring repair in order to be driven, and there is no Authorized Bugatti Partner within 100 miles, please contact an authorized representative of Your Selling Dealer for assistance.

## IV. <u>YOUR RESPONSIBILITIES</u>

You must only use Your Bugatti Approved Vehicle for Normal Vehicle Use. Normal Vehicle Use means use in accordance with the Owner's Manual and only using Your Bugatti Approved Vehicle:

1. To carry passengers and cargo within specified load limits. (The load limits are specified on labels located in Your Bugatti Approved Vehicle. Your Owner's Manual gives the locations.)
2. To be driven on reasonable road surfaces within legal speed limits.
3. To generally be driven daily over a distance of several miles. In the event of prolonged storage, contact Your local Authorized Bugatti Partner for instructions.
4. A battery maintainer is available at your local Authorized Bugatti Partner. It must be used to maintain Your Bugatti Approved Vehicle's battery state of charge if Your Bugatti Approved Vehicle will not be used for several days.
5. To be run on unleaded gasoline with the recommended octane rating as specified in the Owner's Manual.
6. To be properly maintained according to the Maintenance Schedule by the Passport Tranquillité Maintenance Plan. You must keep the receipts as proof of maintenance.

**Maintenance**

You must maintain Your Bugatti Approved Vehicle according to the Passeport Tranquillité Maintenance Plan. Failure to maintain Your Bugatti Approved Vehicle will result in the

cancellation of this Passeport Tranquillité Service Programme. You must keep the receipts as proof of maintenance.

**Your Responsibility for Using Appropriate Replacement Parts**
We recommend only the use of parts supplied by Us. The use of replacement parts not supplied by Us may void this Passeport Tranquillité Service Programme. If a replacement part that We did not supply is used in maintenance, repair or modification of Your Vehicle, and an Authorized Bugatti Partner determines it is defective or not equivalent to the original part, Your claim for Service Contract Service or some or all of this Passeport Tranquillité Service Programme may be voided.

## V. COVERAGE PERIOD

You must obtain any Maintenance Service and report any Breakdowns to Us during the Coverage Period of this Passeport Tranquillité Service Programme. The Coverage Period begins on Your Coverage Period Start Date and ends on Your Coverage Period End Date, as shown on Your Coverage Letter.

Coverage under this Passeport Tranquillité Service Programme will not begin until Your Authorized Bugatti Vehicle no longer has coverage under any existing limited or manufacturer's warranty. Should Your Authorized Bugatti Vehicle have such coverage at the time of Your purchase of the Passeport Tranquillité Service Programme, coverage under the Passeport Tranquillité Service Programme will commence on the first day of the expiration of the limited or manufacturer's warranty, as indicated on Your Coverage Letter.

## VI. EXCLUSIONS AND LIMITATIONS

### A. General Service Contract Service Exclusions:

**Service Contract Services under this Passeport Tranquillité Service Programme will not be provided for:**

1. **Damage to the vehicle, malfunctions or damage to vehicle components which occurred while participating in a race or happened under race-like conditions e.g., on a racetrack.**
2. **Damage or malfunctions caused by modifications to the Bugatti Approved Vehicle, particularly by fundamental or structural changes, such as converting the vehicle to cabriolet, installing a glass roof, or similar structural changes.**
3. **Any work performed by a person other than an Authorized Bugatti Partner, including any mechanical or structural repairs or work.**
4. **Damage caused by industrial air pollution (e.g., acid rain), bird droppings, stones, flood water, storms, tree sap or similar.**
5. **Vehicles which have been made up from or repaired parts of another secondhand car.**
6. **Heavily damaged Bugatti Approved Vehicles or those declared a total write off by an insurance company.**
7. **Damage or malfunctions which result from intentional or unintentional misfuelling, rear-impact crashes or modifications to the Bugatti Approved Vehicle such as among other things installing engine management assemblies not approved by Bugatti.**
8. **Damage or malfunctions by continuing to operate the Bugatti Approved Vehicle after a warning indicator, a display or another warning had indicated a mechanical or operational problem.**
9. **Damage to glass unless it is due to a material or processing fault by the manufacturer.**
10. **Tires or wheel balancing, general adjustments, de-carbonation, batteries, bulbs, water ingress, exhaust system and wiper arms and blades.**
11. **Normal maintenance services or replacement of service items; including but not limited to spark plugs, oil filters, lubricants, drive belts and other items fitted in connection with routine servicing.**

### B. Chiron Service Contract Coverage Exclusions:

**Service Contract Services under this Passeport Tranquillité Service Programme will not be provided for:**

1. **The costs associated with parts and labour for scheduled maintenance work, exterior care, servicing measures such as cleaning and polishing, wheel alignment, changing tires or balancing wheels, refilling / changing oil, fluids, or coolant.**
2. **Individual parts such as brake pads, windscreen wiper blades, bulbs, fuses, spark plugs, filters, belts, worn seat covers and other decorative and designer individual parts which are won by normal use or wear.**
3. **Damage or malfunctions which arise from improper repair of the vehicle.**
4. **Damage or malfunctions from installing parts which are not original Bugatti parts and which affect the technical properties of the Bugatti Approved Vehicle.**
5. **Damage or malfunctions from changes to the Bugatti Approved Vehicle (including the engine management system) as well as accessories such as alarm systems, remote starters, roof racks or communication devices.**
6. **Damage or malfunctions from defects or failures due to the use of new parts not sold or approved by Bugatti.**
7. **Damage or malfunctions from old parts or from damaging associated parts or systems.**
8. **Damage or malfunctions caused by not following the servicing and use recommendations in the Bugatti Approved Vehicle operating instructions and in the Owner's Manual**
9. **This Passeport Tranquillité Service Programme does not apply to Vehicles or individual parts and accessories not sold by Bugatti.**

### C. Veyron Exclusions:

**Service Contract Services under this Passeport Tranquillité Service Programme will not be provided for:**

1. **Damage or malfunctions to bodywork (interior or exterior), paintwork, wheels, glass, and cosmetic finishers.**

2. **Deterioration of any soft trim (including convertible vehicle soft tops) and appearance of items due to normal wear and prolonged exposure.**
3. **Renewal of brake calipers and brake pads due to general wear or abnormal use of the brakes.**
4. **Renewal of any clutch component due to incorrect adjustment, misuse or general wear and tear.**
5. **Cleaning of fuel lines, filters, injectors, pumps, or any other component within the fuel delivery system including damage to components resulting from the use of incorrect or contaminated fuel.**
6. **Damage or malfunctions which have been caused by modifications to the chassis, such as installing additional springs, additional shock absorbers or lowering the Bugatti Approved Vehicle.**
7. **Custom made products inside and outside which were manufactured based on a special request by You but approved by Us (e.g., a special color of paint or leather or materials previously never used before) are excluded from this Passeport Tranquillité Service Programme. However, the technical and functional safety of the new developments are not excluded.**
8. **This Agreement does not apply to Vehicles or individual parts and accessories not sold by Bugatti.**

**CONSEQUENTIAL AND INCIDENTAL DAMAGES ARE EXCLUDED. Some states do not allow the exclusion or limitation of consequential and incidental damages. Therefore, such limitations or exclusions may not apply to You. No expressed guarantees given other than that stated herein. This Passeport Tranquillité Service Programme gives you specific legal rights. You may have other rights, which vary from state to state.**

**WE RESERVE THE RIGHT TO DENY ANY CLAIM SUBMITTED WITH FALSE OR MISLEADING INFORMATION, OR IF THE DOCUMENTATION DOES NOT CLEARLY IDENTIFY THE ORIGINAL PURCHASER, VEHICLE OR TIRES. ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY OBLIGOR, FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE, INCOMPLETE, OR MISLEADING INFORMATION MAY BE GUILTY OF A CRIME AND SUBJECT TO CIVIL AND/OR CRIMINAL SANCTIONS.**

**LIMITATION OF LIABILITY: THIS PASSEPORT TRANQUILLITÉ SERVICE PROGRAMME SETS OUT THE FULL EXTENT OF OUR RESPONSIBILITIES, AND THE EXCLUSIVE REMEDY REGARDING YOUR VEHICLE. THE OBLIGOR SHALL NOT BE LIABLE FOR SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES (INCLUDING DAMAGES FOR LOSS OF BUSINESS PROFITS, BUSINESS INTERRUPTION, EXPENSES ARISING OUT OF THIRD PARTY CLAIMS, LOSS OF USE OF THE VEHICLE, INCONVENIENCE, OR ANY OTHER LOSS), WHETHER OR NOT CAUSED BY OR RESULTING FROM BREACH OF CONTRACT, NEGLIGENCE, OR OTHER WRONGFUL ACT OR OMISSION, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE OBLIGOR DOES NOT AUTHORIZE ANY PERSON, ENTITY OR AUTHORIZED BUGATTI PARTNER TO CREATE FOR THEM ANY OTHER OBLIGATION OR LIABILITY IN CONNECTION WITH THIS PASSEPORT TRANQUILLITÉ SERVICE PROGRAMME.**

## VII. CANCELLATION

You may return this Passeport Tranquillité Service Programme to the Selling Dealer within thirty (30) days of the Coverage Period Start Date. If no claim has been made under the Passeport Tranquillité Service Programme, the Passeport Tranquillité Service Programme is void and You shall receive a refund of the full price paid for the Passeport Tranquillité Service Programme.

We may cancel this Passeport Tranquillité Service Programme for non-payment of the Purchase Price to the Authorized Bugatti Partner or for material misrepresentation or fraud at time of sale.

## VIII. General Provisions

### A. Transfer of Passeport Tranquillité Service Programme

**The balance of this Passeport Tranquillité Service Programme may be transferred to another private owner through retail transaction.**

We do not charge a fee for this transfer. We do require that notice be provided to Us either by contacting an Authorized Bugatti Dealer or by contacting Us directly.

This Passeport Tranquillité Service Programme is not valid on sales by any non-authorized commercial dealer or broker. If this Authorized Bugatti Vehicle is traded to a non-Authorized Bugatti Partner or broker for resale purposes, the Passeport Tranquillité Service Programme is void if the new owner fails to obtain the Maintenance Services.

If You sell Your Vehicle, the Owner's Manual, and this Passeport Tranquillité Service Programme should be left in the Vehicle to make all operating safety and maintenance information available to the next owner.

### B. Selling Dealer

If Your Selling Dealer ceases to operate a Bugatti franchise or withdraws from operating within the requirements of the Passeport Tranquillité Service Programme, then We will work directly with You to identity a suitable alternative Bugatti Authorized Partner for You to transfer the Service Contract and Maintenance Services. Solely in these specific instances will

We cover any additional transport related costs incurred or anticipated by engagement with another Bugatti Authorized Partner who is further away from the registered keeper address of the Bugatti Approved Vehicle than the original Authorized Bugatti Partner.

**C. Modification**

We will provide You with written notification of any material changes to this Passeport Tranquillité Service Programme at least thirty (30) days in advance of the implementation of such changes. You may not receive a notice when the changes are favorable to You or when changes are mandated by a regulatory agency.

## IX. ADDRESS CHANGE

If You change Your address, or if You bought this Bugatti Approved Vehicle used, be sure to Notify Us in writing regarding Your new address. You may also notify an Authorized Bugatti Partner of such change.

## X. DISPUTE RESOLUTION/ARBITRATION AGREEMENT and CLASS ACTION WAIVER

We have a commitment to You and Your satisfaction. From Your first phone call or visit to Your Authorized Bugatti Partner, through the purchase and delivery of Your new Bugatti Approved Vehicle, to parts & service, Your satisfaction is Our number one objective.

If You should experience a problem that has not been resolved to Your satisfaction through Our Authorized Bugatti Partner, all disputes will be settled in accordance with the Arbitration Section below.

**A. Arbitration**

Except as otherwise specified below, all actions, disputes, claims and controversies under common law, statutory law or in equity of any type or nature whatsoever, whether arising before or after the date of this Passeport Tranquillité Service Programme, and whether directly or indirectly relating to: (a) this Passeport Tranquillité Service Programme and/or any amendments and addenda hereto, or the breach, invalidity or termination hereof; (b) any previous or subsequent agreement between the parties; and/or (c) any other relationship, transaction or dealing between the parties (collectively the "Disputes"), will be subject to and resolved by non-binding arbitration pursuant to the Arbitration Rules of U.S. Arbitration & Mediation, (www.usam.com). In the event either party is dissatisfied with the decision reached by the arbitrators, such party may pursue adjudication of the dispute in a court of law. Each party shall be responsible for his or its own attorneys' fees and costs, and the fees and costs of the arbitrator or mediator shall be paid equally by each party.

## XI. INSURANCE STATEMENT

**THE OBLIGOR'S OBLIGATIONS TO PERFORM UNDER THIS SERVICE CONTRACT ARE BACKED BY THE FULL FAITH AND CREDIT OF THE OBLIGOR. THEY ARE NOT GUARANTEED UNDER A SERVICE CONTRACT REIMBURSEMENT POLICY, EXCEPT AS SPECIFICALLY DESIGNATED IN THE STATE DISCLOSURE SECTION BELOW.**

DRAFT

# BUGATTI PASSEPORT TRANQUILLITÉ Service Programme
RETAILER AGREEMENT
ANNEX A

## COVERAGE LETTER

<<Mailing Month/Day, YYY>>
<<Contract Holder Name>>
<<Street Address>>
<<City>>, <<ST>>, <<ZIP>>

[insert logo]

Thank you for purchasing your service contract package from <<Authorized Bugatti Partner>>! BUGATTI is committed to providing an exceptional, high-quality ownership experience. BUGATTI vehicles are the pinnacle of performance. However, to keep your Bugatti vehicle in optimal condition, it is essential to have periodic inspections and maintenance performed. The Passeport Tranquillité Service Programme is designed specifically to deliver this care in a convenient package.

Additional details regarding specific coverages, exclusions, and limitations for your Passeport Tranquillité Service Programme are provided in the enclosed Terms & Conditions. Should you have any questions regarding your plan's coverage, please contact us at customerservice.americas@bugatti.us or 818-309-8161

The table below will outline the specific plan details regarding your purchase. It will be essential to keep a copy of this information in your records if you need to contact us.

| | | | |
|---|---|---|---|
| VIN: | <<variable>> | Purchase Price: | <<variable>> |
| Model Year: | <<variable>> | Coverage Period Start Date: | <<variable>> |
| Model: | <<variable>> | Coverage Period End Date: | <<variable>> |
| Mileage: | <<variable>> | Trade Call Fee: | <<variable>> |
| Plan Selected: | <<variable>> | Duration of Coverage | <<variable>> |

To schedule a service appointment, please contact your Authorized Bugatti Partner at <<URL>> or <<Toll Free Number>>

Once again we would like to take this opportunity to thank you for your continued commitment to the BUGATTI Brand and we wish you many years of enjoyment in your BUGATTI.

Vive la marque !

<<Authorized BUGATTI Partner>>

# ANNEX B

## Bugatti Veyron and Chiron Passeport Tranquillité Service Programme MSRP and Retailer Pricing 2022

| Passeport Tranquillité Product | 2022 MSRP (per vehicle) | 2022 Retailer Price (per vehicle) |
|---|---|---|
| Veyron 2 Year Active | $38,000 | $38,000 |
| Veyron 2 Year Collector (less than 200 kilometers / 125 miles per year) | $18,400 | $18,400 |
| Veyron 4 Year Active | $72,450 | $72,450 |
| Veyron 4 Year Collector (less than 200 kilometers / 125 miles per year) | $57,400 | $57,400 |
| Veyron Set of Tires | $31,500 | $31,500 |
| Chiron 4 Year Active | $71,900 | $71,900 |
| Chiron Set of Tires | $13,800 | $13,800 |

Retailers will receive a Sales Commission for the sale of any Maintenance Product of 1% of the Retailer Price. The 1% commission will be calculated against the published Retailer Price for the product shown above in the table. The 1% will be awarded to the Retailer by way of BUGATTI invoicing the Retailer for the value of the Retail Price of the product sold minus 1%.

As an example, a Veyron 4 Year Active product sold would result in the Retailer being invoiced $71,676 against a Retailer Price in 2022 of $72,450. As a result, the Retailer receives in this example a Sales Commission of $724.

All prices shown above assume that the first service delivered within the Passeport Tranquillité is within 2022 with the exception of the Chiron 4 Year Active where the first service is assumed to be delivered in 2023.

## ANNEX C

### Passeport Tranquillité Service Programme Order Form Examples

BUGATTI

**Passeport Tranquilité - Purchase Order**

Partner:

Wednesday, April 06, 2022

**Customer Information**

Create PDF

Title:
Last Name:
First Name

Street & No.:
Zip Code & Town:
Country:

| VIN | Short VIN | Type of service package | Sets of Tires | Package Price | Tires | Total Price Per Package | Last Service Date | Mileage (km) |
|---|---|---|---|---|---|---|---|---|
| | | | | | | $ - | | |
| | | | | | | $ - | | |
| | | | | | | $ - | | |
| | | | | | | $ - | | |
| | | | | | | $ - | | |
| | | | | | | $ - | | |
| | | | | | | $ - | | |
| | | | | | | $ - | | |
| | | | | | | $ - | | |
| | | | | | | $ - | | |
| | | | | | | $ - | | |
| | | | | | | $ - | | |
| **Grand total** | | | | $ - | $ - | $ - | | |
| **Sales Commission for BUGATTI Partner** | | | | | | $ - | | |
| **Invoice Value towards BUGATTI Partner** | | | | | | $ - | | |

**Partner Representative:**
Name & Signature:
Date:

**Bugatti Representative:**
Name & Signature:
Date:

# BUGATTI PASSEPORT TRANQUILLITÉ Service Programme

RETAILER AGREEMENT
ANNEX C

| Record Typ | Short VIN | | Planned Services | | | |
|---|---|---|---|---|---|---|
| | | | Service 1 | Service 2 | Service 3 | Service 4 |
| | 0 | Month/Year | | | | |
| | | Service Type | | | | |
| | 0 | Month/Year | | | | |
| | | Service Type | | | | |
| | 0 | Month/Year | | | | |
| | | Service Type | | | | |
| | 0 | Month/Year | | | | |
| | | Service Type | | | | |
| | 0 | Month/Year | | | | |
| | | Service Type | | | | |
| | 0 | Month/Year | | | | |
| | | Service Type | | | | |
| | 0 | Month/Year | | | | |
| | | Service Type | | | | |
| | 0 | Month/Year | | | | |
| | | Service Type | | | | |
| | 0 | Month/Year | | | | |
| | | Service Type | | | | |
| | 0 | Month/Year | | | | |
| | | Service Type | | | | |
| | 0 | Month/Year | | | | |
| | | Service Type | | | | |
| | 0 | Month/Year | | | | |
| | | Service Type | | | | |

## ANNEX D

### 110 Point Vehicle Inspection Checklist Form Example

# BUGATTI PASSEPORT TRANQUILLITÉ Service Programme
RETAILER AGREEMENT
ANNEX D

BUGATTI

**110 POINT VEHICLE INSPECTION FORM: Passeport Tranquillité Extended Service Application**

| | | | |
|---|---|---|---|
| **Partner:** | | **VIN:** | |
| **Inspection Technician:** | | **Model:** | |
| **Date:** | | **Derivative:** | |
| **Mileage Vehicle Arrival:** | | **Mileage Vehicle Departure:** | |

**INSTRUCTIONS:**
Please complete the Partner and Vehicle details above and check the relevant right hand-side box. **Detailed explanations on each point can be found below this checklist.** Additional road test & diagnostic documents to be attached.

Please use the number reference for any comments that are made at the ADDITIONAL COMMENTS at the bottom of this checklist.

**NB: Photos must be taken as specified by the photo item list in the Operations Description.**

**LEGEND:** This checklist shall be used for all derivitaves of Bugatti Veyron series, Chiron and One-off's and the following abbreviations shal be used: (Veyron Grand Sport: **GS**) (Veyron Grand Sport Vitesse: **GSV**)

***Defective: In case of defective item, please submit photographic evidence (*All photos must be no less than 4mb*)**

| | GENERAL VEHICLE INFORMATION | OK | Missing | Defective* | Comments | Bugatti Approval |
|---|---|---|---|---|---|---|
| 1 | VIN | ☐ | ☐ | ☐ | | ☐ |
| 2 | Service history | ☐ | ☐ | ☐ | | ☐ |
| 3 | Recall and service campaign | ☐ | ☐ | ☐ | | ☐ |

| | VEHICLE ACCESSORIES | OK | Missing | Defective* | Comments | Bugatti Approval |
|---|---|---|---|---|---|---|
| 4 | Handover box | ☐ | ☐ | ☐ | | ☐ |
| 5 | Leather key | ☐ | ☐ | ☐ | | ☐ |
| 6 | Speedkey | ☐ | ☐ | ☐ | | ☐ |
| 7 | Vallet (service) key | ☐ | ☐ | ☐ | | ☐ |
| 8 | Owner's manuals | ☐ | ☐ | ☐ | | ☐ |
| 9 | First aid kit | ☐ | ☐ | ☐ | | ☐ |
| 10 | Warning vests (x2) | ☐ | ☐ | ☐ | | ☐ |
| 11 | Licence plate holder | ☐ | ☐ | ☐ | | ☐ |
| 12 | Warning triangle | ☐ | ☐ | ☐ | | ☐ |
| 13 | Fire extinguisher | ☐ | ☐ | ☐ | | ☐ |
| 14 | Towing eye | ☐ | ☐ | ☐ | | ☐ |
| 15 | Hook grille cover | ☐ | ☐ | ☐ | | ☐ |
| 16 | Internal hex wrench for emergency release/transmission parking lock | ☐ | ☐ | ☐ | | ☐ |
| 17 | Battery charger and storage bag/box | ☐ | ☐ | ☐ | | ☐ |
| 18 | Special equipment (e.g. valve extention, wheel bolt cover puller) | ☐ | ☐ | ☐ | | ☐ |
| 19 | Air compressor for tyre inflation | ☐ | ☐ | ☐ | | ☐ |
| 20 | Car cover and storage bag | ☐ | ☐ | ☐ | | ☐ |
| 21 | *Roof spoiler and top teaser cover (Veyron GSV only)* | ☐ | ☐ | ☐ | | ☐ |
| 22 | *Windschott and storage bag (Veyron GSV only)* | ☐ | ☐ | ☐ | | ☐ |
| 23 | *Soft top and holder (Veyron GS + GSV only)* | ☐ | ☐ | ☐ | | ☐ |
| 24 | *Air intake protection (Veyron GS + GSV only)* | ☐ | ☐ | ☐ | | ☐ |
| 25 | *Roof support (Veyron GS + GSV only)* | ☐ | ☐ | ☐ | | ☐ |

# BUGATTI PASSEPORT TRANQUILLITÉ Service Programme
RETAILER AGREEMENT
ANNEX D

BUGATTI

**110 POINT VEHICLE INSPECTION FORM: Passeport Tranquillité Extended Service Application**

| VEHICLE EXTERIOR | | OK | Missing | Defective* | Comments | Bugatti Approval |
|---|---|---|---|---|---|---|
| 26 | Exterior | | | | | |
| 27 | Body panels | | | | | |
| 28 | Front and rear windsheild | | | | | |
| 29 | Windows | | | | | |
| 30 | Windsheild wipers | | | | | |
| 31 | Rear wing and rams | | | | | |
| 32 | Horseshoe | | | | | |
| 33 | Air intakes | | | | | |
| 34 | Side mirrors | | | | | |
| 35 | Powder coated engine cover | | | | | |
| 36 | Doors and doorhandles | | | | | |
| 37 | Bugatti emblem & EB-logo rear bumper | | | | | |
| 38 | Exterior lighting and markers | | | | | |
| 39 | Fuel and oil flaps | | | | | |
| 40 | Fuel and oil inner caps | | | | | |
| 41 | *Roof (Veyron GS & GSV only)* | | | | | |
| 42 | *Rear bumper (US spec only)* | | | | | |

| VEHICLE INTERIOR | | OK | Missing | Defective* | Comments | Bugatti Approval |
|---|---|---|---|---|---|---|
| 43 | Interior | | | | | |
| 44 | Steering wheel and stitching | | | | | |
| 45 | Hand & middle glove compartment | | | | | |
| 46 | Middle console | | | | | |
| 47 | Pocket & handle inner parts | | | | | |
| 48 | Interior mirror | | | | | |
| 49 | Sun visors | | | | | |
| 50 | Armrests | | | | | |
| 51 | Gearshift | | | | | |
| 52 | Front seats | | | | | |
| 53 | Interior clock | | | | | |
| 54 | Foot pedals | | | | | |
| 55 | Carpets | | | | | |
| 56 | Interior lighting | | | | | |
| 57 | Security belt | | | | | |
| 58 | Door sills | | | | | |
| 59 | Climate control | | | | | |
| 60 | Inner door handles | | | | | |
| 61 | Release levers (hood/luggage compartment/filler lids) | | | | | |
| 62 | Luggage compartment | | | | | |
| 63 | Airbag | | | | | |

# BUGATTI PASSEPORT TRANQUILLITÉ Service Programme
RETAILER AGREEMENT
ANNEX D

BUGATTI

**110 POINT VEHICLE INSPECTION FORM: Passeport Tranquillité Extended Service Application**

| | VEHICLE TECHNICAL | OK | Missing | Defective* | Comments | Bugatti Approval |
|---|---|---|---|---|---|---|
| 64 | Wheels | | | | | |
| 65 | Tyres | | | | | |
| 66 | Decorative wheel cover | | | | | |
| 67 | Brake calipers | | | | | |
| 68 | Brake discs | | | | | |
| 69 | Brake heatshields | | | | | |
| 70 | Radiators, fans and air intakes | | | | | |
| 71 | Exhaust system | | | | | |
| 72 | Engine and its components from the top | | | | | |
| 73 | Engine air filter | | | | | |
| 74 | Engine drive belt | | | | | |
| 75 | Fuel circuit | | | | | |
| 76 | Gearbox | | | | | |
| 77 | Gearbox pump | | | | | |

| | VEHICLE UNDERSIDE | OK | Missing | Defective* | Comments | Bugatti Approval |
|---|---|---|---|---|---|---|
| 78 | Front vehicle undercover and spoiler | | | | | |
| 79 | Middle vehicle undercover | | | | | |
| 80 | Rear vehicle undercover | | | | | |
| 81 | Diffusor strikes | | | | | |
| 82 | Front high speed flap | | | | | |
| 83 | Ball joints | | | | | |
| 84 | Tie rods | | | | | |
| 85 | Front drive axle | | | | | |
| 86 | Power distribution | | | | | |
| 87 | HVAC system | | | | | |
| 88 | Rear axle | | | | | |

| | VEHICLE ELECTRICAL | OK | Missing | Defective* | Comments | Bugatti Approval |
|---|---|---|---|---|---|---|
| 89 | Battery | | | | | |
| 90 | Electric plug and adaptor for battery charger | | | | | |
| 91 | 12V Power supply | | | | | |
| 92 | Instruments cluster panel (Combi) | | | | | |
| 93 | Audio system | | | | | |
| 94 | IPOD/USB | | | | | |
| 95 | Bluetooth | | | | | |
| 96 | Car horn | | | | | |
| 97 | PDC (front and rear) | | | | | |
| 98 | Rearview camera | | | | | |
| 99 | All switches | | | | | |
| 100 | Anti-theft alarm system | | | | | |
| 101 | Navigation | | | | | |
| 102 | *PDA (Veyron series only)* | | | | | |

# BUGATTI PASSEPORT TRANQUILLITÉ Service Programme
RETAILER AGREEMENT
ANNEX D

BUGATTI

**110 POINT VEHICLE INSPECTION FORM: Passeport Tranquillité Extended Service Application**

| FLUID LEVELS | OK | Missing | Defective* | Comments | Bugatti Approval |
|---|---|---|---|---|---|
| 103 Brake fluid | ☐ | ☐ | ☐ | | ☐ |
| 104 Washer fluid | ☐ | ☐ | ☐ | | ☐ |
| 105 Hydraulic oil system | ☐ | ☐ | ☐ | | ☐ |
| 106 Engine oil level | ☐ | ☐ | ☐ | | ☐ |
| 107 Coolant level | ☐ | ☐ | ☐ | | ☐ |
| 108 Gearbox oil level | ☐ | ☐ | ☐ | | ☐ |

| VEHICLE DIAGNOSTICS | OK | Missing | Defective* | Comments | Bugatti Approval |
|---|---|---|---|---|---|
| 109 DTC memory | ☐ | ☐ | ☐ | | ☐ |

| ROAD TEST | OK | Not OK | Incomplete | Comments | Bugatti Approval |
|---|---|---|---|---|---|
| 110 Test drive checklist | ☐ | ☐ | ☐ | | ☐ |

**ADDITIONAL COMMENTS**

**ADDITIONAL INFORMATION (Only to be completed by BUGATTI Automobiles S.A.S.)**

Transport Date:

Transport Mileage:

**Company stamp & Signatures:**

| Service Technician | Service Manager | Bugatti Technical |
|---|---|---|

Page 4 of 9

# BUGATTI PASSEPORT TRANQUILLITÉ Service Programme

RETAILER AGREEMENT
ANNEX D

BUGATTI

## OPERATIONS DESCRIPTIONS

### GENERAL VEHICLE INFORMATION

| | | |
|---|---|---|
| 1 | **VIN** | Cross check with another VIN on the vehicle, eg. Windshelid, Salesforce CRM and vehicle paperwork. Also verify the marketing plate |
| 2 | Service history | Verify on Salesforce or compare with the owner's manual |
| 3 | Recall and service campaign | Check and assure all open Recall and Service Campaigns are complete |

### VEHICLE ACCESSORIES

| | | |
|---|---|---|
| 4 | Handover box | Check if it is present and if it is matching the interior configuration colour |
| 5 | Leather key | Check the function (Start the vehicle) and check that the leather colour matches the interior colour. Take photo |
| 6 | Speedkey | Insert in speed key slot and check the functionality. Take photo |
| 7 | Valet (service) key | Check function. Take photo |
| 8 | Owner's manual | Check if it is present and if the contents contain the service history etc |
| 9 | First aid kit | Check if it is present. Very NB: note the expiry date of contents and if the region requires it. Replace if necessary |
| 10 | Warning vests (x2) | Check if they are present and check for any damage to the refective material |
| 11 | Licence plate holder | Check if the front (and rear if applicable) is present and if it is matching the country specific |
| 12 | Warning triangle | Check if it is present and check the condition |
| 13 | Fire extinguisher | Check if it is present and verify the country specific. Very NB: note the expiry date. If expired, it must be replaced |
| 14 | Towing eye | Check if it is present and check the condition |
| 15 | Hook grille cover | Check if it is present and check the condition |
| 16 | Internal hex wrench for emergency release/transmission parking lock | Check if it is present and check the condition |
| 17 | Battery charger and storage bag/box | Check if it is present and check the function. Check for any damage to the bag or the blue box for Veyron |
| 18 | Special equipment (e.g. valve extention, wheel bolt cover puller) | Check if present and check the condition |
| 19 | Air compressor for tyre inflation | Check the function. Check if the liquid puncture repair bottle is present and note the expiry date |
| 20 | Car cover and storage bag | Check if it is present, fit and check for damage. Check the bag for damage |
| 21 | *Roof spoiler and top water cover (Veyron GSV only)* | *Check if it is present and if the leather colour matches the interior, and that there are no tears in the material. Check the fit of the roof spoiler* |
| 22 | *Windschott and storage bag (Veyron GSV only)* | *Check if it is present, check the fit and if it is the correct condition. Check the condition of the bag* |
| 23 | *Soft top and holder (Veyron GS + GSV only)* | *Check all umbrella functions* |
| 24 | *Air intake protection (Veyron GS + GSV only)* | *Check if present and check the condition* |
| 25 | *Roof support (Veyron GS + GSV only)* | *This is the mount for the garage wall. Check if it is present and the fit of the roof* |

# BUGATTI PASSEPORT TRANQUILLITÉ Service Programme

RETAILER AGREEMENT
ANNEX D

## VEHICLE EXTERIOR

| | | |
|---|---|---|
| 26 | Exterior | Thoroughly check the vehicle exterior for cleanliness, and clean if necessary. Inspect the paintwork for defects. Take the applicable photos (not less than 4mb) as per the guide below |






## VEHICLE EXTERIOR continued...

| | | |
|---|---|---|
| 27 | Body panels | Visually inspect the alignment and fit of all body panels |
| 28 | Front and rear windshield | Inspect the front and rear windshield very carefully: inspect for any cracks, chips and excessive scratches or sand marks |
| 29 | Windows | Check power function run the full operation of each. Check for damage |
| 30 | Windshield wipers | Check the condition and take a photo of the wiper arms. Check the condition of the blades. Check the function of all wiper settings and check the washer function |
| 31 | Rear wing and rams | Check the aesthetics, the function and the condition of both the wing and the rams. Check for any leaks. Take a photo of both rams |
| 32 | Horseshoe | Check for any scratches and for damage |
| 33 | Air intakes | Check for any scratches and for damage |
| 34 | Side mirrors | Check function and check mirror glass for damage from any impact |
| 35 | Powder coated engine cover | Check for any scratches, discolouration and for damage |
| 36 | Doors and doorhandles | Check the full operating movement and check the locking system, including the remote system |
| 37 | Bugatti emblem & EB-logo rear bumper | Check for any scratches and for damage |
| 38 | Exterior lighting and markers | Check the condition and the function. Check that they are free from any moisture, scratches cracks and other damage. Check the headlight alignment and adjust if necessary |
| 39 | Fuel and oil flaps | Check the function of the locking system |
| 40 | Fuel and oil inner caps | Check the function and verify that they are original |
| 41 | *Roof (Veyron GS & GSV only)* | *Remove, and check the locking functions. Make sure the roof is free from scratches and discolouration and other damage* |
| 42 | *Rear bumper (US spec only)* | *Check if it is present and check the condition* |

## VEHICLE INTERIOR

| | | |
|---|---|---|
| 43 | Interior | Thoroughly check the vehicle interior for cleanliness, and clean if necessary. Take the applicable photos as per the guide below |




# BUGATTI PASSEPORT TRANQUILLITÉ Service Programme

RETAILER AGREEMENT
ANNEX D

## VEHICLE INTERIOR continued...

| | | |
|---|---|---|
| 44 | Steering wheel and stitching | Check the full operation and check that it is free from wear, stains and/or cracks and free from any stitching damage. Check the lock and tilt/telescopic system |
| 45 | Hand & middle glove compartment | Check the operation and the locking function. Check for any onboard documents |
| 46 | Middle console | Check that it is free from wear, stains and/or cracks and free from any stitching damage |
| 47 | Pocket & handle inner parts | Check that they are free from wear, stains and/or cracks and free from any stitching damage |
| 48 | Interior mirror | Check the function and for any cracks in the mirror glass |
| 49 | Sun visors | Check the full operation and check that they are free from wear, stains and/or cracks and free from any stitching damage |
| 50 | Armrests | Check the full operation and check that they are free from wear, stains and/or cracks and free from any stitching damage |
| 51 | Gearshift | Check the full operation and check it is free from wear, stains and/or cracks and free from any stitching damage |
| 52 | Front seats | Check the cleanliness, the full operation and for any damage to the stitching etc. Check the heating function if applicable and check the lumbar support and seatback angle adjustment |
| 53 | Interior clock | Check adjustment function and set to the correct time if necessary |
| 54 | Foot pedals | Check the full operation. Check for any play and for damage |
| 55 | Carpets | Check cleanliness and and for any damage. Make sure there are no burn marks, cuts or excessive wear |
| 56 | Interior lighting | Check the function and for any damage including the Courtesy/Vanity lighting. Replace if necessary |
| 57 | Security belt | Check the full operation by rolling and unrolling fully and check that they are free from wear, stains and/or cracks and free from any stitching damage |
| 58 | Door sills | Check for any scuffs, scratches and damage |
| 59 | Climate control | Run and the check the full functional range. Make sure there is no dust exiting the vents |
| 60 | Inner door handles | Check the operational function and for any damage |
| 61 | Release levers (hood/luggage compartment/filler lids) | Check the operational function |
| 62 | Luggage compartment | Inspect for cleanliness and for damage. Check the lighting function |
| 63 | Airbag | Visual inspection for damage and if the area around it is free and clear |

## VEHICLE TECHNICAL

| | | |
|---|---|---|
| 64 | Wheels | Check the overall appearance and for any curb damage. Check for any damage to the hubcaps and verify the torque tightening. Adjust if necessary. Take photo of all |
| 65 | Tyres | Check the condition, date (DOT) and tread depth (Minimum depth: 1,6mm) and take a photo of this. Take the valve pressure and correct if necessary (Use the PDA) |
| 66 | Decorative wheel cover | Check if mounted and install if necessary |
| 67 | Brake calipers | Take a photo of all. Perform a visual check for defects and fluid leaks and make sure they do not show signs of excessive damage and check that they perform properly. (Road test) |
| 68 | Brake discs | Take a photo of all. Perform a visual check for defects and make sure they do not show signs of excessive damage and check that they perform properly (Road test) |
| 69 | Brake heatshields | Check for any damage |
| 70 | Radiators, fans and air intakes | Check and clean if necessary |
| 71 | Exhaust system | Check for any overall damage, support damage and for any visible leaks |
| 72 | Engine and its components from the top | Check for leaks and defects. Listen for unnatural noises whilst the engine is running. NB: Log the Engine number in the Comments section and take a photo |
| 73 | Engine air filter | Check the cleanliness |

# BUGATTI PASSEPORT TRANQUILLITÉ Service Programme
RETAILER AGREEMENT
ANNEX D

## VEHICLE TECHNICAL continued...

| | | |
|---|---|---|
| 74 | Engine drive belt | Check for any contamination and cracks. Check for noise whilst running |
| 75 | Fuel circuit | Check for any visible leaks |
| 76 | Gearbox | NB: Extract the list of all gearbox measurement blocs with ODIS and submit document with the pre-approval process |
| 77 | Gearbox pump | Check for any visible leaks and check that there is no specific noise whilst running |

## VEHICLE UNDERSIDE

| | | |
|---|---|---|
| 78 | Front vehicle undercover and spoiler | Take a photo. Perform visual check for scratches damage, leaks and defects. Remove and check rust levels of all parts, screws or nuts and replace if necessary. Clean before handover |
| 79 | Middle vehicle undercover | Take a Photo. Perform visual check for damage, leaks and defects. Remove and check rust levels of all parts, screws or nuts and replace if necessary. Clean before handover |
| 80 | Rear vehicle undercover | Take a Photo. Perform visual check for damage, leaks and defects. Remove and check rust levels of all parts, screws or nuts and replace if necessary. Clean before handover |
| 81 | Diffusor strikes | Check for any damage |
| 82 | Front high speed flap | Check for any damage |
| 83 | Ball joints | Check boots for any leaks and defects |
| 84 | Tie rods | Check for play, fixing and damaged boots |
| 85 | Front drive axle | Check for leaks and any damage |
| 86 | Power distribution | Check for leaks and any defects |
| 87 | HVAC system | Check for leaks and any defects |
| 88 | Rear axle | Check for leaks and any defects |

## VEHICLE ELECTRICAL

| | | |
|---|---|---|
| 89 | Battery | Check terminals for proper seating (connect the battery terminal clamps after a transport). Check the battery level with VW tool that advises acceptable level. Replace if necessary |
| 90 | Electric plug and adaptor for battery charger | Check if it is present and that it is country specific |
| 91 | 12V Power supply | Check the voltage, if applicable |
| 92 | Instruments cluster panel (Combi) | Check function and operation of warning lights. Make sure all of the indicators operate properly according to standard conditions. Take a photo whilst ignition is on |
| 93 | Audio system | Check the function. Listen to the overall sound quality. Note any hissing, popping, or speakers that do not work properly |
| 94 | IPOD/USB | If this option is present, check the connection |
| 95 | Bluetooth | If this option is present, check the function by pairing it with a device |
| 96 | Car horn | Sound the horn and make sure it is audible as per normal standards |
| 97 | PDC (front and rear) | Check the function |
| 98 | Rearview camera | Check the function |
| 99 | All switches | Check that all switches operate and engage correctly, and check for any damage |
| 100 | Anti-theft alarm system | Check the function |
| 101 | Navigation | If this option is present, check the functions |
| 102 | *PDA (Veyron series only)* | *If this option is present, check the functions* |

*Page 8 of 9*

# BUGATTI PASSEPORT TRANQUILLITÉ Service Programme

RETAILER AGREEMENT
ANNEX D

## FLUID LEVELS

| | | |
|---|---|---|
| 103 | Brake fluid | Check and top up to the correct level if necessary |
| 104 | Washer fluid | Check and top up to the correct level if necessary |
| 105 | Hydraulic oil system | Check for any leaks and top up to the correct level if necessary |
| 106 | Engine oil level | Check and top up to the correct level if necessary |
| 107 | Coolant level | Check and top up to the correct level if necessary |
| 108 | Gearbox oil level | Check and top up to the correct level if necessary |

## VEHICLE DIAGNOSTICS

| | | |
|---|---|---|
| 109 | DTC memory | Check. Erase and fix all mentioned faults. Set and note the readiness code |

## ROAD TEST

| | | |
|---|---|---|
| 110 | Test drive checklist | NB: Complete the relevant road test checks and submit document as part of the pre-approval process |

## PHOTOS TO BE INCLUDED IN THE REPORT:

| | | |
|---|---|---|
| 5 | Leather key | ☐ |
| 6 | Speedkey | ☐ |
| 7 | Valet (service) key | ☐ |
| 26 | Exterior | ☐ |
| 30 | Windsheild wipers | ☐ |
| 31 | Rear wing and rams | ☐ |
| 43 | Interior | ☐ |
| 64 | Wheels | ☐ |
| 65 | Tyres | ☐ |
| 67 | Brake calipers | ☐ |
| 68 | Brake discs | ☐ |
| 72 | Engine and its components from the top | ☐ |
| 78 | Front vehicle undercover and spoiler | ☐ |
| 79 | Middle vehicle undercover | ☐ |
| 80 | Rear vehicle undercover | ☐ |
| 89 | Battery | ☐ |
| 92 | Instruments cluster panel (Combi) | ☐ |

# ANNEX E

## Suggested Repair Times

| SUGGESTED REPAIR TIMES | |
|---|---|
| Veyron Biennial Service | 14 Hours |
| Veyron Annual Service | 32 Hours |
| Chiron Low / Small Service | 14 Hours |
| Chiron Major / 4th Year Service | 72 Hours |

0149257.0751539 4880-5442-0256v2
4/5/2022 2:46 pm

EXHIBIT

6

## AFFIDAVIT

I, Sascha Doering, Chief Operating Officer of RIMAC of the Americas, an operating unit of Volkswagen Group of America, Inc., a New Jersey corporation, hereby acknowledge that the terms or provisions of the form of Retailer Agreement and Standard Provisions to be entered into with Florida-licensed motor vehicle dealers, are not inconsistent with, or contrary to the provisions contained in sections 320.60-320.70, Florida Statutes. The form Retailer Agreement and Standard Provisions provide, and any Retailer Agreement offered to a motor vehicle dealer in the State of Florida shall provide, that all terms and conditions in such agreement inconsistent with the law and rules of the State of Florida are of no force and effect.

Dated March 1st, 2024

Sascha Doering, Chief Operating Officer

STATE OF CALIFORNIA )
COUNTY OF Los Angeles )

I, hereby certify that on March 1st, 2024 before me, the subscriber, a notary public in the State of California, in and for the County of Los Angeles personally appeared, Sascha Doering, and made oath under the penalties of perjury that the matters and facts set forth in this affidavit are true to the best of his knowledge, information and belief.

As witness my hand and notarized seal

See CA Jurat attached KN
NOTARY PUBLIC 3/1/2024

(SEAL)

EXHIBIT

RIMAC

# RETAILER AGREEMENT STANDARD PROVISIONS

## UNITED STATES

# RETAILER AGREEMENT
# STANDARD PROVISIONS

# UNITED STATES

## TABLE OF CONTENTS

Article 1 Basic Obligations of Rimac ........ 1
Article 2 Basic Obligations of Retailer ........ 1
Article 3 Management and Facility Requirements ........ 2
Article 4 Identification; Advertising ........ 2
Article 5 Sales ........ 4
Article 6 Parts and Accessories ........ 7
Article 7 Service ........ 7
Article 8 Retailer's Purchases and Inventories ........ 9
Article 9 Warranty to Customers ........ 12
Article 10 Retailer's Record Keeping and Reports; Inspection of Retailer's Operations ........ 13
Article 11 Retailer Performance Review ........ 14
Article 12 Succeeding Retailers ........ 14
Article 13 Dispute Resolution ........ 17
Article 14 Termination ........ 17
Article 15 Rights and Liabilities upon Termination ........ 20
Article 16 Definitions ........ 23
Article 17 General Provisions ........ 25

# RETAILER AGREEMENT
# STANDARD PROVISIONS

## UNITED STATES

## ARTICLE 1
## BASIC OBLIGATIONS OF RIMAC

### SUPPLY OF AUTHORIZED PRODUCTS

(1) Rimac will sell and deliver Authorized Products to Retailer in accordance with this Agreement.

### ASSISTANCE

(2) Rimac will endeavor to assist Retailer with regard to Retailer's Operations through such means as Rimac considers appropriate. Rimac may, from time to time and at its discretion, provide assistance through such methods, as it deems appropriate, including:

(a) Conducting periodic reviews of Retailer's compliance with this Agreement and the Additional Retailer Documents;

(b) Providing Recommendations; and

(c) Providing classes, special training and meetings for Retailer's personnel.

### COMPLIANCE WITH ETHICAL STANDARDS

(3) In the conduct of its business, Rimac will:

(a) Safeguard and promote the reputation of Authorized Products and the Manufacturer;

(b) Refrain from all conduct which might be harmful to the reputation or marketing of Authorized Products or inconsistent with the public interest; and

(c) Avoid all discourteous, deceptive, misleading, unprofessional or unethical practices.

## ARTICLE 2
## BASIC OBLIGATIONS OF RETAILER

### SALES, SERVICE AND PARTS SUPPLY

(1) Retailer is responsible for the promotion and sale of Authorized Products and for the supply of Genuine Parts and customer service for Authorized Products. This

Agreement does not give Retailer any exclusive right to sell or service Authorized Products in any area or territory.

**COMPLIANCE WITH ETHICAL STANDARDS**

(2) In the conduct of its business, Retailer must:

(a) Safeguard and promote the reputation of Authorized Products, the Manufacturer and Rimac;

(b) Refrain from all conduct which might be harmful to the reputation or marketing of Authorized Products or inconsistent with the public interest; and

(c) Avoid all unlawful, discourteous, deceptive, misleading, unprofessional or unethical practices.

**DISCLAIMER OF FURTHER LIABILITY BY RIMAC**

(3) Except as expressly provided in this Agreement, Rimac is not liable for any expenditure made or liability incurred by Retailer in connection with Retailer's performance of its obligations under this Agreement.

## ARTICLE 3
## MANAGEMENT AND FACILITY REQUIREMENTS

**RETAILER'S MANAGEMENT**

(1) In the conduct of its business, Retailer must have the following minimum staff:

(a) An Authorized Representative, and

(b) Such personnel as set forth in the Additional Retailer Documents.

**RETAILER'S PREMISES**

(2) Retailer's Premises, in sales, service and parts, will conform to the requirements of this Agreement, the Additional Retailer Documents and such other reasonable standards as Rimac may prescribe from time to time, after review with Retailer.

(3) Retailer must operate Retailer's Premises during the hours set forth in the Additional Retailer Documents or, if no such hours are set forth, the customary business hours of the trade in the community in which Retailer operates.

## ARTICLE 4
## IDENTIFICATION; ADVERTISING

**USE OF AUTHORIZED TRADEMARKS**

(1) Subject to the terms and conditions of this Agreement, Rimac grants Retailer the non-exclusive right and license to use Authorized Trademarks at Retailer's Premises and in Retailer's online communications solely in connection with the promotion and sale of new Authorized Products and customer service for Authorized Products, or such other purposes as Rimac specifies in writing.

(a) Retailer will use and display Authorized Trademarks only in the form and manner designated or approved by Rimac in writing.

(b) Rimac will supply Retailer, from time to time, with trademark standards to assist Retailer in the proper usage of Authorized Trademarks, including standards in the Rimac Corporate Identity Guidelines. Retailer must comply with such trademark standards and may use the Authorized Trademarks only to the extent its operations are in compliance with such standards and this Agreement and are consistent with the reputation and tradition of the Authorized Trademarks and the Authorized Products. At Rimac's request, Retailer will provide to Rimac representative samples of Retailer's use of the Authorized Trademarks as necessary for Rimac to verify Retailer's compliance with the trademark standards and this Agreement.

(c) Under no circumstances does Retailer have any authority, license, or permission to use any Authorized Trademark as part of its corporate or entity name, and Retailer agrees it will never do so under any circumstances. Retailer must not use any Authorized Trademark as part of its business name without the prior written consent of Rimac, except that Retailer's assumed name shall be in the form set forth in the Retailer Brand Standards.

(d) Retailer must not register any domain name incorporating Authorized Trademarks or otherwise use Authorized Trademarks in connection with any online profile (on social media, in online directories, or otherwise) without Rimac's prior written authorization.

(e) The license granted under this Agreement to use Authorized Trademarks may not be sublicensed or assigned without Rimac's prior written authorization.

(f) Retailer acknowledges that, as between Retailer and Rimac, Rimac is the owner of all right, title, and interest in, to, and under the Authorized Trademarks, and of all goodwill attached to the Authorized Trademarks. All use by Retailer of Authorized Trademarks will inure to the benefit of Rimac and its licensors. Rimac has the sole right and discretion, but not the obligation, to take any legal or other actions it deems necessary or desirable to protect its or its licensors' interests in Authorized Trademarks.

(g) This Agreement does not grant Retailer any license or permission to use Authorized Trademarks or any other trademark or other intellectual property of Rimac except as specifically granted in this Agreement, and Retailer has no right to grant any such permission or interest to any other person or entity. Retailer has no license or permission to use Authorized Trademarks or any other trademark or other intellectual property of Rimac other than as specifically granted in this Agreement. Retailer will cooperate fully and in good faith with Rimac as necessary for Rimac to secure and preserve its and its licensors' rights in and to all Authorized Trademarks.

**SIGNS**

(2) Retailer must display conspicuously at Retailer's Premises Authorized Signs as set forth in the Additional Retailer Documents and as Rimac reasonably may require. Retailer must use its best efforts to obtain all governmental approvals

necessary for such display. If Retailer transfers any of Retailer's Premises to another location, Retailer immediately must remove all Authorized Signs and other references to Authorized Products displayed at or around the prior location.

**STATIONERY**

(3) Rimac will supply Retailer, from time to time, with stationery and business form standards, including standards in the Rimac Corporate Identification Guidelines. All stationery and business forms used in Retailer's Operations must be prepared in accordance with such standards. Retailer's use of Authorized Trademarks on stationery and business forms must be in accordance with trademark standards supplied by Rimac, including standards in the Rimac Corporate Identity Guidelines.

**ADVERTISING**

(4) Rimac and Retailer recognize the need for maintaining the highest standards of ethical advertising, and that it is of a quality that is consistent with the Rimac Brand in the United States. Accordingly, neither Rimac nor Retailer must publish or cause to be published any advertising relating to Authorized Products that is not in compliance with all applicable Federal, state and local laws, ordinances, rules, regulations and orders or that is likely to mislead, confuse or deceive the public or impair the goodwill of Manufacturer, Rimac or Retailer, or the reputation of Authorized Products or Authorized Trademarks. Retailer shall advertise Authorized Products and customer service for Authorized Products only in accordance with reasonable guidelines and policies established by Rimac. Retailer shall refrain from all false, deceptive, misleading or unlawful advertising. Authorized Trademarks will be used for identification in all product and customer service advertising, in accordance with the provisions of this Agreement. Rimac will provide or sell to Retailer sufficient quantities of all legally required brochures, as well as all current sales, service and parts literature and promotional materials, and Retailer must prominently display them and make them readily available.

## ARTICLE 5
## SALES

**NEW VEHICLE SALES OPERATIONS**

(1) Retailer's new vehicle operations must conform to the requirements of the Additional Retailer Documents and such other reasonable standards as Rimac may prescribe, in consultation with Retailer, or as reasonably established by Rimac

**SALES PROMOTION AND PERFORMANCE**

(2) Retailer must use its best efforts to promote the sale of Authorized Automobiles through regular contacts with owners, users, and prospective owners and users of Authorized Products; through promotion, prospecting, and follow-up programs; and through such means and at such levels as are set forth in the Additional Retailer Documents, as may be indicated by Rimac in consultation with Retailer, or as reasonably may be established by Rimac. Retailer understands and acknowledges that it is of vital importance to the reputation of Authorized Products that such Authorized Products are sold in a manner that promotes consumer satisfaction. Retailer must fully and accurately disclose to its customers all

material information concerning the products and services sold by Retailer and the terms of purchase and sale including, without limitation, the items making up the price of the product or service, the source of products or services and all warranties applicable to the products or services. Retailer must not make any misleading statement or misrepresentation concerning the products or services sold by Retailer, the terms of the sale, the applicable warranties, the source of the products or services or the recommendations or approvals of Rimac or Manufacturer.

(3) Retailer must achieve the best sales performance possible for each model and type of Authorized Automobile. To measure Retailer's performance against such standard, Rimac may from time to time, in its discretion with or without consultation with Retailer, establish sales objectives for Retailer

## SALES OUTSIDE AREA

(4) Subject to Retailer's performance of its obligations under Article 5(2), Retailer may sell Authorized Products within the 50 United States. Retailer understands and acknowledges, however, that it is necessary to preserve the integrity of the orderly worldwide distribution network for the products produced by the Manufacturer, and to maximize customer satisfaction by ensuring that Authorized Products meet the certification and operational standards of the markets for which they are designed. Retailer therefore is authorized to sell new Authorized Products only in the 50 United States, and is not authorized to, and agrees that it will not, sell any new Authorized Product for sale or use elsewhere and will not knowingly assist others in importing or exporting Authorized Products into or from the United States. Retailer agrees that in the event it receives inquiries from prospective customers outside the United States for deliveries outside the United States, Retailer will inform Rimac promptly so that Rimac may ensure that such prospective customers receive prompt follow up from the Rimac distributor authorized in such other country.

## DEFECTIVE OR DAMAGED AUTHORIZED PRODUCTS

(5) If any Authorized Product sold by Rimac to Retailer should become defective or damaged prior to its delivery by Retailer to a customer, Retailer must repair such defect or damage so that such Authorized Product is placed in first-class salable condition prior to such delivery. Retailer immediately must notify Rimac of any substantial defects or damage and must follow such procedures for making damage claims as Rimac may establish from time to time. Rimac shall have the option to repurchase any Authorized Products with substantial defects or damage at the price at which they were originally sold by Rimac, less any prior refunds or allowances made by Rimac and less any insurance proceeds received by Retailer in respect of such defect or damage. Rimac may make an equitable adjustment with respect to damage that Retailer can demonstrate occurred prior to the time of delivery to Retailer. Rimac will disclose to Retailer as may be required any damage that Rimac repaired before delivering an Authorized Automobile to Retailer. Retailer must properly disclose such repair prior to delivering such Authorized Automobile to a customer, and shall hold Rimac harmless from any claims that required disclosure was not made.

## CHANGES BY RETAILER TO AUTHORIZED PRODUCTS

(6) Rimac may request Retailer to make changes, or not to make changes, to Authorized Products, and Retailer agrees to comply promptly with such requests. Retailer also agrees to take such steps as Rimac may direct it to take to comply with any law or regulation pertaining to safety, emissions, noise, fuel economy or vehicle labeling. Rimac will reimburse Retailer at the then-current rate of reimbursement specified by Rimac for Retailer for Genuine Parts and for labor, which may be used by Retailer in making such required changes on Authorized Products. Parts and other materials necessary to make such changes may be shipped to Retailer without Retailer's authorization and Retailer must accept them. Rimac will give Retailer credit for parts so shipped which prove unnecessary, provided they are returned or disposed of in accordance with Rimac's instructions. If the laws of the state in which Retailer is located or a vehicle is to be registered require motor vehicles to carry equipment not installed or supplied as standard equipment by the Manufacturer or Rimac, upon Rimac's request Retailer must, prior to selling any Authorized Automobiles on which such installation is required, properly install at its own or its customers' expense equipment conforming to such laws and to Rimac's standards. Retailer agrees to indemnify the Manufacturer and Rimac and hold them harmless against and from any and all liabilities that may arise out of Retailer's failure or alleged failure to comply with any obligation assumed by Retailer in this paragraph.

## PRODUCT CHANGES BY RETAILER NEITHER REQUESTED BY RIMAC NOR REQUIRED BY LAW

(7) Retailer agrees that it will not modify or alter or permit to be modified or altered any Authorized Automobile, Genuine Part or Authorized Accessory or install aftermarket accessories or equipment on any Authorized Automobile in a manner that would violate applicable law or impair or otherwise adversely affect the safety, emissions, structural integrity or performance of such Authorized Automobile, Genuine Part or Authorized Accessory. If Retailer installs on a new Authorized Automobile any equipment, accessory or part other than a Genuine Part; sells any new Authorized Automobile which has been modified; or sells in conjunction with a new Authorized Automobile a service contract not offered or specifically endorsed in writing by Rimac, then Retailer must advise the customer of the identity of the warrantor of such modification, equipment, accessory or part, or, in the case of a service contract, of the identity of the provider of its coverage. Retailer must indemnify Rimac against claims that may be asserted against Rimac in any action by reason of such modification, equipment, accessory, part or service contract. **ANY VIOLATION OF THIS SECTION SHALL BE CAUSE FOR TERMINATION PURSUANT TO ARTICLE 14(2).**

## PRE-OWNED VEHICLE OPERATIONS AND SALES

(8) Retailer must use its best efforts to acquire, promote, and sell at retail pre-owned Authorized Automobiles and other pre-owned vehicles, through such means and at such levels as are set forth in the Additional Retailer Documents, as may be indicated by Rimac in consultation with Retailer, or as reasonably may be established by Rimac. Retailer's pre-owned vehicle operations must conform to the requirements of the Additional Retailer Documents and such other reasonable standards as Rimac may prescribe, in consultation with Retailer, or as reasonably established by Rimac.

# ARTICLE 6
# PARTS AND ACCESSORIES

## PARTS AND ACCESSORIES OPERATIONS

(1) Retailer's parts and accessories operations must conform to the requirements of the Additional Retailer Documents and such other reasonable standards as Rimac may prescribe, in consultation with Retailer, or as reasonably established by Rimac.

## PARTS AND ACCESSORIES PROMOTION AND PERFORMANCE

(2) Retailer must use its best efforts to promote and sell Genuine Parts and Authorized Accessories through regular contacts with owners, users, and prospective owners and users of Authorized Products; through promotion, prospecting and follow-up programs; and through such means and at such levels as are set forth in the Additional Retailer Documents, as may be indicated by Rimac in consultation with Retailer, or as reasonably may be established by Rimac. Notwithstanding the foregoing, Retailer may not sell Genuine Parts at wholesale or retail other than to an owner or user of an Authorized Automobile.

## SALE OF NON-GENUINE PARTS AND ACCESSORIES

(3) Retailer shall not sell any parts that are not equivalent in quality and design to Genuine Parts if such parts are necessary to the mechanical operation of Authorized Automobiles. Retailer shall not represent as new Genuine Parts or Authorized Accessories any parts or accessories that are not new Genuine Parts or Authorized Accessories. If Retailer sells a part or accessory that is not a Genuine Part or Authorized Accessory, Retailer must advise the customer of the identity of the warrantor of such part or accessory.

## PARTS AND ACCESSORIES INVENTORY

(4) Retailer must maintain an inventory of Genuine Parts as set forth in the Additional Retailer Documents and that is sufficient to perform reasonably anticipated warranty repair and service.

# ARTICLE 7
# SERVICE

## SERVICE OPERATIONS

(1) Retailer's service operations must conform to the requirements of the Additional Retailer Documents and such other reasonable standards as Rimac may prescribe, in consultation with Retailer, or as reasonably established by Rimac.

## SERVICE PROMOTION AND PERFORMANCE

(2) Retailer must use its best efforts to promote the servicing of Authorized Automobiles, and other automobiles formerly sold by Rimac, through regular contacts with owners and users of Authorized Products and other automobiles formerly sold by Rimac; through promotion, prospecting, and follow-up programs;

and through such means and at such levels as are set forth in the Additional Retailer Documents, as may be indicated by Rimac in consultation with Retailer, or as reasonably may be established by Rimac. Retailer must provide the best possible customer service for all owners and users of Authorized Automobiles and other automobiles formerly sold by Rimac.

**TOOLS AND EQUIPMENT**

(3) Retailer must have special tools and general workshop equipment meeting Rimac's standards available at Retailer's Premises in working condition. The types and quality of such special tools and equipment must meet the requirements set forth in the Additional Retailer Documents.

**USE OF NON-GENUINE PARTS**

(4) Retailer must not use in the repair or servicing of Authorized Automobiles any parts that are not equivalent in quality and design to Genuine Parts, if such parts are necessary to the mechanical operation of such Authorized Automobiles. **RETAILER MUST USE ONLY GENUINE PARTS IN PERFORMING WARRANTY SERVICE ON AUTHORIZED AUTOMOBILES. RETAILER MUST NOT REPRESENT AS NEW GENUINE PARTS ANY PARTS USED BY IT IN THE REPAIR OR SERVICING OF AUTHORIZED AUTOMOBILES THAT ARE NOT NEW GENUINE PARTS.**

**OWNER'S DOCUMENTS**

(5) Upon delivering a new Authorized Automobile to a customer, Retailer must provide the Owner's Documents supplied by Rimac for such Authorized Automobile, properly completed by Retailer. Retailer must take all steps required prior to delivery of the Authorized Automobile, and, in particular, will perform properly any and all services specified from time to time by Rimac to be performed either before or after the delivery of the Authorized Automobile to the customer.

**MAINTENANCE AND OTHER SERVICES WITHOUT CUSTOMER CHARGE**

(6) In accordance with bulletins issued from time to time by Rimac and Rimac's Warranties, certain maintenance services and other repairs following delivery of a new Authorized Automobile may be free of charge to the customer. Upon presentation of an appropriate Owner's Document, Retailer must perform properly the services required, whether or not the Authorized Automobile to be serviced was sold by Retailer. Upon the submission of appropriate claims, Rimac will reimburse Retailer for performing such services at the then-current rate of reimbursement specified by Rimac for Retailer. Rimac will establish procedures for submitting and processing such claims and transmitting reimbursements to Retailer. Retailer must comply with these procedures to receive reimbursement

**REPEATED REPAIRS**

(7) Retailer must notify Rimac of repairs to Authorized Automobiles pursuant to Rimac's Warranties under each of the following circumstances:

(a) The Authorized Automobile has been brought to Retailer a specified number of times for the same complaint; or

(b) The Authorized Automobile has been in Retailer's custody for all repairs pursuant to Rimac's Warranties for a specified number of days.

Notification under this Article 7(7) shall be made at the times and by the means Rimac may have instructed in any then-current retailer warranty manual issued by Rimac, including the Aftersales Policies and Procedures Guide.

**IN THE EVENT THAT RETAILER FAILS TO COMPLY WITH THESE NOTIFICATION REQUIREMENTS FOR AN AUTHORIZED AUTOMOBILE AND RIMAC THEREAFTER REPURCHASES THAT AUTHORIZED AUTOMOBILE FROM A CUSTOMER, RETAILER'S OPEN PARTS AND ACCESSORIES ACCOUNT MAY BE CHARGED BACK, AT RIMAC'S DISCRETION, FOR ANY AMOUNT THAT RIMAC PAYS OVER THE MANUFACTURER'S SUGGESTED RETAIL PRICE FOR THE AUTHORIZED AUTOMOBILE.**

**FURTHER, TO THE EXTENT THAT SUCH CUSTOMER BECOMES ENTITLED TO THE REPURCHASE OR REPLACEMENT OF SUCH AUTHORIZED AUTOMOBILE PURSUANT TO ANY STATE'S "LEMON LAW," THROUGH THE PASSAGE OF TIME IN RETAILER'S POSSESSION OR THROUGH A NUMBER OF REPEATED REPAIR ATTEMPTS BY RETAILER, AND TO THE EXTENT THAT THE FAILURE TO REPAIR SUCH AUTHORIZED AUTOMOBILE WAS DUE TO FAILURE OR INABILITY ON THE PART OF RETAILER AND NOT DUE TO ANY FAULT OF RIMAC, RIMAC MAY, TO THE EXTENT PERMITTED BY LAW, SEEK INDEMNIFICATION FROM RETAILER FOR ALL OR A PORTION OF RIMAC'S EXPENSES IN CONNECTION WITH THE REPURCHASE OR REPLACEMENT OF SUCH AUTHORIZED AUTOMOBILE.**

## ARTICLE 8
## RETAILER'S PURCHASES AND INVENTORIES

### TERMS OF ORDERING, PAYMENT, AND DELIVERY

(1) Retailer will comply with the terms of ordering, payment and delivery prescribed by Rimac from time to time.

### INVENTORIES

(2) Retailer will have in inventory or on order such number of Authorized Automobiles as the Additional Retailer Documents may prescribe from time to time.

### PRODUCT ALLOCATION

(3) Retailer recognizes that certain Authorized Products may not be available in sufficient supply from time to time because of factors such as product importation, consumer demand, component shortages, manufacturing constraints, governmental regulations, or other causes. Rimac will endeavor to make a fair and equitable allocation and distribution of the Authorized Products available to it but Rimac reserves the discretion to make allocation decisions in the overall best interests of the Rimac brand.

### TAXES

(4) Retailer is responsible for any and all taxes (including but not limited to Goods & Services, luxury, sales and excise taxes) and other governmental charges imposed, levied, or based upon the sale of Authorized Products by Rimac to

Retailer and not included in MSRP. Retailer represents and warrants, as of the date of the purchase of each Authorized Product, that all Authorized Products purchased from Rimac are purchased by Retailer for resale in the ordinary course of Retailer's business and that Retailer has complied with all laws relating to the collection and payment of all taxes and other governmental charges applicable to the purchase of such products and will furnish evidence thereof upon request. If any Authorized Products are put to taxable use by Retailer, or are purchased by Retailer for purposes other than resale in the ordinary course of Retailer's business, Retailer must make timely return and payment to the appropriate taxing authorities of all applicable taxes and other governmental charges imposed, levied, or based upon the sale of such Authorized Products by Rimac to Retailer and will hold Rimac harmless with respect thereto.

**PAYMENTS TO RETAILER OR RETAILER'S PERSONNEL**

(5) From time to time, Rimac may conduct incentive programs that involve payments to Retailer or to Retailer's personnel. Retailer acknowledges that regardless of the nature of such programs or payments, Retailer's personnel are not employees, contractors or agents of Rimac. All matters relating to the employment or retention of Retailer's personnel are solely Retailer's responsibility. In the case of payments by Rimac to Retailer, Retailer alone will be responsible for the payment of any and all applicable taxes. In the case of payments to Retailer's personnel, Rimac will make appropriate information or other returns to appropriate taxing authorities. In the event Retailer does not want Rimac to make direct payments to Retailer's personnel, Retailer must notify Rimac to that effect in writing. After receiving such written notice, Rimac will pay directly to Retailer any subsequent payments coming due Retailer's personnel. Retailer represents and warrants that it shall pass such payments directly through to Retailer's personnel as intended; that it will make any necessary returns to any taxing authority; and that it will hold Rimac harmless from any claims whatsoever that such payments were not received by the intended recipients or that appropriate withholdings were not made.

**PAYMENT BY RETAILER**

(6) Retailer must pay for Authorized Products in the manner, at the time, and upon the conditions specified in the terms of payment established from time to time by Rimac. Delivery of instruments of payment other than cash does not constitute payment until Rimac has collected the full amount in cash. Retailer must pay all collection charges, including reasonable attorney's fees, and costs of exchange, if any, incurred in connection with its payments.

**PASSING OF TITLE; SECURITY INTEREST**

(7) Title to Authorized Products remains with Rimac until Rimac has collected their full purchase price in cash. Retailer must execute and deliver, and Rimac is authorized to execute and deliver on behalf of Retailer or, to the extent permitted by law, to file without the signature of Retailer, all financing statements and other instruments that Rimac may deem necessary to evidence its ownership of such Authorized Products. Where applicable Retailer hereby grants Rimac a purchase money security interest in all Authorized Products for which Rimac has not collected in full, authorizes Rimac to take such steps as Rimac deems necessary to perfect such security interests, and agrees to cooperate fully with Rimac in

connection therewith. Rimac may take possession at any time of Authorized Products to which it has title.

**PASSING OF RISKS**

(8) Authorized Products will be at Retailer's risk and peril from the time of their delivery to Retailer or Retailer's agent. Retailer must insure such risks for its benefit and at its expense.

**RESPONSIBILITY FOR DEFECTS AND DAMAGE**

(9) Rimac assumes responsibility for the quality and condition of Authorized Products, to the extent of (a) defects caused by its own negligence and (b) damage caused or repaired prior to delivery of the Authorized Products to Retailer or Retailer's agent. Rimac will make any required disclosure thereof to Retailer. If Rimac has insured against such defects in or damage to Authorized Products, Rimac's liability to Retailer for such damage will be limited to the amount actually paid by the insurance carrier to Rimac by reason of such defect of damage, together with any deductible amount applicable to such claim. Retailer may decline to accept any Authorized Products delivered to Retailer in damaged condition or with respect to which Rimac has notified Retailer that Rimac has repaired damage; however, should Retailer accept such Authorized Product Retailer must, subject to the provisions of Article 5(5), repair all such defects and damage fully as required by Rimac before any defective or damaged Authorized Product is delivered to a customer. Retailer must make any required disclosure to Retailer's customers of damage or repairs, and shall hold Rimac harmless with respect thereto. Rimac will notify Retailer promptly of the amount thereof, or any other amount due from Rimac pursuant to this paragraph, following Retailer's submission of such proof of repair as Rimac may require.

**CLAIMS FOR INCOMPLETE DELIVERY**

(10) Retailer must make all claims for incomplete delivery of Authorized Products (including the delivery of Authorized Products with damage) in writing not later than three business days after Retailer's receipt of shipment; *provided, however,* that Retailer must make claims as to Genuine Parts within the period specified in policies established by Rimac from time to time, including in the Aftersales Policies and Procedures Guide; and *provided, further,* that Retailer must note claims for visible damage to Authorized Automobiles on the delivery receipt.

**CHANGES OF SPECIFICATIONS**

(11) Rimac will deliver Authorized Products to Retailer in accordance with specifications applicable at the time of their manufacture. In the event of any change or modification with respect to any Authorized Products, Retailer shall not be entitled to have such change or modification made to any Authorized Products manufactured prior to the introduction of such change or modification. Rimac expressly reserves, and Retailer acknowledges, the right to make such changes and modifications, and Retailer's only right in such event shall be the right, hereby granted, to cancel any orders for Authorized Products affected by the change or modification and not yet accepted by Rimac.

FAILURE OF OR DELAY IN DELIVERY BY RIMAC

(12) Rimac will not be liable to Retailer for failure of or delay in delivery under orders of Retailer accepted by Rimac, other than failure or delay resulting from willful misconduct or gross negligence of Rimac.

RETURN OR DIVERSION ON RETAILER'S FAILURE TO ACCEPT

(13) If Retailer fails or refuses for any reason to accept delivery of any Authorized Products ordered by Retailer (except as permitted under Article 8(11)), Retailer shall be liable to Rimac for all expenses incurred as a result of such failure or refusal, and will store such Authorized Products at no charge to Rimac until Rimac can arrange for their removal. Retailer's liability pursuant to this paragraph will be in addition to, and not in lieu of, any other liabilities that may arise from Retailer's failure or refusal to accept delivery.

AUTHORIZED ACCESSORIES AND AUTHORIZED PARTS

(14) Retailer acknowledges that some of or all Authorized Accessories, Authorized Parts, or both, will be sold and supplied to Retailer by the Manufacturer pursuant to a separate agreement, and that except to the extent specifically set forth in this Agreement, Rimac will have no responsibility with respect thereto.

## ARTICLE 9
## WARRANTY TO CUSTOMERS

RIMAC'S WARRANTIES

(1) Rimac warrants each new Authorized Automobile as set forth in Rimac's Warranties.

INCORPORATION OF RIMAC'S WARRANTIES IN RETAILER'S SALES

(2) Retailer must make all sales of Authorized Automobiles in such a way that its customers acquire all rights in accordance with Rimac's Warranties and, to the extent permitted by law, no other express or implied warranties. Retailer must make the text of Rimac's Warranties part of its contracts for the sale of Authorized Automobiles and shall display the text of the warranties of all products it sells in customer contact areas where Authorized Automobiles are offered.

WARRANTY PROCEDURES

(3) Retailer must comply with the provisions of the various retailer warranty manuals that Rimac may issue from time to time and the provisions of other Additional Retailer Documents, as applicable, and shall follow the procedures established by Rimac for processing warranty claims and returning and disposing of defective Genuine Parts. Retailer must also comply with all requests of Rimac for the performance of services pursuant to warranty claims and shall maintain detailed records of time and parts consumption and any other records used as the basis for submitting warranty claims. Unless otherwise specified in the Additional Retailer Documents or otherwise by notice to Retailer from time to time, Retailer will before performing any service pursuant to warranty claims consult with Rimac and obtain prior authorization from an authorized representative of Rimac. Retailer must submit warranty claims to Rimac electronically, and in accordance with

procedures established by Rimac. Upon Retailer's compliance with such requests and maintenance of such records, Rimac will reimburse Retailer within a reasonable time for warranty claims at the then-current rate of reimbursement specified by Rimac for Retailer. Strict adherence to the procedures and means established for processing warranty claims is necessary for Rimac to process such claims fairly and expeditiously. Rimac shall have no obligation with respect to warranty claims not submitted electronically and not made strictly in accordance with such procedures.

## ARTICLE 10
## RETAILER'S RECORD KEEPING AND REPORTS; INSPECTION OF RETAILER'S OPERATIONS

### RETAILER'S FORMS, BUSINESS MACHINES, OFFICE EQUIPMENT AND BOOKKEEPING

(1) Retailer must use accounting, sales, bookkeeping and service workshop forms; business machines; data processing and transmission equipment; and other office equipment, which meets specifications, and which enables Retailer and Rimac to communicate electronically for all purposes and which otherwise provides information and functions in the manner prescribed by Rimac and its affiliates in the Additional Retailer Documents, and by other means. Rimac will advise Retailer, or ensure that suppliers to Rimac advise Retailer, periodically of the hardware and software requirements, communications protocols, and other specifications which Retailer's data processing and transmission equipment must meet in order to satisfy the requirements of this paragraph, and Retailer must timely adhere to such requirements, protocols and specifications. Retailer must keep accurate and current records in accordance with Rimac's uniform accounting system and with accounting practices and procedures reasonably satisfactory to Rimac, in order to enable Rimac to develop comparative data and to furnish Retailer business management assistance.

### FINANCIAL STATEMENTS TO BE SUPPLIED BY RETAILER

(2) Retailer must transmit to Rimac (a) on or before the tenth day of each calendar month in such form and by such methods as Rimac reasonably may require, a financial and operating statement reflecting the consolidated operations of Retailer for the preceding month and from the beginning of the calendar year to the end of the preceding month and (b) within three and one-half months after the close of Retailer's fiscal or calendar year, a consolidated balance sheet and profit and loss statement of Retailer, which documents shall be certified by a chartered accountant if so requested by Rimac at least 30 days prior to the close of Retailer's fiscal or calendar year. **RETAILER'S FAILURE TO PROVIDE FINANCIAL AND OPERATING STATEMENTS IN THE FORMAT AND BY THE METHOD REQUIRED BY RIMAC MAY, AT RIMAC'S DISCRETION, RESULT IN THE REVOCATION OF RETAILER'S OPEN PARTS AND ACCESSORIES ACCOUNT.**

### REPORTS TO BE SUPPLIED BY RETAILER

(3) Retailer must furnish to Rimac, on such forms and by such methods as Rimac reasonably may require, accurate timely reports of retailer's sales and transfers of new Authorized Automobiles. Retailer also must furnish to Rimac, on a timely and

accurate basis, such other reports and financial statements as Rimac reasonably may require.

**INSPECTION OF RETAILER'S OPERATIONS AND RECORDS**

(4) Until the expiration or termination of this Agreement, and thereafter until consummation of all transactions referred to in Article 15, Rimac, through its employees and other designees, at all reasonable times during regular business hours, may inspect Retailer's Operations, Retailer's Premises and the methods, records and accounts of Retailer relating to Retailer's Operations.

## ARTICLE 11
## RETAILER PERFORMANCE REVIEW

Rimac may from time to time evaluate Retailer's Operations, including but not limited to, Retailer's vehicle sales, service and parts operations and performance, Retailer's Premises and Retailer's customer satisfaction. When evaluating Retailer's compliance with its obligations under this Agreement, Rimac may take into account any objectives established for Retailer by Rimac in consultation with Retailer, or as reasonably established by Rimac from time to time. If Retailer's performance does not meet the requirements of this Agreement and/or the Additional Retailer Documents, then Rimac, at its discretion, may take such steps as may be reasonably necessary to assist Retailer in improving Retailer's performance or to terminate this Agreement, in accordance with the provisions of Article 14(2).

## ARTICLE 12
## SUCCEEDING RETAILERS

**PROCEDURE**

(1) If Retailer chooses to transfer its principal assets or change any of Retailer's Owners, Rimac has the right to approve the proposed transferees and, if different from Retailer's Premises, the proposed premises. Rimac will consider any such proposal Retailer may submit to it during the term of this Agreement, provided, however, that Rimac shall have no obligation to consider any such proposal unless the proposal is in writing, accompanied by a definitive and executed purchase-and-sale agreement or other similar agreement, and has been provided to Rimac in accordance with the Notice provisions of this Agreement. Any such proposal that includes the proposed sale of multiple (i.e., two or more) dealerships shall set forth, separately for each dealership, the purchase price for each such dealership and any unique terms relating to each such dealership. Rimac has no obligation to approve such proposal in general, and in particular if such proposal includes relocation from Retailer's Premises. In determining whether the proposal is acceptable to it, Rimac will take into account factors such as the personal, business and financial qualifications of the proposed new owners and executives as well as the proposal's effect on competition. In such evaluation, Rimac may consult with the proposed new owners and executives on any aspect of the transaction or their proposed dealership operations. Rimac will consider the proposal reasonably and in good faith.

**APPROVALS**

(2) Rimac will notify Retailer in writing of the approval or disapproval of a proposal by Retailer for transfer of principal assets or change of any owner within 45 business days, or of the exercise by Rimac of its right of first refusal under Article 12(3) within 30 calendar days, after Retailer has furnished to Rimac all applications and information reasonably requested by Rimac to evaluate such proposal. If Rimac approves Retailer's proposal, Rimac shall be obligated to grant the proposed transferees only a Retailer Agreement in substantially the same form as the Retailer Agreements then currently offered by Rimac to its retailers in Authorized Automobiles generally. Retailer understands and agrees that Rimac's approval of a proposed buyer who otherwise meets Rimac's reasonable and consistently applied requirements will be conditioned upon Retailer meeting all outstanding commitments and obligations to Rimac. Rimac's approval of Retailer's proposal may be conditioned on the proposed transferees agreeing to provide different facilities for their Rimac operations. Upon the consummation of Retailer's approved proposal, Retailer must deliver to Rimac a voluntary termination of this Agreement, a general release in favor of Rimac and payment in full for any net balance then owing from Retailer to Rimac.

**RIGHT OF FIRST REFUSAL**

(3) Whenever Retailer proposes to transfer its principal assets or change owners of a majority interest, Rimac shall have the right to purchase such assets or ownership interest, as follows:

(a) Rimac may elect to exercise its purchase right by written notice to Retailer within 30 calendar days or less after Retailer has furnished to Rimac all applications and information reasonably requested by Rimac to evaluate Retailer's proposal.

(b) If Retailer's proposed sale or transfer was a sale or transfer exclusively to a successor approved in advance by Rimac, to any of Retailer's Owners, to Retailer's employees as a group or to Retailer's spouse, children or heirs, then Retailer may withdraw its proposal within 30 calendar days following receipt of Rimac's notice of election of its purchase right.

(c) Rimac's right under this Article 12(3) shall be a right of first refusal, permitting Rimac to:

(i) assume the proposed transferee's rights and obligations under its agreement with Retailer as such rights and obligations relate to Retailer's Operations, unless, if required by law, Rimac must exercise its right with respect to Retailer's operations for all of its line makes, in which such case Rimac may choose, at its election, to assume the proposed transferee's rights and obligations respecting Retailer's Operations and Retailer's operations for other line makes; and

(ii) cancel this Agreement and all rights granted Retailer hereunder.

Except to the extent specifically inconsistent with the terms of this Agreement, the price and all other terms of Rimac's purchase shall be as set forth in any bona fide written purchase and sale agreement between Retailer and its proposed transferee and in any related documents.

(d) Retailer must furnish to Rimac copies of all applicable liens, mortgages, encumbrances, leases, easements, licenses or other documents affecting any of the property to be transferred, and shall assign to Rimac any permits or licenses necessary for the continued conduct of Retailer's Operations.

(e) Rimac may assign its right of first refusal to any party it chooses, but in that event Rimac will remain primarily liable to Retailer for payment of the purchase price or such portion of the purchase price as is allocated to Retailer's Operations.

(f) If Rimac exercises its purchase right, Rimac will reimburse Retailer's proposed transferee for reasonable documented actual expenses that such proposed transferee incurred through the date of such exercise which are directly and solely attributable to the transaction Retailer proposed.

(g) Nothing contained in this Article 12(3) shall require Rimac to exercise its right of first refusal in any case, nor restrict any right Rimac may have to refuse to approve Retailer's proposed transfer.

**SUCCESSION**

(4) Article 14(1)(a) notwithstanding, in the event of the death of any of Retailer's Owners, Rimac will not terminate this Agreement by reason of such death if:

(a) The owner's interest in Retailer passes directly as specified in any Successor Addendum to this Agreement; or

(b) The owner's interest in Retailer passes directly to his or her surviving spouse or children, or any of them, and (i) Retailer's Authorized Representative remains as stated in the Statement of Ownership and Management or (ii) within 90 days after the death of such owner Retailer appoints another qualified individual as Retailer's Authorized Representative; *provided, however,* that in this event, the following provisions apply: Rimac will evaluate Retailer's performance during the 12 months following the owner's death. After the expiration of this 12-month period and Rimac's evaluation of the performance of Retailer's performance during such period, Rimac will review with Retailer the changes, if any, in the management or equity interests of Retailer required by Rimac as a condition of continuing a relationship with Retailer. Retailer shall make such changes, if any. Any new Retailer Agreement entered into pursuant to this paragraph will be in substantially the same form as the Retailer Agreements then currently offered by Rimac to its retailers in Authorized Automobiles generally.

**MODIFICATION OF TERMS OF PAYMENT**

(5) Upon receipt of an application for approval of a transfer or principal assets or change of owners of a majority interest, Rimac may modify its terms of payment with respect to Retailer to the extent Rimac deems appropriate, irrespective of Retailer's credit standing or payment history, including placing Retailer's Open Parts and Accessories Account on C.O.D.

## ARTICLE 13
## DISPUTE RESOLUTION

**STATUTE OF LIMITATIONS FOR DAMAGES**

(1) All claims by Retailer for damages against Rimac shall be brought within one year of the accrual date of the claim, or in accordance with the applicable state statute of limitations, whichever is shorter.

**PERFORMANCE TO CONTINUE**

(2) Rimac and Retailer agree to continue to perform their respective obligations under this Agreement pending final resolution of any dispute arising out of or relating to this Agreement.

## ARTICLE 14
## TERMINATION

**IMMEDIATE TERMINATION BY RIMAC**

(1) Except to the extent a greater notice period is required by any applicable statute, Rimac may terminate this Agreement, with immediate effect, by sending notice of termination to Retailer, if any of the following should occur:

(a) Death or incapacity of any of Retailer's Owners; any change, whether voluntary or by operation of law, in the record or beneficial ownership of Retailer or Authorized Representative without Rimac's prior written consent; any change in Retailer's Executives, except with regard to the Authorized Representative, without prior written notice to Rimac; or any failure of Retailer's Executives to continue to manage Retailer's Operations (unless, in the case of a death of Retailer's owners, the provisions of Article 12(4) above have been satisfied);

(b) Dissolution or liquidation of Retailer;

(c) Insolvency of Retailer or voluntary institution by Retailer of any proceeding under the Bankruptcy Act or state insolvency law; or the involuntary institution against Retailer of any proceeding under the Bankruptcy Act or state insolvency law which is not vacated within ten days from the institution thereof; or the appointment of a receiver or other officer having similar powers for Retailer or Retailer's business who is not removed within ten days of his appointment; or any levy under attachment, execution or similar process which is not within ten days vacated or removed by payment or bonding.

(d) Any transfer or assignment or attempted transfer or assignment of this Agreement by Retailer, in whole or in part, without Rimac's prior written consent;

(e) Any change in the location of any of Retailer's Premises or the establishment of any additional premises for Retailer's Operations without Rimac's prior written consent;

(f) Failure of Retailer to continue to operate any of Retailer's Premises in the usual manner for a period of five consecutive business days, unless caused by an Act of God, war, riot, strike, lockout, fire, explosion or similar event;

(g) Retailer's failure, for a period of ten consecutive business days, to have any license necessary for the conduct of Retailer's Operations;

(h) Conviction of Retailer or any of Retailer's Owners or Retailer's Executives of a felony or any misdemeanor involving fraud, deceit or an unfair business practice or Conviction of Retailer or any of Retailer's Owners or Retailer's Executives of any crime or violation of law, if in Rimac's opinion such conviction may adversely affect the conduct of Retailer's business, or be harmful to the goodwill of the Manufacturer or Rimac or to the reputation and marketing of Authorized Products;

(i) Any material misrepresentation by any of Retailer's Owners or Retailer's Executives as to any fact relied upon by Rimac in entering into this Agreement;

(j) Submission by Retailer of any fraudulent or knowingly false report, statement or claim for payment, reimbursement, refund or credit;

(k) Failure or refusal of Retailer or Retailer's Owners, Retailer's Executives, or Retailer's agents or employees to provide Rimac, upon request, with access to and the opportunity to inspect and copy all books, papers, instruments, certificates or other documents evidencing the record or beneficial ownership of Retailer;

(l) Failure of Retailer to maintain a wholesale line of credit dedicated solely toward the purchase of Authorized Automobiles with a reputable financial institution reasonable acceptable to Rimac for a period of thirty days;

**TERMINATION BY RIMAC ON 60 DAYS' NOTICE**

(2) Except to the extent a greater notice period is required by any applicable statute, and except as governed by Article 14(1), Rimac may terminate this Agreement upon 60 days' notice if any of the following shall occur:

(a) Any disagreement or personal difficulties of Retailer's Owners or Retailer's Executives which in Rimac's opinion may adversely affect the conduct of Retailer's business, or the presence in the management of Retailer of any person who in Rimac's opinion does not have appropriate qualifications for their position;

(b) Impairment of the reputation or financial standing of Retailer or any of Retailer's Owners or Retailer's Executives or ascertainment by Rimac of any fact existing at or prior to the time of execution of this Agreement which tends to impair such reputation or financial standing;

(c) The failure of Retailer to meet its minimum customer satisfaction requirements, including, but not limited to, measures for sales satisfaction and service satisfaction, as established by Rimac for its retailers generally, from time to time, and as set forth in the Rimac Brand Standards or Additional Retailer Documents, within a minimum of 90 days after notice by Rimac to Retailer that Retailer has not met such requirements; or

(d) The breach by Retailer of any material obligation of Retailer not otherwise addressed in Article 14(1) or (2) pursuant to this Agreement or any other agreement between Rimac or any of its parents, subsidiaries, or affiliates and Retailer or pursuant to any of the Additional Retailer Documents.

### Modification of Terms of Payment

(3) During the period a situation specified in Article 14(1) or 14(2) continues to exist, Rimac may at its discretion modify its terms of payment with respect to Retailer to such extent as Rimac may consider appropriate, irrespective of Retailer's credit standing or payment record, including but not limited to payment on a cash on delivery basis, together with immediate payment of all existing indebtedness.

### No Waiver by Failure To Terminate

(4) Should Rimac be entitled to terminate this Agreement but fail to do so, such failure shall not be considered a waiver of Rimac's right to terminate this Agreement unless the situation entitling Rimac to terminate this Agreement has ceased to exist and (a) six months have elapsed from the time Rimac obtained knowledge of such situation or (b) Rimac has entered into a subsequent written agreement with Retailer superseding this Agreement. Nevertheless, any situation entitling Rimac to terminate this Agreement may be considered at any subsequent time together with any subsequent events in determining Rimac's right to terminate this Agreement.

### No Right To Cure During Termination Notice Period

(5) Retailer has no right to cure its deficiencies during any termination notice period.

### Termination by Retailer

(6) Retailer has the right to terminate this Agreement without cause by Rimac giving 60 days' written notice of such termination. Upon receipt of Retailer's notice of termination, Rimac may, at Rimac's option, waive in writing the 60-day notice period. In the event Retailer, in connection with its termination of this Agreement, also wishes to terminate any other agreement between Retailer and Rimac or any of Rimac's subsidiaries or affiliates, Retailer must do so separately and subject to the provisions of Article 14(9) below.

### Continuation of Business Relations after Termination

(7) Any business relations between Rimac and Retailer after the termination of this Agreement without a written extension or renewal or a new written retailer agreement will not operate as an extension or renewal of this Agreement or as a new retailer agreement. Nevertheless, all such business relations, so long as they are continued, will be governed by terms identical with the provisions of this Agreement.

### Superseding Agreements

(8) If any superseding form of Retailer Agreement is offered by Rimac to its authorized retailers generally at any time, Rimac may, by written notice to Retailer, terminate this Agreement and replace it with a Retailer Agreement in the superseding form.

**OTHER AGREEMENTS WITH RIMAC**

(9) The termination of this Agreement by either party does not waive or terminate any other agreement between Retailer and Rimac or any of its subsidiaries or affiliates. Such other agreements may be terminated only in accordance with their terms, and the parties' respective obligations under any such other agreements will continue in accordance with their terms until terminated.

## ARTICLE 15
## RIGHTS AND LIABILITIES UPON TERMINATION

**RIMAC'S OBLIGATIONS**

(1) Within 90 days after the termination of this Agreement pursuant to Article 14, Rimac will purchase from Retailer and (subject to the provisions of Article 15(4) below) Retailer must sell to Rimac all the following:

**New Authorized Automobile Inventory**

(a) All new, undamaged current model year Authorized Automobiles (introduced in the United States no earlier than 12 months prior to the date of such expiration or termination and not superseded by a later model year) in Retailer's inventory on the date of such expiration or termination which are in first-class salable condition, provided they (i) have 300 or fewer actual miles more than the mileage with which Rimac delivered them to Retailer; (ii) were sold by Rimac and purchased by Retailer from Rimac (or in the ordinary course of business from other retailers of Authorized Automobiles appointed by Rimac) and (iii) have never been sold by Retailer. The price for such Authorized Automobiles shall be the price at which they were originally sold by Rimac, less all prior refunds or allowances made by Rimac, if any.

**New Genuine Parts and Accessories Inventory**

(b) Rimac will purchase all of the following new, unused and undamaged articles listed in Rimac's current Genuine Parts Price List (other than articles listed as obsolete) in Retailer's inventory on the date of such expiration or termination which are in first-class salable condition and complete, *provided* they were purchased by Retailer from Rimac (and not directly from the Manufacturer) and never sold by Retailer:

(i) New parts and new factory remanufactured replacement parts supplied by Rimac for Authorized Automobiles;

(ii) Accessories considered by Rimac to be suitable for installation in the current model year Authorized Automobiles specified in Article 15(1)(a); and

(iii) Other accessories, provided that Rimac has made sales of identical articles during six of the last twelve full calendar months immediately preceding such expiration or termination.

The price for all such articles shall be the price then last established by Rimac for the sale of identical articles, less a handling charge equal to ten

percent of such amount and less all prior refunds or allowances made by Rimac;

**Tools and Equipment**

(c) All special tools and equipment for servicing Authorized Automobiles owned by Retailer on the date of expiration or termination which are in operating condition and complete, provided they were purchased by Retailer from Rimac or pursuant to written requests of Rimac. The price for such tools and equipment shall be determined on the basis of five year straight line depreciation; and

**Authorized Signs**

(d) All Authorized Signs that Retailer displayed publicly or at Retailer's Premises. The price for such Authorized Signs shall be the fair market value thereof.

**TERMS OF SALE**

(2) Any and all items to be sold by Retailer to Rimac pursuant to this paragraph will be delivered by Retailer to Rimac at Retailer's place of business suitably packed for transportation. For such periods of time as Rimac reasonably may determine, Rimac may enter Retailer's Premises for the purpose of taking an inventory of all or any part of Retailer's stock of Authorized Products and special tools and equipment. At the request of Rimac, Retailer must comply in all respects with the provisions of all applicable bulk sales acts or similar statutes protecting a transferee of personal property with respect to liabilities of the transferor. Promptly following performance by Retailer of all its obligations pursuant to this Article 15, the completion by Rimac of all steps required to obtain possession of such items and the delivery to Rimac of a bill of sale, documents of title and a general release of Rimac and the Manufacturer from Retailer and Retailer's Owners, all in form satisfactory to Rimac, Rimac will pay Retailer the specified prices for the said items, less all amounts owed by Retailer to Rimac, its subsidiaries or affiliates. Rimac shall not be required to purchase any item from Retailer pursuant to this paragraph unless Retailer is able to convey to Rimac, within such 90-day period, title to such item free and clear of all liens, claims, encumbrances and security interests.

**PENDING ORDERS AND RETAILER'S OBLIGATIONS**

(3) Upon the expiration or termination of this Agreement, all pending orders of Retailer for Authorized Products previously accepted by Rimac will, at Rimac's option, be canceled or transferred to another authorized Rimac retailer, and Retailer immediately must:

**Removal of Authorized Signs**

(a) Remove at its own expense all Authorized Signs which it displayed publicly or at its premises;

**Authorized Trademarks**

(b) Cease all usage of the Authorized Trademarks, cease to hold itself out as an authorized retailer in Authorized Automobiles, destroy all stationery and other printed material bearing any Authorized Trademark, and, if its corporate or business name contains any Authorized Trademark, take all steps to remove the same therefrom;

**Orders and Files**

(c) Transfer to Rimac

(i) All orders for sale by Retailer of Authorized Products then pending with Retailer,

(ii) All deposits made thereon, whether in cash or property;

(iii) All Retailer's warranty records for Authorized Products or complete copies of all such records and files; and

(iv) All Retailer's customer service files. Upon the written request of Retailer, Rimac will return such customer service files to Retailer after Rimac has made copies of such files at Rimac's expense;

**Customer Lists**

(d) Make available to Rimac in writing the names and addresses of all its service customers and prospective customers for Authorized Products; and

**Literature**

(e) Deliver to Rimac at Retailer's place of business, free of charge, all technical or service literature, advertising and other printed material relating to Authorized Products, including sales instruction manuals or promotional material, then in Retailer's possession and which were acquired by Retailer from Rimac. None of the foregoing will result in any liability of Rimac to Retailer for damages, commissions, loss of profits or compensation for services, or in any other liability of Rimac to Retailer of any kind of nature whatsoever.

**DIRECT SALES BY RETAILER**

(4) Upon Retailer's written request, Rimac may waive Retailer's obligation to sell certain assets to Rimac and may consent to Retailer's sale of any of or all its assets to any party of Retailer's choosing; *provided*, *however*, that Retailer may not sell any new Authorized Automobile, Authorized Sign nor any new Genuine Parts to any person or entity other than another retailer in the same line-make authorized by Rimac.

**SPECIFIC PERFORMANCE**

(5) Since Retailer's obligations under this Article 15 are of such a nature that it is impossible to measure in money the damages which will be suffered by Rimac if Retailer should fail to perform any of them, Retailer agrees that, in the event of any such failure of performance on its part, Rimac will be entitled to maintain an action to compel the specific performance by Retailer of these obligations and Retailer

agrees not to assert in any such action the defense that Rimac has an adequate remedy at law.

## ARTICLE 16
## DEFINITIONS

Throughout this Agreement various abbreviations and abbreviated phrases have been used. Their meanings are:

**AUTHORIZED ACCESSORIES**

(1) "Authorized Accessories" means apparel, gear, vehicle accessories and optional equipment of the Rimac brand and comprising such items as may be supplied by Rimac or by the Manufacturer during the term of this Agreement.

**AUTHORIZED AUTOMOBILES**

(2) "Authorized Automobiles" means motor vehicles of the Rimac brand and comprising such models and types as may be supplied by Rimac during the term of this Agreement.

**AUTHORIZED PRODUCTS**

(3) "Authorized Products" means Authorized Automobiles, Authorized Accessories and Genuine Parts.

**AUTHORIZED REPRESENTATIVE**

(4) "Authorized Representative" means a qualified representative, such as a General Manager, of Retailer who is authorized on behalf of Retailer to execute documents and, make all operational decisions with respect to Retailer's Operations, on whose authority Rimac is entitled to rely, and who is physically present at Retailer's Premises during most of Retailer's customary operating hours.

**AUTHORIZED SIGNS**

(5) "Authorized Signs" means displays of any Authorized Trademark, in such material, type, presentation and colors as Rimac may prescribe from time to time.

**AUTHORIZED TRADEMARKS**

(6) "Authorized Trademarks" means any trademark, service mark or trade name now or any other time hereafter used or claimed by the Manufacturer or Rimac.

**GENUINE PARTS**

(7) "Genuine Parts" means new and factory rebuilt replacement parts for Authorized Automobiles and other automobiles formerly sold by Rimac but only if such parts are supplied by Rimac or by the Manufacturer.

**MANUFACTURER**

(8) "Manufacturer" means Bugatti-Rimac d.o.o, a limited liability company organized under the laws of the Republic of Croatia.

**OWNER'S DOCUMENTS**

(9) "Owner's Documents" means all the documents which are supplied by Rimac in respect of each Authorized Automobile and which are intended for the customer, including, but not limited to, the Owner's Handbook, Owner's Information Booklet, and Owner's Service Booklet.

**RECOMMENDATIONS**

(10) "Recommendations" means written suggestions provided by Rimac to Retailer from time to time during the term of this Agreement, as well as all currently applicable written suggestions previously provided by Rimac.

**RETAILER'S EXECUTIVES**

(11) "Retailer's Executives" means all the persons who are corporate officers, trustees, managing members or managing partners and the person who is the Authorized Representative of Retailer, as well as any other person who succeeds to any such position in Retailer.

**RETAILER'S OPERATIONS**

(12) "Retailer's Operations" means all activities of Retailer relating to the promotion and sale of Authorized Products, the supply of Genuine Parts, customer service for Authorized Products and all other activities of Retailer pursuant to this Agreement.

**RETAILER'S OWNERS**

(13) "Retailer's Owners" means all the persons or entities who have beneficial or record ownership of Retailer, as well as any other person or entity who acquires or succeeds to any beneficial interest or record ownership in Retailer in accordance with the provisions of this Agreement.

**RETAILER'S PREMISES**

(14) "Retailer's Premises" means the premises used by Retailer for or in connection with Retailer's Operations, including sales facilities, service workshops, offices, facilities for storage of Authorized Automobiles and Genuine Parts, used car sales facilities and parking facilities as set forth in the addenda to this Agreement.

**RIMAC**

(15) "Rimac" means Rimac of the Americas, an operating unit of Volkswagen Group of America, Inc., a New Jersey corporation.

**RIMAC'S WARRANTIES**

(16) "Rimac's Warranties" means, with respect to each Authorized Product, those express written warranties provided with such product or as set forth in the Retailer Warranty Manual for Authorized Products in effect at the time such product is first sold at retail, as well as any express written warranties which Rimac may issue with respect to any product during the course of its service life.

# ARTICLE 17
# GENERAL PROVISIONS

## RETAILER NOT AN AGENT

(1) Retailer must conduct all Retailer's Operations on its own behalf and for its own account. Retailer has no power or authority to act for the Manufacturer or Rimac. Retailer is not an agent of Rimac.

## RELEASE OF CLAIMS UNDER PRIOR AGREEMENT

(2) This Agreement terminates and supersedes all prior agreements with respect to Authorized Products between the parties, if any. The parties hereby waive, abandon and relinquish any and all claims of any kind and nature arising out of or in connection with any such prior agreement, except for any accounts payable by one party to the other as a result of the purchase of any Authorized Products, audit adjustments or reimbursement for any services.

## AGREEMENT NON-TRANSFERABLE

(3) No part of this Agreement nor any interest in this Agreement may be transferred by Retailer without the prior written consent of Rimac.

## DEFENSE AND INDEMNIFICATION

(4) Rimac will, upon Retailer's written request:

(a) Defend Retailer against any and all claims for breach of Rimac's Warranties, bodily injury or death, or for physical damage to or destruction of property, that, during the term of this Agreement, may be asserted against Retailer in any action solely by reason of a manufacturing defect or design deficiency in

(i) An Authorized Product; or

(ii) A product previously supplied by Rimac pursuant to this Agreement or a former retailer agreement; and

(b) Hold Retailer harmless from any and all settlements made and final judgments rendered with respect to such claims;

*provided,* that in each case Retailer promptly notifies Rimac in writing of the commencement of such action against Retailer and cooperates fully in the defense of such action in such manner and to such extent as Rimac may require. However, such defense and indemnification by Rimac will not be required if any fact indicates that any negligence, error, omission, act, failure, breach, statement or representation of Retailer may have caused or contributed to the claim asserted against Retailer or if Rimac determines that such action seeks recovery for allegations other than those described in Article 17(4)(a).

## PROTECTION OF CUSTOMER INFORMATION

(5) Rimac and Retailer each agree to maintain physical, electronic and procedural safeguards that comply with Federal and state laws, so as to maintain the confidentiality of all "Customer Information" that may come into their possession.

As used herein, "Customer Information" refers to non-public personal information (as defined in the Gramm-Leach-Bliley Act), collected by Retailer about its customers, including the fact that a person may be a credit customer of Retailer. Rimac and Retailer agree that Customer Information will be held in strict confidence and accessed only for business purposes relating to this Agreement , and will collect, process, use, and protect all Customer Information and other personal information relating to Retailer's Operations in accordance with the provisions of this Agreement and any written policies issued by Rimac from time to time, including, but not limited to, data use and protection policies. Rimac and Retailer agree to protect the Customer Information according to commercially reasonable standards and to afford Customer Information no less protection than that afforded their own customers' personal information .

**CONFIDENTIALITY**

(6) Retailer shall not use, either directly or indirectly, any information concerning Rimac, or the Authorized Products, deemed as confidential by Rimac or that would reasonably be considered as confidential (including without limitation trade secrets, access to Rimac's electronic systems, and other proprietary information), except as strictly necessary to enable Retailer to fulfill its obligations under this Agreement, nor shall Retailer disclose such confidential information to any third party except to its own employees having a need to know such information in order to assist Retailer in fulfilling its obligations hereunder. Retailer shall safeguard confidential information provided by Rimac and Retailer's customers as completely as Retailer would safeguard its own confidential information. Retailer shall not sell, lease, or otherwise transfer to any third parties any means of access to Rimac's confidential or proprietary information (including Rimac's electronic systems), or otherwise allow any third parties to use or access any such confidential or proprietary information.

**WAIVERS**

(7) The waiver by either party of any breach or violation of or default under any provision of this Agreement will not operate as a waiver of such provision or of any subsequent breach or violation thereof or default thereunder. The failure or refusal of Rimac to exercise any right or remedy shall not be deemed to be a waiver or abandonment of any such right or remedy.

**TITLES**

(8) The titles appearing in this Agreement have been inserted for convenient reference only and do not in any way affect the construction, interpretation or meaning of the text.

# EXHIBIT E

Barack Ferrazzano

**Sarah M. Bernstein** | T. 312.984.3226 | sarah.bernstein@bfkn.com

February 11, 2026

**VIA FEDERAL EXPRESS**

Norman Braman, President
Braman Motors, Inc. d/b/a Bugatti Miami
Braman Management Association
2060 Biscayne Blvd.
Second Floor
Miami, FL 33137

Re: **Braman Motors, Inc. d/b/a Bugatti Miami – Waiver of Certain Warranty-Related Obligations**

Dear Mr. Braman:

I am writing on behalf of my client, Bugatti of the Americas ("**Bugatti**"), an operating unit of Volkswagen Group of America, Inc., formerly doing business as Bugatti Automobiles USA, Inc. and Bugatti Automobiles of the Americas. As you know, Bugatti and Braman Motors, Inc. d/b/a Bugatti Miami ("**Retailer**") are parties to a Retailer Agreement dated April 9, 2007 (the "**Retailer Agreement**"), which incorporates the Bugatti Retailer Agreement Standard Provisions (the "**Standard Provisions**") and Bugatti Brand Standards (the "**Brand Standards**"). Bugatti and Braman are also parties to a Bugatti Passeport Tranquillité Service Programme Retailer Agreement, as modified by the parties by letter dated December 2, 2022 (as modified, the "**Passeport Tranquillité Agreement,**" and together with the Retailer Agreement, the **"Agreements"**). Under the Agreements, Retailer has certain obligations to perform warranty service and other Bugatti-paid vehicle maintenance on Bugatti's behalf (collectively, "**Vehicle Service**").

As detailed below, Bugatti is waiving Retailer's obligations under the Agreements to perform Vehicle Service. This waiver will take effect on May 13, 2026 (the "**Effective Date**"). As of the Effective Date, Bugatti will cease compensating Retailer for Vehicle Service that Dealer performs under the Agreements.

## I. Bugatti Does Not Wish to Pay Retailer's Excessive Labor Rate and Parts Markup

Bugatti engages third parties, such as Retailer, to perform Vehicle Service on Bugatti's behalf. Bugatti offers to compensate third parties for such services as set forth in the Standard Provisions. At Retailer's insistence, however, Bugatti compensates Retailer in accordance with Florida statutory formulas for establishing warranty labor rates and parts markups.

Relying on the Florida statutes, Retailer has demanded and obtained a labor rate of $1,350 per hour to perform Vehicle Service on Bugatti's behalf. This labor rate went into effect on

Barack Ferrazzano



January 1, 2026. It represents a 380% increase in Retailer's labor rate over the last two years and is nearly triple the rate of any other Bugatti retailer in the U.S. Likewise, Retailer has demanded and obtained a 160% markup over invoice for genuine Bugatti parts, which is more than quadruple the markup of any other Bugatti retailer in the U.S.

Bugatti does not wish to pay these exorbitant amounts for the Vehicle Service it has agreed to provide customers free-of-charge. Bugatti is able to obtain at least the same quality Vehicle Service from other retailers at far lower costs.

## II. Waiver of Retailer's Vehicle Service-Related Obligations

As noted above, the Agreements impose certain obligations on Retailer to provide for and perform Vehicle Service. These obligations include the following:

Standard Provisions

- Article 6(4): maintain the level of genuine parts inventory "that is sufficient to perform reasonably anticipated warranty repair and service."
- Article 7(6): provide maintenance services and other services without customer charge.
- Article 9(3): process warranty claims and submit warranty claims to Bugatti.

Brand Standards

- Section 5.3.5: support Bugatti in securing workshop space for vehicles subject to Recalls.
- Section 5.3.6: perform warranty repairs on Bugatti vehicles.[1]

Passeport Tranquillité Agreement

- Section 1: perform maintenance services on vehicles covered by the Passeport Tranquillité Programme.
- Section 6: honor maintenance and vehicle service claims under the Passeport Tranquillité Programme.

Bugatti waives each of these obligations as of the Effective Date, at which time Retailer shall no longer be contractually required to perform as specified under the referenced provisions pending further written notice from Bugatti, if any, withdrawing this waiver in whole or in part.

[1] To the extent that Retailer contends that it is still subject to Bugatti Retailer Operating Standards (the "**Operating Standards**"), rather than the Brand Standards, Bugatti waives Retailer's obligation under Section I(C)(4) of the Operating Standards to have a Bugatti Warranty Administrator.

Barack Ferrazzano



### III. Next Steps

Prior to the Effective Date, Bugatti will notify vehicle owners residing in and around Retailer's market area that Vehicle Service is no longer available through Retailer, and will provide them with reasonable alternatives for future Vehicle Service. In addition, we will follow up with you shortly to coordinate relocation of any vehicles that might remain in Retailer's shop on or after the Effective Date, but which still require Vehicle Service before being returned to the customer.

Bugatti will not reimburse Retailer for Vehicle Service that Retailer performs on or after the Effective Date. However, Bugatti will continue to process any requests for payment for Vehicle Server that Retailer performs before the Effective Date, provided Retailer submits such requests within a reasonable time after the Effective Date.

Following the Effective Date, Retailer will be able to dedicate its entire aftersales operations to customer-pay service. In doing so, Retailer should remain mindful of its ongoing obligations under the Retailer Agreement, including, among other things, to "[s]afeguard and promote the reputation" of Bugatti vehicles, genuine Bugatti parts, and the Bugatti brand; to "[r]efrain from all conduct which might be harmful to [their] reputation or marketing" or which is "inconsistent with the public interest"; to avoid all "unethical practices"; and to "provide the best possible customer service" and "use … best efforts to promote the servicing of" Bugatti vehicles. (Standard Provisions, Art. 2(2), 7(2).)

If you have any questions, please contact me.

Sincerely,

Sarah M. Bernstein

cc: Via Email
Alex Shack (ashack@bramanmanagement.com)
Brian Shack (bshack@bramanmanagement.com)
Sascha Doering (sascha.doering@bugatti.us)
Dan Pavlinac (daniel.pavlinac@bugatti.us)
Owen Smith (owen.smith@bfkn.com)